**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN PHYSICIAN PARTNERS, LLC, *et al.*,[1] | Case No. 23-11469 (___) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING THE DEBTORS TO (I) CONTINUE TO PERFORM UNDER
SERVICES AGREEMENT WITH MEDICAL CONSULTANTS, INC. FOR CERTAIN
TRANSITION SERVICES, (II) PAY AND REIMBURSE RELATED FEES AND
EXPENSES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") file this

motion (the "Motion") for entry of interim and final orders, substantially in the forms attached

hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"),

(a) authorizing, but not directing, the Debtors to continue to perform under that certain Services

Agreement dated September 1, 2023 and executed on September 15, 2023, by and between Debtor

American Physician Holdings, LLC and Medical Consultants, Inc. ("MCI"), a subsidiary of RI

RCM Holdco, Inc. ("R1") providing for certain healthcare revenue cycle management services

(the "New MCI Agreement")[2] (including, without limitation, the remittance by MCI of prepetition

patient refunds); (b) pay and reimburse related fees and expenses under the New MCI Agreement

on a postpetition basis; and (c) granting related relief.  In support of the Motion, the Debtors

respectfully state as follows:

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/AmericanPhysicianPartners.  The location of American Physician Partners, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 5121 Maryland Way Suite 300 Brentwood, TN 37027.
.

[2] A redacted copy of the New MCI Agreement is attached to this Motion as **Exhibit C**. The Debtors have concurrently filed a motion to seal certain portions of the New MCI Agreement.

**Jurisdiction and Venue**

1.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are §§ 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

4.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

5.      Founded in 2015, the Debtors were one of the fastest growing, scaled emergency department and hospitalist management platforms in the U.S.  Headquartered in Brentwood, the Debtors had management and related contracts with more than 100 hospitals (including freestanding emergency departments) and other sites in fifteen states primarily in the southeastern, midwestern and southwestern United States, utilizing over 2,500 physicians who served over 4 million patients each year.  Prior to the Petition Date, the Debtors explored alternative strategies to address cash shortfalls, including the refinancing of existing secured indebtedness and potential sale of substantially all the Debtors' service contracts and other assets.  Such efforts by the Debtors proved to be unsuccessful despite extensive negotiations with multiple parties.  In July 2023, the Debtors made the difficult decision to begin transitioning substantially all of their medical service contracts to alternative service providers (competitors) and their health system/hospital partners (customers), in order to avoid any interruptions in its critical life-saving service to the patients.  After successfully transitioning all its medical service contracts without interruption, the Debtors have commenced these bankruptcy cases to facilitate and complete the wind-down process and liquidate their remaining assets in an orderly fashion.

6.      The factual background regarding the Debtors, including their historical business operations and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of John C. DiDonato in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.[3]

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

**New MCI Agreement**

10.     As explained in the First Day Declaration, historically, most of the Company's revenue has been attributable to agreements with emergency departments under the AR (patient receivables) contracts model, where typically the Company (1) provided the staffing/management services and (2) was responsible for coding, billing, and collecting the fees billed for services from Medicaid, Medicare, Blue Cross Blue Shield, commercial payors, insurance companies and/or the patients and related services ("Revenue Cycle Management" or "RCM Services").[4]  Commencing in September 2019, long before the Transition Related Activities that occurred in July 2023, the Debtors contracted with and utilized a non-affiliate service provider – MCI, a subsidiary of R1 – to provide the critical RCM Services for the Debtors.[5]  MCI has been the exclusive Revenue Cycle Management provider for the Company for the past several years.

11.     MCI provided a cancellation notice with respect to its services to the Company effective July 26, 2023, and given the Company's critical need for the RCM Services, the Company negotiated and entered into a short term services agreement with MCI until the parties could negotiate a consensual resolution.  After extensive negotiations, on September 1, 2023, the parties entered into a new agreement effective as of July 26, providing for MCI to continue to provide certain RCM Services (including critical customer service, help desk support, customer refund processing, management of patient receivables, billings, collections, and facilitating the efficient transfer of data to sell patient receivables) at least through October 31, 2023 (with potential

---

[4]   Healthcare revenue cycle management is the financial process healthcare providers and facilities use to manage the administrative and other functions associated with claims processing, payment, and revenue generation, including identifying, managing, and collecting patient service revenue.  The process is crucial to ensuring healthcare organizations stay in operation to treat patients.

[5]   As discussed herein, in the ordinary course, the Company sells uncollectible or older accounts receivable to third parties for cash proceeds and expect to continue to do so postpetition.

extensions) ("New MCI Agreement").  The Prepetition Lenders supported the Company's entry into the New MCI Agreement.

12.    The Debtors have filed the Motion for authority, out of an abundance of caution, to continue to operate under the New MCI Agreement (including, without limitation, the remittance by MCI of prepetition patient refunds).  During their remaining wind-down process, the Debtors' small remaining workforce is not equipped to handle the myriad RCM Services.  Indeed, even if the Company had additional personnel, the Company would not have the capacity and resources to replicate and implement the necessary RCM Services:  The Company lacks:

- The ability and resources to take control of and properly handle all the voluminous records/documents with history and supporting and claims processing details.

- The necessary technological and practical infrastructure to, among other things, respond to and communicate with hundreds of patients, insurance companies, healthcare providers, potential accounts receivable buyers, and other parties, and handle and administer all collections, refunds and other payments and transfers.

- The institutional and experiential knowledge to properly render the RCM Services; as noted, MCI has been providing services to the Company for four years since September 2019.

13.    All of the RCM Services and related services under the New MCI Agreement are necessary and critical for the Debtors to be able to maximize the value of the estates' assets for the benefit of stakeholders (including raising funds for the administration of these cases and a liquidating plan), including, for example, administering and billing and rebilling claims, which will likely increase customer collections, and preparing and providing information to potential accounts receivable purchasers, which purchases will likely result in millions of dollars of postpetition sale proceeds. In addition, MCI's services are critical to making patient refunds, including those arising prepetition, and continuing to remit refunds to patients on a postpetition basis.

## Relief Requested

14.     By this Motion, the Debtors seek entry of an Interim Order and Final Order (a) authorizing, but not directing, the Debtors to continue to perform under the New MCI Agreement (including, without limitation, the remittance by MCI of prepetition patient refunds); (b) pay and reimburse related fees and expenses under the New MCI Agreement on a postpetition basis; and (c) granting related relief.

## Basis for Relief

### A.     The Debtors Should Be Authorized to Continue Performing Under the Services Agreement Under 11 U.S.C. §§ 105(a) and 363(b)

14.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor-in-possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A court can authorize a debtor to use property of the estate pursuant to section 363(b)(1) when such use is an exercise of the debtor's sound business judgment and when such use is proposed in good faith. *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (trustee need only have a "sound business purpose" to justify use of estate property pursuant to section 363(b)).

15.     Additionally, section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to section 105(a), orders are appropriate where they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's creditors. *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999).

6

16.     Here, the Debtors have determined, in the exercise of their business judgment, that continuing to utilize and perform under the Services Agreement provides significant benefits to the estates.  As explained above, the Company's small remaining workforce is not equipped to handle the myriad RCM Services, the Company lacks the ability and resources to take control of and properly handle all of the voluminous records/documents with history and supporting and claims processing details, the Company lacks the necessary technological and practical infrastructure to, handle and administer all collections, refunds and other payments and transfers, and the Company lacks the institutional and experiential knowledge to properly render the RCM Services.  All of the RCM Services and related services under the New MCI Agreement are necessary and critical for the Debtors to be able to maximize the value of the estates' assets for the benefit of stakeholders.  The estates are expected to recover approximately $12 million through the services under the New MCI Agreement.

17.     For the reasons set forth above, the Debtors submit that authorizing, but not directing, them, out of abundance of caution, to continue to operate under the New MCI Agreement (including, without limitation, the remittance by MCI of prepetition patient refunds) meets the sound business purpose test under section 363 and should be approved.

### Waiver of Bankruptcy Rule 6004(h)

29.     To implement the foregoing successfully, the Debtors respectfully request that the Court enter an order waiving the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

30.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the lenders under the Debtors' prepetition credit facility;

(d) MCI; and (e) any party that requests service pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

### **No Prior Request**

31.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Interim Order and Final Order, substantially in the forms attached hereto respectively as **Exhibit A** and **Exhibit B**: (a) authorizing, but not directing, the Debtors to continue to perform under the New MCI Agreement (including, without limitation, the remittance by MCI of prepetition patient refunds); (b) pay and reimburse related fees and expenses under the New MCI Agreement on a postpetition basis; (c) scheduling a final hearing; and (d) granting such other relief as is just and proper.

Dated:  September 18, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
email:  ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        tcairns@pszjlaw.com

*Proposed Counsel for Debtors and Debtors in Possession*

**Exhibit A**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN PHYSICIAN PARTNERS, LLC, *et al.*,[1] | Case No. 23-11469 (___) |
| Debtors. | (Joint Administration Requested) |
| | **Re: Docket No.** |

**INTERIM ORDER AUTHORIZING THE DEBTORS TO (I) CONTINUE TO PERFORM
UNDER SERVICES AGREEMENT WITH MEDICAL CONSULTANTS, INC. FOR
CERTAIN TRANSITION SERVICES, (II) PAY AND REIMBURSE RELATED FEES
AND EXPENSES, (III) SCHEDULING FINAL HEARING,
AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession
(collectively, the "Debtors") for entry of an interim order (this "Interim Order"):  (a) authorizing,
but not directing, the Debtors to continue to perform under New MCI Agreement (including,
without limitation, the remittance by MCI of prepetition patient refunds); (b) pay and reimburse
related fees and expenses under the New MCI Agreement on a postpetition basis; and (c) granting
related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the
United States District Court for the District of Delaware having jurisdiction over this matter
pursuant to 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to
the *Amended Standing Order of Reference from the United States District Court for the District of
Delaware*, dated February 29, 2012; and the Court having found that this is a core proceeding
pursuant to 28 U.S.C. § 157(b)(2), and that the Court may enter a final order consistent with Article

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://dm.epiq11.com/AmericanPhysicianPartners.  The location of
American Physician Partners, LLC's principal place of business and the Debtors' service address in these Chapter
11 Cases is 5121 Maryland Way Suite 300 Brentwood, TN 37027.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that the relief requested in the Motion is necessary to the ongoing orderly operation of the Debtors' business and is in the best interest of the Debtors, their estates, and their creditors; and it appearing that the notice of the Motion having been given as set forth therein was appropriate and that no other or further notice need be given; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and good and sufficient cause appearing therefor; IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on an interim basis as set forth in this Interim Order.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2023 at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2023.  In the event that no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      The Debtors are authorized, but not directed, on an interim basis, to:  (a) continue to perform under the New MCI Agreement (including, without limitation, the remittance by MCI of prepetition patient refunds); and (b) pay and reimburse related fees and expenses under the New MCI Agreement on a postpetition basis.

4.      All applicable banks and other financial institutions are authorized to receive, process, honor, and pay any and all prepetition checks or by automated clearinghouse payment

2

issued by the Debtors for the payment of fees related to the New MCI Agreement, whether prior to or after commencement of the Chapter 11 Cases.

5.    The Debtors are authorized, consistent with this Interim Order, to issue postpetition checks or to effect postpetition automated clearinghouse requests in replacement of any checks or automated clearinghouse requests relating to payments in connection with the New MCI Agreement that were dishonored or rejected.

6.    Nothing in the Motion, this Interim Order, or the Debtors' payment of any claims pursuant to this Interim Order, shall be construed as:  (i) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtors' properties; (ii) a waiver of the Debtors' or any other party in interest's rights to dispute any claim or lien on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute an allowed claim; (v) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (vi) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to this Interim Order.  Nothing contained herein or in the Motion shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent that it is not paid.

7.    Notwithstanding the possible applicability of Bankruptcy Rules 6003 and 6004, the terms and conditions of this Interim Order shall be immediately effective and enforceable.  The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the Motion.  To the extent the 14-day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Order, such stay is hereby waived.

3

8.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and Local Rule 9013-1(m) are satisfied by such notice.

9.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

10.     This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, or enforcement of this Interim Order.

DOCS_DE:244834.4 03370/001

**Exhibit B**

**Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN PHYSICIAN PARTNERS, LLC, *et al.*,[1] | Case No. 23-11469 (___) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No.** |

**FINAL ORDER AUTHORIZING THE DEBTORS TO (I) CONTINUE TO PERFORM
UNDER SERVICES AGREEMENT WITH MEDICAL CONSULTANTS, INC. FOR
CERTAIN TRANSITION SERVICES, (II) PAY AND REIMBURSE RELATED FEES
AND EXPENSES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of a final order (this "<u>Final Order</u>"): (a) authorizing, but not directing, the Debtors to continue to perform under New MCI Agreement (including, without limitation, the remittance by MCI of prepetition patient refunds); (b) pay and reimburse related fees and expenses under the New MCI Agreement on a postpetition basis; and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the United States District Court for the District of Delaware having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/AmericanPhysicianPartners. The location of American Physician Partners, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 5121 Maryland Way Suite 300 Brentwood, TN 37027.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that the relief requested in the Motion is necessary to the ongoing orderly operation of the Debtors' business and is in the best interest of the Debtors, their estates, and their creditors; and it appearing that the notice of the Motion having been given as set forth therein was appropriate and that no other or further notice need be given; and an interim order having been entered [Docket No. _____]; and the Court having reviewed the Motion and an opportunity for a hearing having been provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and good and sufficient cause appearing therefor; IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on a final basis as set forth in this Final Order.

2.      The Debtors are authorized, but not directed, on an interim basis, to:  (a) continue to perform under the New MCI Agreement (including, without limitation, the remittance by MCI of prepetition patient refunds); and (b) pay and reimburse related fees and expenses under the New MCI Agreement on a postpetition basis.

3.      All applicable banks and other financial institutions are authorized to receive, process, honor, and pay any and all prepetition checks or by automated clearinghouse payment issued by the Debtors for the payment of fees related to the New MCI Agreement, whether prior to or after commencement of the Chapter 11 Cases.

4.      The Debtors are authorized, consistent with this Final Order, to issue postpetition checks or to effect postpetition automated clearinghouse requests in replacement of any checks or automated clearinghouse requests relating to payments in connection with the New MCI Agreement that were dishonored or rejected.

5.      Nothing in the Motion, this Final Order, or the Debtors' payment of any claims pursuant to this Final Order, shall be construed as:  (i) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtors' properties; (ii) a waiver of the Debtors' or any other party in interest's rights to dispute any claim or lien on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute an allowed claim; (v) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (vi) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to this Final Order.  Nothing contained herein or in the Motion shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent that it is not paid.

6.      Notwithstanding the possible applicability of Bankruptcy Rule 6004, the terms and conditions of this Final Order shall be immediately effective and enforceable.  To the extent the 14-day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Order, such stay is hereby waived.

7.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and Local Rule 9013-1(m) are satisfied by such notice.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

9.      This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, or enforcement of this Final Order.

3

# **Exhibit C**

## **New MCI Agreement**

**SERVICES AGREEMENT**

This Services Agreement (this "Agreement") between American Physician Holdings, LLC, a Delaware limited liability company, on behalf of itself and its Affiliates (collectively, "Client"), and Medical Consultants, Inc., a subsidiary of R1 RCM Holdco Inc. ("MCI"), is dated September 1, 2023 and effective as of July 26, 2023 (the "Effective Date"). Client and MCI are each sometimes referred to herein as a "Party" and collectively, as the "Parties".

WHEREAS, Client and MCI entered into that certain Master Services Agreement effective as of September 20, 2019 ("Original Services Agreement"), pursuant to which MCI agreed to provide certain revenue cycle management services to Client;

WHEREAS, the Original Services Agreement was terminated by notice effective July 26, 2023; and

WHEREAS, Client desires to procure from MCI, and MCI desires to provide to Client, certain transitional services, as described herein, subject to the terms and conditions set forth below.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, and incorporating the recitals above, the Parties hereby agree as follows.

## ARTICLE I
### SERVICES; TECHNOLOGY

1.1     Services.  Commencing as of the Effective Date, MCI or one or more of its Affiliates (as defined below), will provide to Client the services described on **Exhibit A** (the "Services"). MCI and its applicable Affiliates (the "R1 Parties") will perform the Services (a) in a professional and workmanlike manner, and (b) in accordance with (i) industry standards applicable to the Services, (ii) the terms and conditions of this Agreement, including **Exhibit A**; (iii) applicable law; and (iv) third party contracts between Client, its Affiliates, or any Practice Entity, on the one hand, and any third party payors (including governmental and commercial payors, plans or networks), on the other hand (but only to the extent such third party contracts are in writing, have been made available to MCI in advance, and MCI is given a reasonable opportunity to become compliant prior to enforcement), and any applicable manuals or guidance issued by such third party payors.  MCI will remain responsible for the activities of its Affiliates in connection with providing the Services as if those activities were performed by MCI. Any changes to the scope of Services shall be agreed in writing through an amendment to this Agreement. As used in this Agreement, "Affiliate" means, with respect to a particular Party, any person or entity that controls, is controlled by or is under common control with such Party; and "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another person or entity,

whether through the ownership of voting securities or equity interests, by contract or otherwise.

1.2     Staffing.  Subject to, and in accordance with, applicable law or payor requirements, MCI or its Affiliates may augment staffing for performance of the Services through subcontracting, and MCI may delegate any of its obligations hereunder to any of its Affiliates, including using Affiliate resources located outside of the United States in India and the Philippines. MCI will require all subcontractors and delegees to comply with the requirements of MCI set forth in this Agreement and the BAA (as defined below) between the Parties. Any reference in this Agreement to MCI that imposes any obligation or grants any rights, relating to the provision of the Services, will be deemed to also be a reference to MCI's Affiliates who perform the Services under this Agreement and their subcontractors, provided, however, that under no circumstances will Client have any rights to make any claims against any such Affiliates or subcontractors and Client can only make claims against MCI.

1.3     No Access to Technology.  Client will not have access to any MCI technology as part of MCI's provision of the Services under this Agreement. To the extent that access by Client to MCI technology becomes required to provide the Services, such access will require an amendment to this Agreement.

1.4     Structure.  This Agreement consists of the body of this agreement and all exhibits and other documents attached hereto or referenced herein and sets forth the

terms and conditions pursuant to which MCI will render the Services to Client.  In the event of a conflict between the terms of the various documents, such conflict will be resolved in the following descending order of priority: (a) the BAA (as defined below) (b) the main body of this Agreement, (c) **Exhibits A** and **B**.

## ARTICLE II
### CLIENT OBLIGATIONS

2.1     Client Systems; Access.  Client will maintain Client's information technology infrastructure ("Client Systems") that impact MCI's ability to provide Services to Client.  Client will provide all personnel and subcontractors or MCI with access to Client Systems, as reasonably required for MCI to perform the Services. Client acknowledges that MCI's performance of the Services depends on Client's timely, accurate, and effective performance of all its responsibilities under this Agreement. Client further acknowledges and agrees that its failure to satisfy any such responsibilities may prevent or delay MCI's performance of the Services which may result in an adjustment of the Fees.

2.2     Client Data and Information.  Client will provide MCI access to Client Data (as defined below) reasonably required by MCI to perform the Services. Client Data will be provided on at least a weekly automated data feed or as otherwise agreed to by the Parties, and in a format to be mutually agreed by the Parties. "Client Data" means all information, data and other content, in any form or medium, that is collected, downloaded or otherwise received by MCI directly or indirectly from Client or a Client Facility (as defined below) in connection with the provision of the Services. Client will obtain all consents or permissions as necessary or appropriate for MCI system or portal access necessary to perform the Services contemplated by this Agreement. Client will (a) employ sufficient data privacy and security measures to detect intrusions to Client Systems or potential corruption of Client Data and (b) maintain a data breach plan which includes prompt notification to MCI of any incident which would compromise MCI's systems or MCI Confidential Information. Client shall further obtain all patient authorizations and other consents required to provide the R1 Parties with access to patient records or to enable MCI to communicate with third-party payers on Client's behalf. "Client Facility" means any hospital or similar healthcare facility for which Client, its Affiliate or an emergency medicine or hospitalist medicine practice that is owned or managed by Client or its Affiliate (such person, "Practice Entity") has (or had) a contractual arrangement for the provision of emergency medicine or hospitalist medicine services, at such hospital or facility.

2.3     Data Use.  MCI uses de-identified or aggregated data to benchmark trends and ensure optimal analytics across all providers and payers. Results and metrics derived directly benefit clients yielding more exact payment integrity results and the ability to trend against industry performance. Client hereby authorizes MCI to de-identify Client Data in accordance with HIPAA (as defined below) and use and disclose the results for the purposes described in this Section 2.3 or as otherwise permitted under this Agreement. Client additionally authorizes MCI to aggregate Client Data as permitted under HIPAA for analyses to Client.

2.4     Data Quality. Client acknowledges and agrees that optimal performance of the Services is dependent on the quality and accuracy of the Client Data. MCI assumes no responsibility for the accuracy or completeness of the Client Data, or for any erroneous or incomplete billing resulting from such incorrect information.  Client represents and warrants that: (a) subject to Section 2.8, all information provided to MCI by Client in connection with MCI's performance of the Services is complete and accurate in all material respects; and (b) no consent, approval, authorization, declaration or filing with any third party or governmental agency, except as has already been completed or obtained, is required of Client in connection with this Agreement and performance of the Services.

2.5     Notification of Investigation.  Client will notify MCI telephonically or in writing as soon as reasonably practicable upon becoming aware of an investigation by a government agency or contractor where the subject of the investigation involves any aspect of the Services.

2.6     Professional Services.  In connection with Client's receipt of the Services, only licensed personnel who are members, employees or independent contractors of Client or any Practice Entity (collectively, the "Professionals") will have furnished health care services and prepare related medical records and reports (collectively, "Medical Services"), all in accordance with applicable law, payor requirements and Client's services contracts. MCI and its Affiliates will have no authority or responsibility regarding the provision or supervision of Medical Services.

2.7     Professional Standards. Client will ensure that Professionals will have been appropriately licensed to perform their respective services, and take appropriate steps to maintain such licensure. All Professionals will have

complied with applicable scope of licensure rules with respect to eligibility and entitlement for payment.

2.8 <u>Additional Obligations</u>. To the extent necessary for performance of the Services:

(a) Client will provide complete, accurate and timely records to MCI and reasonably assist MCI in obtaining insurance and patient demographic information from each Client Facility at which Client provides(d) Medical Services. In the event that MCI is unable to obtain this information from the Client Facility, Client will use commercially reasonable efforts to provide this information via electronic media.

(b) Professionals will sign all necessary assignments and agreements that are required to allow MCI to (i) have access to, or at the request of Client, obtain required provider numbers; and (ii) bill third party payors on behalf of or in the name of Client or Practice Entities, including Medicare, Medicaid, managed care plans and Tricare.

(c) In the event a Professional or Client becomes aware of any inaccuracy in any information, documentation or records submitted to MCI, Client will promptly inform MCI and the Parties will cooperate in promptly taking appropriate steps to update and rectify such inaccuracies.

(d) Client will promptly notify MCI in the event it believes a coding, billing or claims submission error or other similar error has been made; and, upon such notice, MCI will take prompt action to correct any such errors and coordinate with Client to make any necessary refunds.

(e) Client will respond in a timely manner to MCI's written requests for information regarding services, diagnoses, or other matters on any document relevant to billing received from Client or a Client Facility.

(f) Client will provide MCI and its applicable Affiliates with, at a minimum, viewing access to Client's lockbox and any other payment mechanism to aid in the posting of payments to patient accounts. All related lockbox/ banking fees will be the responsibility of Client. In no event will Client be required to change any lockboxes in connection with this Agreement.

2.9 <u>Professional Fees</u>. Client has provided MCI with complete and accurate current fee schedules for the Practice Entities or any physicians or physician groups using current CPT codes and terminology.

## ARTICLE III
### FEES

3.1 <u>Fees; Payment Terms</u>. In consideration of the Services, Client will pay to MCI the fees set forth in **Exhibit B** (the "<u>Fees</u>"). Payment will be due as provided in **Exhibit B**. All amounts payable to MCI under this Agreement will be paid by Client to MCI in full without any setoff, recoupment, deduction or withholding of Fees or other payments for any reason.

3.2 <u>Failure to Pay Timely</u>. If any Fee has not been received by MCI within three (3) business days after becoming due in accordance with the payment terms set forth on **Exhibit B**, then, in addition to all other remedies that may be available:

(a) MCI may suspend performance for all Services until payment has been made in full or, subject to Section 9.2(a), terminate this Agreement immediately upon notice to Client;

(b) MCI may charge interest on the past due amount at a rate equal to the lesser of: (i) one percent (1%) per month (which is an annual rate of twelve percent (12%)); and (ii) the highest rate permitted under applicable law; and

(c) Client shall reimburse MCI for all reasonable costs incurred by MCI in collecting any late payments or interest, including attorneys' fees, court costs and collection agency fees.

3.3 <u>Payer Refunds</u>. Except to the extent caused or directed by MCI, if any refunds of patient accounts of Client are required to be refunded to or offset by any government or commercial payer as a result of Client's violation of applicable laws or its obligations under this Agreement, MCI shall not be required to refund to Client any Fees earned or previously paid to MCI as a result of its collection of such refund or otherwise as a result of including such refund in its calculations of collections for purposes of Fees. Client shall be fully responsible for the payment of any such refunds or

offsets and hereby agrees to indemnify MCI from any and all costs, expenses or liabilities arising out of or relating to any demand for (and/or collection of) such refunds or setoffs.

3.4     Taxes. Client will pay all applicable federal, state, local, sales, use and other taxes, including any interest and penalties in connection therewith (collectively, "Taxes") imposed with respect to the Services, but not including taxes on MCI's revenues or income, unless Client can demonstrate that it is exempt from the imposition of Taxes.

## ARTICLE IV
## INTELLECTUAL PROPERTY RIGHTS

4.1     Client Data. Client retains all right, title and interest in and to the Client Data, and hereby grants to MCI and its Affiliates a fully paid up non-exclusive, sublicensable, transferable (as permitted in Section 11.3) right and license, solely during the Term, to access, use, reproduce, distribute, and create derivative works of the Client Data as needed to provide the Services, as directed by Client or as otherwise set forth in this Agreement. MCI acknowledges and agrees that it is prohibited from and shall not use, disclose, sell, assign, lease, exploit, or retain Client Data for any purpose other than as permitted in this Section 4.1, including for MCI's own commercial benefit.

4.2     Reporting. MCI retains all right, title and interest in and to MCI's and its Affiliates' technology, and all know-how, tools, techniques, programming, software, inventions or other intellectual property created by MCI or any of its Affiliates at any time, including, without limitation, the templates and reports delivered through MCI's technology (the "Reports"). Client may, solely for its internal business purposes, use, copy, modify and distribute the Reports; provided, however, that Client shall not distribute or share the Reports with any third-party vendor of revenue management services or technology, without MCI's prior written consent.

## ARTICLE V
## CONFIDENTIAL INFORMATION; BAA

5.1     Definition. "Confidential Information" means any non-public information that either Party (as the disclosing Party) treats as confidential or proprietary, including, without limitation, any personally identifiable information, information, documents and data relating to a Party or its Affiliates or its and their respective businesses, operations,

technical or financial information, including, without limitation, customer lists, marketing information, finances, pricing and any other information or materials not available to the general public, or any information that is of a nature that it should reasonably be considered as proprietary, trade secret, or confidential, including the terms of this Agreement and its exhibits. Client Data is Confidential Information of Client; and the Reports are Confidential Information of MCI. Confidential Information does not include: (a) "protected health information" or "PHI" (as that term is defined under HIPAA)); (b) information that is or becomes publicly known through no wrongful act of the receiving Party; (c) information that is received by the receiving Party on a non-confidential basis from a third party, who is not under any obligation to maintain its confidentiality; or (d) information that is independently developed by the receiving Party without the use of, or reliance on, the disclosing Party's Confidential Information. For purposes herein, "HIPAA" means: (i) the Health Insurance Portability and Accountability Act of 1996; and (ii) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009), and any and all rules or regulations promulgated thereunder from time to time.

5.2     Protection of Confidential Information. During the Term and for a period of five (5) years thereafter, the receiving Party agrees to safeguard the disclosing Party's Confidential Information from unauthorized use, access or disclosure using at least the degree of care that such Party uses to protect its similarly sensitive information and in no event less than a reasonable degree of care, to use such information solely in connection with this Agreement, and to make no disclosure of such information except in accordance with the terms of this Agreement. Client shall not disclose any Confidential Information of MCI or any of its Affiliates to any vendor of revenue management services or technologies or any entity that Client knows or should reasonably know to be a competitor of MCI or any of its Affiliates at the time of disclosure, except with the prior written consent of MCI.

5.3     Permitted Disclosures. The receiving Party may disclose Confidential Information of the disclosing Party only to its personnel, directors, agents, advisors and subcontractors (collectively, "Representatives") who have a need to know in connection with the Services and who are bound by confidentiality obligations no less restrictive than those described in this Article 5. Each Party will be responsible and liable for any breach of confidentiality obligations by their Representatives.

5.4     Required Disclosures.   Should the receiving Party be required to disclose Confidential Information of the disclosing Party by order of a government agency, bureau, a court of law or equity, the receiving Party may make such disclosure, provided that the receiving Party will first provide the disclosing Party with prompt written notice of such required disclosure (unless legally prohibited) and will take commercially reasonable steps to allow the disclosing Party to seek a protective order with respect to the Confidential Information required to be disclosed.

5.5     Business Associate Agreement.   The Parties entered into that certain HIPAA Business Associate Addendum ("BAA") dated September 16, 2019, which is hereby incorporated by reference, governing the use and disclosure of PHI. MCI will safeguard any PHI pursuant to, and in accordance with, the Parties' BAA.

5.6     Return of Confidential Information.   Upon expiration or termination of this Agreement, each receiving Party shall, at the disclosing Party's option, either return or destroy all Confidential Information of the other Party and all copies thereof and other materials containing such Confidential Information in the receiving Party's possession, other than (a) Confidential Information archived in the ordinary course of business on electronic storage systems or media, or (b) as required by applicable law. Any such retained Confidential Information shall continue to be subject to the terms hereof.

5.7     Injunctive Relief. Each Party acknowledges that in the event of a breach by the receiving Party of the obligations in this Article V, damages may not be an adequate remedy and the disclosing Party will be entitled, in addition to any other rights and remedies available under this Agreement or at law or in equity, to seek injunctive relief to restrain any such breach, threatened or actual, without proof of irreparable injury and without the necessity of posting bond even if otherwise normally required.

## ARTICLE VI
### COMPLIANCE, TESTIMONY

6.1     Compliance with Laws. The Parties agree to comply with all applicable laws, regulations and standards applicable to the performance of this Agreement, including but not limited to, the requirements of the Anti-Kickback Statute, 42 U.S.C. 1320a-7b, the federal False Claims Act and the regulations promulgated thereunder.

6.2     PHI and Data Privacy Policies.   Each Party will have in place appropriate privacy, security and other policies and procedures that comply with applicable law.  During the Term, Client agrees to maintain a policy and procedure related to patient financial liability that defines self-pay accounts receivable management and timelines for placement with pre-collection and bad debt collection agencies.  Client agrees that such policy will contain a definition for when an account is in default and will provide such policy to MCI.

6.3     Testimony.   If during or after the Term of this Agreement, MCI or any of its Affiliates are legally compelled as a result of this engagement or is requested by Client to either give testimony or produce documents or both in any court, investigative or regulatory proceeding or other legal process (including any form of discovery related there), other than in any such proceeding where MCI, an Affiliate or any of its personnel are a party, Client will reimburse MCI or its Affiliates at the applicable, reasonable, actual hourly rate for the time of the participating professional, together with all reasonable expenses associated with such activity, including the reasonable fees and expenses of MCI's counsel, if counsel is deemed necessary by MCI.  MCI will promptly notify Client of any such demand for testimony or the production of documents, but MCI will be under no obligation to seek to quash or otherwise limit the scope of such a demand.

6.4     Record Retention. For a period of four (4) years after Services are furnished under this Agreement, MCI shall retain and permit the Comptroller General of the United States, the U.S. Department of Health and Human Services and their respective duly authorized representatives access to examine or copy this Agreement and such books, documents, and records of MCI as are reasonably necessary to verify the nature and extent of the costs of the Services supplied under this Agreement. In the event MCI provides any of its Services under this Agreement pursuant to a subcontract and if (a) the services provided pursuant to such subcontract have a value or cost of ten thousand dollars ($10,000.00) or more over a twelve (12) month period and (b) such subcontract is with a related organization, then MCI agrees that such subcontract shall contain a clause requiring the subcontractor to retain and allow access to its records on the same terms and conditions as required by Client. This provision shall be null and void should it be determined that Section 1861(v)(1)(I)

of the Social Security Act is not applicable to this Agreement.

## ARTICLE VII
### REPRESENTATIONS AND WARRANTIES; DISCLAIMER

7.1    Representations and Warranties.  Each Party hereby represents and warrants that: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation; (b) it has full corporate or other entity power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (c) this Agreement constitutes a valid and binding agreement enforceable against such Party in accordance with its terms; and (d) the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and shall not: (i) conflict with or result in a breach of any provision of such Party's organizational documents; (ii) result in a breach of any agreement to which such Party is party; or (iii) violate any law applicable to such Party's business. Each Party further represents and warrants that neither it, nor any of its employees or contractors providing services hereunder, are (x) listed by a federal or state agency as excluded, disbarred, suspended or otherwise ineligible to participate in Federal or state health care programs (including Medicare or Medicaid) or (y) identified on the General Services Administration List of Parties Excluded from the Federal Procurement and Non-Procurement Programs.

7.2    Disclaimer. Except as specifically provided, MCI makes no other representations or warranties with respect to the Services, data or systems to be provided to Client pursuant to this Agreement, or any results of the use thereof, and MCI explicitly disclaims all other representations and warranties, express or implied, including the implied warranties of merchantability, fitness for a particular purpose, title or noninfringement. MCI does not warrant that the Services, any materials or the operation of any systems, technology, hardware or software will be uninterrupted or error-free. Client understands and agrees that, as part of the Services, MCI makes recommendations as to appropriate billing and documentation only and does not provide any medical or clinical advice or consultation as to clinical care. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN THE EVENT OF AN ERROR OR OMISSION IN THE PERFORMANCE OF THE SERVICES, CLIENT'S SOLE REMEDY IS RE-PERFORMANCE OF THE SERVICES BY MCI AT NO ADDITIONAL COST.

## ARTICLE VIII
### INDEMNIFICATION; LIMITATION OF LIABILITY

8.1    Client Indemnification.  Client will defend and indemnify MCI, its Affiliates, and each of its and their officers, directors, managers and employees from any and all liabilities, costs and expenses (including attorney's fees) incurred by them in connection with: (a) except to the extent caused by the gross negligence or willful misconduct of MCI or its Affiliates or subcontractors, any Claims arising out of or in connection with performance of the Services; (b) any Claims arising from Client's or its employees', agents' or contractors' gross negligence or willful misconduct in connection with this Agreement; or (c) any Claims alleging that Client Data infringes or misappropriates any patent, copyright, trademark, trade secret, other intellectual property right of any third party.

8.2    Indemnification Procedure. MCI agrees to: (a) promptly notify Client of any Claim for which MCI seeks indemnification hereunder; and (b) provide Client with reasonable cooperation in the defense of any such Claim. Client must obtain the prior written approval of MCI before entering into any settlement of such Claim imposing financial or non-financial obligations or restrictions on MCI or constituting an admission of guilt or wrongdoing by MCI or ceasing to defend against such Claim.

8.3    Limitation of Liability.  The total cumulative liability of MCI (including incidental, indirect, special, consequential and punitive damages) under or related to this Agreement shall not exceed $50,000. The foregoing cap shall not apply to Claims arising out of MCI's or its Affiliates' or subcontractors' fraud, willful or intentional misconduct.

8.4    Offset.  If MCI incurs any liabilities, costs or expenses for which MCI is entitled to indemnification under this Agreement, MCI may offset an amount equal to such liabilities, costs or expenses against any amounts owed to Client by MCI, whether under this Agreement or otherwise.

## ARTICLE IX
### TERM AND TERMINATION

9.1    Term.  The term of this Agreement commenced on the Effective Date and will terminate on October 31, 2023 (the "Initial Term").  The Parties may mutually agree, no later than thirty (30) days prior to the end of the then-current

Term, to an extension of 30 days (any such extended period of time, a "Extension Term"). During any Extension Term, APP will be required to pay outstanding invoices as they become due. The Initial Term and Extension Term are together referred to herein as the "Term".

9.2 **Termination for Cause.** Either Party may terminate the Agreement immediately upon written notice to the other Party if the other Party materially breaches any provision of this Agreement and that breach has not been cured within ten (10) days after such Party's receipt of written notice of such breach (except for Client's breach of any payment obligation, which will have a 3-business day cure period). For the avoidance of doubt, a "material breach" in this Section 9.2 will include, but not be limited, to a breach of any payment obligation in **Exhibit B**.

9.3 **Termination for Convenience.** Commencing after the Initial Term, MCI may terminate this Agreement without cause, upon ten (10) days' notice to Client.

9.4 **Effect of Termination.**

(a) Survival. The rights and obligations of the Parties in this Agreement that, by their nature, should survive the expiration or termination of this Agreement will survive the expiration or termination of the Agreement. For clarity, Article 3, Article 4, Article 5, Section 6.3, Article 7, Article 8, Section 9.4, Article 10, and Article 11, and Client's obligation to pay MCI for all Services provided survives any expiration or termination of the Agreement.

(b) Return of Property. Upon termination of this Agreement, each Party will promptly: (i) return or destroy all copies of the other Party's Confidential Information, except as otherwise required by appliable law; and (ii) upon such other Party's request, certify in writing compliance with this Section. Notwithstanding the foregoing, upon the later to occur of expiration or termination of this Agreement or any transition services, and at Client's request, MCI shall return a complete copy of all Client Data in the possession of MCI or its MCI Service Providers, in HL7 form and format. Once Client has confirmed receipt of such Client Data and that it has successfully migrated the Client Data to a new platform, MCI shall securely destroy all remaining Client Data, except for such Client

Data that may be retained pursuant to Section 5.6 and the BAA.

## ARTICLE X
### DISPUTE RESOLUTION

10.1 **Exclusive Remedies.** Each Party agrees that the sole and exclusive remedy for (a) any dispute between the Parties arising under this Agreement, (b) any breach of this Agreement by the other Party, or (c) any claim for indemnification arising under this Agreement shall be, subject to the limitations set forth therein, the processes and rights of the Parties set forth in this Article 10 and Articles 8 and 9.

10.2 **Arbitration.** The Parties will attempt to settle any disputes through good faith negotiations between their respective senior executives for a period of thirty (30) days. In the event a dispute has not been resolved, it will be finally settled by final and binding arbitration, conducted on a confidential basis, under the Federal Arbitration Act, if applicable, and the then-current dispute resolution procedures ("Rules") of the American Arbitration Association strictly in accordance with the terms of this Agreement and the laws of the state of Utah, excluding its principles of conflicts of laws. To the extent permitted by the Rules, all Parties will direct that any arbitration be held on an expedited basis. All arbitration hearings will be held in Salt Lake City, Utah or such other location as the Parties mutually agree upon.

10.3 **Arbitration Awards.** Any award shall be paid within thirty (30) days of the issuance of the arbitrator(s)' decision. If any award is not paid within thirty (30) days, any Party may seek entry of a judgment in the amount of the award in any state or federal courts having jurisdiction thereof.

10.4 **No Limitation on Provisional Remedies.** Neither Party will be excluded from seeking provisional remedies in the courts of competent jurisdiction, including, but not limited to, temporary restraining orders and preliminary injunctions, but such remedies shall not be sought as a means to avoid or stay arbitration.

10.5 **WAIVER OF JURY TRIAL; THIRD PARTIES.** THE PARTIES IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY. THE REQUIREMENT OF ARBITRATION SET FORTH IN THIS ARTICLE 10 SHALL NOT APPLY IN THE EVENT THAT THERE IS THIRD-PARTY JOINDER BY EITHER PARTY OR A THIRD PARTY INSTITUTES AN

ACTION AGAINST ANY PARTY TO THIS AGREEMENT, AND SUCH THIRD PARTY IS NOT AMENABLE TO JOINDER IN THE ARBITRATION PROCEEDINGS CONTEMPLATED BY THIS ARTICLE 10.

## ARTICLE XI
### MISCELLANEOUS

11.1    Entire Agreement. This Agreement sets forth the entire agreement of the Parties with respect to the Services and, except as specifically provided, supersedes and merges all prior oral and written agreements between the Parties with respect to its subject matter hereof.  This Agreement may not be amended or modified except in a writing executed by authorized representatives of both Parties.

11.2    Release of MCI. Client hereby remises, releases and forever discharges MCI and each of its predecessors, successors, assigns, related entities, affiliates, parent companies, direct and indirect subsidiaries, and each of its directors, officers, representatives, agents, owners and employees (collectively the "MCI Releasees") of and from all manner of civil actions, causes, causes of action, suits, obligations, liabilities, disputes, contracts, attorney's or expert's fees, fees, costs, expenses, awards, debts, sums of money, accounts, reckonings, bonds, bills, covenants, controversies, agreements, promises, damages, judgments, claims and demands whatsoever, in law or in equity, known or unknown, past or present, absolute or contingent, suspected or unsuspected, which Client has, had, or may claim to have against the MCI Releasees prior to the Effective Date.

11.3    Relationship of the Parties.  At all times during the Term, each Party will be an independent contractor. Neither Party is the agent of the other, and neither may make commitments on the other's behalf. Except as expressly provided in this Agreement, MCI does not undertake to perform any obligation of Client, whether legal or contractual, or assume any responsibility for Client's business or operations.

11.4    Assignment.   Neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement without the prior, written consent of the other Party; provided, however, that a Party may, upon written notice to the other Party and without consent, assign or otherwise transfer this Agreement (a) to any of its Affiliates or (b) in connection with a change of control transaction (whether by merger, consolidation, sale of equity interests,

sale of all or substantially all assets, or otherwise) but, in the case of (b), only to the extent the assignee agrees in writing to assume all liabilities under this Agreement, including any liabilities accruing prior to the effectiveness of such assignment. Any assignment or other transfer in violation of this Section will be null and void. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties hereto and their permitted successors and assigns.

11.5    Notice.  All notices required by or relating to this Agreement (other than routine operational communications or as otherwise set forth in this Agreement) will be in writing and signed by an authorized representative of the Party providing such notice and will be sent by means of email with a copy by certified mail, postage prepaid to the receiving Party at its address set forth below:

American Physician Holdings, LLC
Attention: Jim Nugent
With a copy to:  General Counsel
5121 Maryland Way, Suite 300
Brentwood, Tennessee 37027

R1 RCM Holdco Inc.
Attention: Chief Executive Officer
With a copy to: General Counsel
433 West Ascension Way, 2nd Floor
Murray, Utah 84123-2790
With a copy to: Legal@r1rcm.com

11.6    Waiver; Severability.  No term of this Agreement will be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing and signed by the Party granting such waiver or consent. The waiver by any Party of a breach of any provision shall not operate or be construed as a further or continuing waiver or as a waiver of any other or subsequent breach. Should any one or more of the provisions be determined to be invalid, illegal or unenforceable in any respect, such provision will be construed to be adjusted to the minimum extent necessary to cure such invalidity or unenforceability, and the remaining provisions shall not in any way be adversely affected thereby.

11.7    No Third Party Beneficiaries.  Nothing in this Agreement is intended or shall be construed to confer upon any person (other than the Parties hereto and the indemnified parties specifically identified herein) any rights, benefits or remedies of any kind or character whatsoever,

and no person or entity shall be deemed a third party beneficiary under or by reason of this Agreement.

11.8    Force Majeure.  Except with respect to payment obligations hereunder, if a Party is prevented or delayed in performance of its obligations hereunder as a result of circumstances beyond such Party's reasonable control, including, but not limited to, war, riot, fires, floods, elements of nature or acts of God, epidemics, pandemics, failure of public utilities or public transportation systems, such failure or delay will be excused and shall not be deemed to constitute a breach of this Agreement.

11.9    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Utah without regard to conflict of laws principles thereof, and each Party irrevocably consents to the exclusive jurisdiction of the federal and state courts located in the State of Utah.

11.10    Counterparts.  This Agreement may be executed in counterparts (including signatures sent via electronic transmission in portable format (pdf), each of which shall be deemed an original, but all of which together will constitute the same agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement as of the Effective Date. Each person signing below represents that he or she has the authority to sign this Agreement for and on behalf of the Party for whom he or she is signing.

AMERICAN PHYSICIAN HOLDINGS, LLC

By: _James E. Nugent_

Name: _____James E, Nugent_____

Title: _____Interim CEO_____

MEDICAL CONSULTANTS, INC.

By: _John Sparby_

Name: __John Sparby__

Title: _____President, R1 RCM_____

9/15/2023

**Exhibit A**
**Services**

The Services described below are being undertaken for the purposes of optimizing the Revenue Cycle Operations process to maximize compliant collections from the amounts billable as a result of the Medical Services performed by Client. None of the Services described below are being undertaken to manage medical decisions or business operations of Client, nor are any of the Services intended to increase the volume of operations of Client.

1.      **Services.** MCI will provide the following Services for Client's emergency medicine and hospitalist medicine management business:

  a.      Code each Emergency Department patient's record having a date of service prior to August 1, 2023. MCI's trained coders will code with appropriate and accurate ICD-10, ICD-11, Provider, HCPCS and CPT Codes, as applicable.

  b.      Prepare and submit third party payor claims in accordance with applicable third party contracts with such payors, payor policies and procedures and within a commercially reasonable period of time (provided, however, that all relevant information, e.g., appropriate physician authorizations, provider numbers, etc.) has been provided).

  c.      Bill claims using information obtained from each Client Facility for each patient encounter.

  d.      Promptly post payments upon receipt of an Explanation of Benefits.

  e.      Provide patient statements or notices as appropriate on a regular basis.

  f.      Follow up on bad or NSF checks issued to Client.

  g.      Pursuant to Client's guidelines, refer accounts to collection agency(ies) designated by Client.

  h.      In the event any claims are denied by the applicable payor and if there is an actionable/ appealable reason for denial, MCI will process appropriate claim appeals. Subject to Client's payment of the IDR fee, R1 will assist with arbitration proceedings. In the event any claims, including managed care claims, become subject to arbitration proceedings under the No Surprises Act, or similar state acts, are unpaid/underpaid claims by an applicable insurer, or are otherwise pending litigation or other dispute resolution process (individually, an "Adjudicated Claim" and collectively, the "Adjudicated Claims"), diligently pursue the appropriate individual Adjudicated Claim or support and assist Client's pursuit of the Adjudicated Claims as applicable. MCI will follow all applicable laws and government or other third party payor program guidance for submission of claims in the processing or pursuit of claim appeals and Adjudicated Claims.

  i.      Process returned mail.

  j.      Provide, and list on statements, a toll-free telephone number to answer inquiries from patients concerning account information. MCI customer services staff will assist patients with: (i) patient questions and concerns regarding bills; and (ii) remitting payments. MCI customer services will be made available during normal business hours.

  k.      MCI and its personnel will identify itself as communicating on behalf of Client in all permitted correspondence and conversations with patients, Client Facilities, Professionals and other

individuals in connection with any questions on specific account status if proper authorization is received (as applicable).

l.    Receive, on behalf of Client, payment or copies of payments and reimbursements for the accounts of Client and post payments to patient accounts. Electronic remittance or deposits will be used when possible and subject to third-party payor guidelines.

m.    On a monthly basis, MCI will provide Client with an invoice listing MCI's estimate of total expected patient refunds with supporting detail. Client agrees to fund, within 8 business days of receipt of the estimate, such refunds before the refunds are released. Subject to funding from Client, MCI will promptly process credit balances on patient accounts and issue any related refund checks consistent with mutually agreed upon policies and procedures, and with applicable laws and payor requirements. If funding is not received within the 8 business day period, MCI shall not be responsible for the processing or payment of such refunds, rather, MCI will provide Client with the information and details required to process the related credit balances for the month and Client shall be responsible for all such governmental and patient refunds. Any deposit remitted for patient refunds is to be used exclusively for patient refunds.

n.    Assist with managing provider payor enrollments.

o.    Provide patients with options for paying account balances, including credit card, check and electronic check. Make available to patients a portal for payments, insurance updates and communication.

p.    Until September 15, 2023, MCI will assist Client with providing current reports requested regarding RVUs or assignments.

q.    Support and assist with Client's sales of accounts receivable, including providing reports, transitioning the applicable claim file(s) to the purchaser, and providing other information reasonably requested by Client or the purchaser. A charge of $150/hour will be charged for special reports and must be paid by Client via a written quote provided by MCI in advance of development work.

**Client Obligation**: Client will provide MCI with written notice of the purchaser and associated accounts promptly following a sale of accounts receivable.

r.    Support and assist with Client's provider relief fund ("<u>PRF</u>") and COVID Uninsured reimbursement audits by providing Client with accounts receivable, collection, adjustment and patient demographic information including insurance coverage or self-payment status. With respect to additional scope requests and reports and support for previous years, such requests will require investigation and MCI will use best efforts to support.

s.    Provide weekly reporting on the status of billing of claims:

1.    New claims pending to be billed,

2.    Collections (cash postings) by financial period,

3.    Unpaid denial report for all services lines,

4.    Emergency Department RVU Charges by date of service, and

5.   Emergency Department APP Chart Recon report that contains the following data summarized by month of date of service:  Logged, Billed, Demo Hold, Doc Hold, Coding, CAC, Manual, Data Entry, Pending HP, 880, 881 (Void), 825 (LWOBS), 883, 884, Void, and Other.

t.      Participate in weekly meetings with APP management to discuss patient billing, rework and rebilling of denied claims, pending claims in process to be rebilled, follow-up on aged accounts with managed care, Medicare, Medicaid and private pay payors, and matters related to the weekly reports.

u.      Provide APP with accounts receivable aging by payor type weekly.

v.      Upon request from physicians or other providers formerly employed by Client or emergency medicine or hospitalist medicine practices employing former Client physicians or other providers, MCI will provide case logs to the physician, provider or practice for credentialing.

**2.**      **Reporting**. Upon request by Client, MCI will provide standard month-end Reports that will include summaries of all collections and accounts receivables. Reports are compiled based on the date of the Services. MCI will provide any report currently available on the MCI system at no cost. Custom reports, which includes any reports regarding liability accounts, may incur a programming charge of $150/ hour. MCI will provide Client with an estimate for approval prior to creating a specially requested report.

**3.**      **Insurance Capture.** MCI will provide insurance eligibility services through its third party vendor, Medlytix, LLC. A payor will be considered identified if Medlytix identifies such payor in the information sent to MCI or Client for accounts with active eligibility. Client agrees to pay for this insurance capture service.

**4.**      **Excluded Services.** The Parties agree that any services that are not described above will be considered out-of-scope services. Any additional services are subject to agreement of the Parties. For clarity, enhanced analytical reporting, provided under the Original Services Agreement through Gateway, is an out-of-scope service.

<u>Exhibit B</u>
Fees









## ACKNOWLEDGEMENT AS TO TERMS

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., as Administrative and Collateral Agent pursuant to that certain Amended and Restated Credit and Guaranty Agreement dated as of December 21, 2016, and as amended from time to time, (the "Credit Agreement") on behalf of the Lenders in the Credit Agreement (collectively, "Secured Party") hereby acknowledges the terms of this Services Agreement. Secured Party further acknowledges and agrees that APH may pay to MCI, and MCI may accept from APH, payments of the Fee from proceeds of any and all collateral of Secured Party (the "Collateral"). For purposes of clarification, Secured Party agrees that the proceeds of accounts receivable collateral received by APH may be used to pay the applicable Fees in Exhibit B of this Services Agreement to MCI. Notwithstanding anything to the contrary in this Agreement or this acknowledgment, the Secured Party has not waived any of its rights under the Credit Agreement or applicable law, and nothing in this Services Agreement or the Secured Party's acknowledgement hereto shall amend or modify the terms of the Credit Agreement or any consents required thereby. For the avoidance of doubt, the Secured Party's claims are senior secured claims and to the extent the Secured Party elects to exercise its rights and remedies under the Credit Agreement or applicable law, including, without limitation, with respect to APH's cash or accounts receivable collateral, the Secured Party's claims and corresponding lien are, and shall be, senior in payment and priority to any right of MCI under this Agreement. However, Secured Party agrees that it will not seek disgorgement or return of any amounts paid by APH to MCI to the extent that (a) such payments were made in accordance with the terms of the Services Agreement, and (b) in the event of a bankruptcy filing by APH, for any payments made after such bankruptcy filing, such payments were made in accordance with the budget and related cash collateral order approved by the bankruptcy court.

**SECURED PARTY:**

**GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., as Administrative and Collateral Agent**

By: _____

Name: **Greg Watts**
~~Authorized Signatory~~

Title: _____