> **THE BANKRUPTCY COURT HAS NOT APPROVED SOLICITATION OF THIS PLAN, AND THIS PLAN HAS NOT YET BEEN CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN PHYSICIAN PARTNERS, LLC, *et al.*,[1] | Case No. 23-11469 (___) |
| Debtors. | (Joint Administration Requested) |

## COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION OF AMERICAN PHYSICIAN PARTNERS, LLC AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (*pro hac vice*)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        tcairns@pszjlaw.com

*Proposed Counsel for Debtors and Debtors in Possession*

Dated: September 18, 2023

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/AmericanPhysicianPartners.  The location of American Physician Partners, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 5121 Maryland Way Suite 300, Brentwood, TN 37027.

# TABLE OF CONTENTS

SECTION 1 INTRODUCTION ................................................................. 1

SECTION 2 SUMMARY OF CLASSIFICATION AND TREATMENT OF
     CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT
     SOLICITATION AND CONFIRMATION DATES AND DEADLINES ...................... 3

SECTION 3 DEFINED TERMS ............................................................... 6

   3.1    "Administrative Claim" ................................................. 6
   3.2    "Administrative Expense Bar Date" .............................. 7
   3.3    "Administrative / Priority / Other Distributions Reserve".................... 7
   3.4    "Allowed" ................................................................... 7
   3.5    "Allowed Claim" or "Allowed … Claim" ..................... 7
   3.6    "APP" ....................................................................... 8
   3.7    "Available Cash" ....................................................... 8
   3.8    "Avoidance Actions" .................................................. 8
   3.9    "Ballots"................................................................... 8
   3.10   "Bankruptcy Code"................................................... 8
   3.11   "Bankruptcy Court" ................................................. 8
   3.12   "Bankruptcy Rules" ................................................. 8
   3.13   "Bar Date"............................................................... 8
   3.14   "Bar Date Order"..................................................... 8
   3.15   "Beneficiaries"......................................................... 8
   3.16   "Business Day" ........................................................ 8
   3.17   "Cash"..................................................................... 8
   3.18   "Cash Collateral Orders" .......................................... 9
   3.19   "Causes of Action" .................................................. 9
   3.20   "Chapter 11 Cases".................................................. 9
   3.21   "Claim" ................................................................... 9
   3.22   "Claimant" .............................................................. 9
   3.23   "Claims Agent"........................................................ 9
   3.24   "Claims Objection Deadline" ..................................... 9
   3.25   "Class" .................................................................... 9
   3.26   "Collateral" ............................................................. 9
   3.24   "Combined Plan and Disclosure Statement" ................. 9
   3.25   "Committee" ............................................................ 9
   3.26   "Company" .............................................................. 10
   3.27   "Confirmation" ........................................................ 10
   3.28   "Confirmation Date".................................................. 10
   3.29   "Confirmation Order"................................................. 10
   3.30   "Consummation" or "Consummate".............................. 10
   3.31   "Contingent Claim" .................................................. 10
   3.32   "Creditor"................................................................ 10
   3.33   "Debtors" ................................................................ 10
   3.34   "Debtor/Estate Release"............................................. 10
   3.35   "Debtor/Estate Releasors" .......................................... 10

| | | |
|---|---|---|
| 3.36 | "Disallowed Claim" | 10 |
| 3.37 | "Disclosure Statement" | 10 |
| 3.38 | "Disputed" | 10 |
| 3.39 | "Disputed Claim" | 10 |
| 3.40 | "Disputed Claim Reserve" | 11 |
| 3.41 | "Distributable Assets" | 11 |
| 3.42 | "Distribution Dates" | 11 |
| 3.43 | "Distribution Record Date" | 11 |
| 3.44 | "Distribution(s)" | 11 |
| 3.45 | "Effective Date" | 11 |
| 3.46 | "Entity" | 11 |
| 3.47 | "Estate-Retained Causes of Action" | 11 |
| 3.48 | "Estates" | 11 |
| 3.49 | "Exculpated Parties" | 11 |
| 3.50 | "Final Decree(s)" | 11 |
| 3.51 | "Final Cash Collateral Order" | 11 |
| 3.52 | "Final Distribution" | 12 |
| 3.53 | "Final Order" | 12 |
| 3.54 | ["General Claims Bar Date" | 12 |
| 3.55 | "Governmental Unit" | 12 |
| 3.56 | "GUC Fund" | 12 |
| 3.57 | "Huron" | 12 |
| 3.58 | "Huron Approval Order" | 12 |
| 3.59 | "Impaired" | 12 |
| 3.60 | "Indemnified Parties" | 12 |
| 3.61 | "Initial Distribution Date" | 12 |
| 3.62 | "Insider" | 13 |
| 3.63 | "Insurance Policies" | 13 |
| 3.64 | "Intercompany Claim" | 13 |
| 3.65 | "Intercompany Interest" | 13 |
| 3.66 | "Interest" | 13 |
| 3.67 | "Interim Cash Collateral Order" | 13 |
| 3.68 | ["Interim Fee Order" | 13 |
| 3.69 | "Lien" | 13 |
| 3.70 | "Liquidation Proceeds" | 13 |
| 3.71 | "Liquidating Trust" | 13 |
| 3.72 | "Liquidating Trust Agreement" | 13 |
| 3.73 | "Liquidating Trust Assets" | 13 |
| 3.74 | "Liquidating Trust Assets Account" | 14 |
| 3.75 | "Liquidating Trust Expense Reserve" | 14 |
| 3.76 | "Liquidating Trust Expenses" | 14 |
| 3.77 | "Liquidating Trust Interests" | 14 |
| 3.78 | "Liquidating Trustee" | 14 |
| 3.79 | "Litigation" | 14 |
| 3.80 | "Litigation Recovery" | 15 |
| 3.81 | "Person" | 15 |

3.82    "Petition Date" ........................................................................................................... 15
3.83    "Plan" ........................................................................................................................... 15
3.84    "Plan Objection Deadline" .......................................................................................... 15
3.85    "Plan Supplement" ....................................................................................................... 15
3.86    "Prepetition Agent" ..................................................................................................... 15
3.87    "Prepetition Credit Agreement" .................................................................................. 15
3.88    "Prepetition Lenders Deficiency Claim" ..................................................................... 15
3.89    "Prepetition Lenders Secured Claims" ........................................................................ 15
3.90    "Priority Non-Tax Claim" ........................................................................................... 15
3.91    "Priority Tax Claim" .................................................................................................... 15
3.92    "Pro Rata" .................................................................................................................... 16
3.93    "Professional" .............................................................................................................. 16
3.94    "Professional Fee Claim" ............................................................................................. 16
3.95    "Professional Fee Escrow" .......................................................................................... 16
3.96    "Record Date" .............................................................................................................. 16
3.97    "Rejection Bar Date" ................................................................................................... 16
3.98    "Related Persons" ........................................................................................................ 16
3.99    "Released Parties" ........................................................................................................ 16
3.100   "Releasing Parties" ...................................................................................................... 17
3.101   "Schedules" .................................................................................................................. 17
3.102   "Secured Claim" .......................................................................................................... 17
3.103   "Subsequent Distribution Date(s)" .............................................................................. 17
3.104   "Tax" ............................................................................................................................ 17
3.105   "Tax Claim" ................................................................................................................. 17
3.106   "Third Party Release" .................................................................................................. 17
3.107   "Unimpaired Claim" ..................................................................................................... 17
3.108   "Unsecured Claim" ....................................................................................................... 17
3.109   "U. S. Trustee" ............................................................................................................. 17
3.110   "Voting Instructions" ................................................................................................... 17
3.111   "Voting Record Date" .................................................................................................. 17

SECTION 4 BACKGROUND ............................................................................................................. 18

4.1     General Background. .................................................................................................... 18
4.2     Debtors' Business and Operations. ............................................................................... 19
4.3     Debtors' Workforce and Employee Matters. ................................................................ 21
4.4     Corporate Growth and Significant Prepetition Transactions. ...................................... 21
4.5     Debtors' Organizational Structure. ............................................................................... 21
4.6     Debtors' Debt Structure. ............................................................................................... 22
4.7     Equity Structure. .......................................................................................................... 24
4.8     Events and Circumstances Leading to the Bankruptcy Cases. ..................................... 24

SECTION 5 THE CHAPTER 11 CASES ............................................................................................ 31

5.1     First Day and Other Early Relief. ................................................................................ 31
5.2     Cash Collateral. ............................................................................................................ 31
5.3     Retention of Professionals. ........................................................................................... 32
5.4     Debtors' Schedules and Statements of Financial Affairs. ............................................ 32

SECTION 6 CONFIRMATION AND VOTING PROCEDURES ............................................. 32

6.1    Confirmation Hearing. ........................................................................... 32
6.2    Procedures for Objections. ..................................................................... 32
6.3    Requirements for Confirmation. ............................................................ 32
6.4    Classification of Claims and Interests.................................................... 33
6.5    Impaired Claims or Interests. ................................................................. 34
6.6    Confirmation without Necessary Acceptances; Cramdown. ................. 35
6.7    Feasibility. .............................................................................................. 36
6.8    Best Interests Test and Liquidation Analysis. ....................................... 36
6.9    Eligibility to Vote on the Combined Plan and Disclosure Statement. .. 38
6.10   Solicitation Package / Release Opt-Out. ............................................... 38
6.11   Voting Procedures, Voting Deadline, and Applicable Deadlines. ......... 38
6.12   Acceptance of the Combined Plan and Disclosure Statement. .............. 39

SECTION 7 CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER
DISCLOSURES ............................................................................................... 39

7.1    Certain Risk Factors to be Considered. .................................................. 39
7.2    The Combined Plan and Disclosure Statement May Not Be Accepted. ... 40
7.3    The Combined Plan and Disclosure Statement May Not Be Confirmed. ... 40
7.4    Distributions to Holders of Allowed Claims Under the Combined Plan
and Disclosure Statement May be Inconsistent with Projections. ......... 40
7.5    Objections to Classification of Claims. .................................................. 41
7.6    Failure to Consummate the Combined Plan and Disclosure Statement. .. 41
7.7    The Releases May Not Be Approved. ..................................................... 42
7.8    Reductions to Estimated Creditor Recoveries. ...................................... 42
7.9    Certain U.S. Federal Income Tax Consequences. .................................. 42
7.10   Tax Consequences for U.S. Holders of Certain Claims. ........................ 43
7.11   Tax Consequences in Relation to Liquidating Trust. ............................. 44
7.12   Information Reporting and Withholding. ................................................ 46
7.13   Releases, Exculpations, and Injunctions. ............................................... 47
7.14   Alternatives to the Combined Plan and Disclosure Statement. ............. 47

SECTION 8 UNCLASSIFIED CLAIMS ........................................................................... 48

8.1    Unclassified Claims. .............................................................................. 48
8.2    Administrative Claims. ........................................................................... 48

SECTION 9 CLASSIFICATION OF CLAIMS AND INTERESTS ........................................ 50

9.1    Summary of Classification. .................................................................... 50
9.2    Special Provision Governing Unimpaired Claims. ................................ 51
9.3    Vacant and Abstaining Classes. ............................................................. 51

SECTION 10 TREATMENT OF CLAIMS AND INTERESTS ............................................. 51

10.1   Class 1—Priority Non-Tax Claims. ....................................................... 51
10.2   Class 2—Prepetition Lenders Secured Claims. ..................................... 51
10.3   Class 3—Other Secured Claims. ............................................................ 52
10.4   Class 4—Unsecured Claims. .................................................................. 52
10.5   Class 5—Intercompany Claims. ............................................................. 53

10.6   Class 6—Intercompany Interests. ............................................................... 53
10.7   Class 7—Interests. ..................................................................................... 53

SECTION 11 DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS............................ 53

11.1   Distribution Dates. ..................................................................................... 53
11.2   Subsequent Distributions. .......................................................................... 54
11.3   Distribution Record Date. .......................................................................... 54
11.4   Manner of Cash Payments Under the Plan or Liquidating Trust
Agreement. ................................................................................................. 54
11.5   Time Bar to Cash Payments by Check. ...................................................... 54
11.6   Liquidating Trust Assets Account. ............................................................. 55
11.7   Tax Identification Numbers. ....................................................................... 55

SECTION 12 PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
REDISTRIBUTIONS ......................................................................................... 55

12.1   No Distributions Pending Allowance. ........................................................ 55
12.2   Resolution of Disputed Claims. ................................................................. 55
12.3   Authority to Object to, Settle, and Resolve Claims. ................................... 56
12.4   Objection Deadline. ................................................................................... 56
12.5   Estimation of Claims.................................................................................. 56
12.6   Disallowance of Claims. ............................................................................ 56
12.7   Claims Register ......................................................................................... 57
12.8   Reserve Provisions for Disputed Claims. .................................................. 57
12.9   *De minimis* Distributions, Rounding. ........................................................ 58
12.10 Unclaimed and Undeliverable Distributions.............................................. 58
12.11 Books and Records and Vesting of Privileges............................................ 58

SECTION 13 TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED
LEASES............................................................................................................. 59

13.1   Rejection. ................................................................................................... 59
13.2   Rejection Claims. ....................................................................................... 60
13.3   Insurance Policies. ..................................................................................... 60

SECTION 14 MEANS FOR IMPLEMENTATION OF THE PLAN........................................ 60

14.1   Global Settlement of Claims. ..................................................................... 60
14.2   Establishment and Administration of Liquidating Trust Assets Account;
GUC Fund.................................................................................................. 60
14.3   Dissolution of Debtors; Corporate Action by Debtors. .............................. 61
14.4   Limited Substantive Consolidation. ........................................................... 61
14.5   Appointment of the Liquidating Trustee..................................................... 62
14.6   The Liquidating Trust. ............................................................................... 62
14.7   Rights and Powers of the Liquidating Trustee............................................ 63
14.8   Fees and Expenses of the Liquidating Trust. .............................................. 64
14.9   Transfer of Beneficial Interests in the Liquidating Trust............................ 64
14.10 Litigation................................................................................................... 64
14.11 Dissolution of the Committee. ................................................................... 64
14.12 Termination After Five Years and Extension. ........................................... 65

SECTION 15 EFFECT OF CONFIRMATION ............................................................ 65

   15.1   Binding Effect of the Plan. ................................................................... 65
   15.2   Vesting of Liquidating Trust Assets in the Liquidating Trust. ............ 65
   15.3   Property Free and Clear. ....................................................................... 66

SECTION 16 EXCULPATIONS, INJUNCTIONS, AND RELEASES .................... 66

   16.1   Exculpation. ......................................................................................... 66
   16.2   Releases. ............................................................................................... 66
   16.3   Injunction. ............................................................................................ 68
   16.4   Post-Confirmation Liability of Liquidating Trustee. .......................... 68
   16.5   Preservation of Rights of Action. ........................................................ 69
   16.6   No Discharge. ....................................................................................... 70

SECTION 17 CONDITIONS PRECEDENT TO CONFIRMATION  AND
CONSUMMATION OF THE PLAN ........................................................................ 70

   17.1   Conditions to Confirmation of the Plan. .............................................. 70
   17.2   Conditions to the Effective Date. ......................................................... 71
   17.3   Waiver of Conditions Precedent. ......................................................... 71

SECTION 18 RETENTION OF JURISDICTION ................................................... 71

SECTION 19 MISCELLANEOUS PROVISIONS ................................................... 72

   19.1   Payment of Statutory Fees / Closing of Chapter 11 Cases. ................. 72
   19.2   Revocation of the Combined Plan and Disclosure Statement. ............. 73
   19.3   Severability of Plan Provisions. ........................................................... 73
   19.4   Exhibits. ............................................................................................... 73
   19.5   Notices. ................................................................................................. 73
   19.6   Reservation of Rights. .......................................................................... 74
   19.7   Defects, Omissions and Amendments. ................................................. 74
   19.8   Filing of Additional Documents. .......................................................... 74
   19.9   Successors and Assigns. ....................................................................... 75
   19.10  Setoffs and Recoupments. .................................................................... 75
   19.11  Tax Exemption. .................................................................................... 75
   19.12  Securities Exemption. .......................................................................... 75
   19.13  Implementation. ................................................................................... 75
   19.14  Record Date. ........................................................................................ 75
   19.15  Certain Actions. ................................................................................... 76
   19.16  Substantial Consummation. .................................................................. 76
   19.17  Waiver of Fourteen-Day Stay. ............................................................. 76
   19.18  Governing Law. ................................................................................... 76
   19.19  Entire Agreement. ............................................................................... 76

SECTION 20 RECOMMENDATION ....................................................................... 77

EXHIBIT A:  CORPORATE CHART

EXHIBIT B:  LIQUIDATION ANALYSIS [TO COME]

## DISCLAIMERS

**EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE.  IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.  THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

**THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

**THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS.  THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT.  CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.**

1

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS. ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND

**DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.**

# SECTION 1
# INTRODUCTION

American Physician Partners, LLC ("APP") and its affiliated debtors, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors" or "Company"), hereby propose the following combined disclosure statement and plan of liquidation pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement"). Capitalized terms used in the Combined Plan and Disclosure Statement and not otherwise defined have the meanings ascribed to such terms in Section 3.

Prepetition, prior to the Transition Related Activities primarily in July 2023, the Debtors were one of the fastest growing, scaled emergency department (ED) and hospitalist management platforms in the U.S. Headquartered in Brentwood, Tennessee, prepetition, the Company had management and related contracts with more than 100 hospitals (including freestanding emergency departments) and other sites in fifteen states primarily in the southeastern, midwestern and southwestern United States, utilizing over 2,500 physicians who served over 4 million patients each year. The physicians and other medical providers who the Company worked with, typically delivered care in settings with the most acute and life-changing needs – emergency rooms. As discussed below, prepetition, the Debtors were unable to come to agreement with their secured lenders or locate buyers or other transaction partners, despite extensive negotiations. Thus, in mid-July 2023, the Company began transitioning certain management and/or other services for their client hospitals and other healthcare providers, in order to avoid any interruptions in service, ultimately to the patients. The Debtors have commenced these bankruptcy cases to liquidate their remaining assets and wind-down their businesses, in an orderly manner to preserve and maximize the value of the estates' assets for the benefit of all stakeholders.

During the Chapter 11 Cases, the Debtors will sell, liquidate or otherwise dispose of their remaining assets (primarily patient receivables), and pursuant to the proposed Plan, the Debtors will complete the orderly liquidation and wind-down of their business, address pending claims, including litigation claims, and make distributions to Creditors as efficiently as possible through the liquidating Plan.

The Plan provides for, as of the Effective Date, a Liquidating Trust to liquidate, collect, sell, or otherwise dispose of the remaining assets of the Debtors' estates (the "Estates") (including, without limitation, certain causes of action), if and to the extent such assets were not previously monetized to Cash or otherwise transferred or disposed of by the Debtors prior to the Effective Date, and to distribute all net proceeds to Creditors generally in accordance with the priority scheme under the Bankruptcy Code other than the GUC Fund which shall be for the benefit of general unsecured creditors subject to the terms of the Plan and Liquidating Trust Agreement. There will be no distributions to Holders of Interests. As of the Effective Date, the Liquidating Trust will be funded with all the remaining assets of the Debtors (referred to herein as Distributable Assets) (except for certain carveouts including the Professional Fee Reserve). In particular, under the Plan, there will be a $250,000 GUC Fund, to be used to fund Distributions to general unsecured creditors and only in the case of certain circumstances administrative costs of the Liquidating Trust, with the consent and agreement of the Debtors' Prepetition Lenders. In a Chapter 7

proceeding, absent such consent, general unsecured creditors would likely receive no distribution on account of their claims.  The Plan further provides for the limited substantive consolidation of the Debtors' Estates for the purposes of voting on the Plan by the Holders of Claims and making Distributions to Holders of Claims.

The Debtors submit that the Combined Plan and Disclosure Statement and/or notice thereof will be distributed to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code; Rules 2002, 3016, and 3017 of the Federal Rules of Bankruptcy Procedure; and the Court's order conditionally approving the Combined Plan and Disclosure Statement [Docket No. [•]].  The Combined Plan and Disclosure Statement and the exhibits hereto include a discussion of:  (i) the nature and history of the Debtors' business and liabilities; (ii) events during the Chapter 11 Cases; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan.  The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtors to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section 19.3 of the Combined Plan and Disclosure Statement, if any, the Debtors expressly reserve the right to alter, amend, or modify the Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times, before substantial consummation thereof.

*Please read the Combined Plan and Disclosure Statement, the exhibits, other supporting materials, and any appropriate ballot carefully and follow the instructions set forth below and on the appropriate ballot to vote on the Combined Plan and Disclosure Statement. The Debtors believe that the Combined Plan and Disclosure Statement provides the best method of maximizing the recoveries for the holders of Claims against the Debtors. Therefore, the Debtors recommend that all creditors who are entitled to vote should vote in favor of the Combined Plan and Disclosure Statement.*

Unless otherwise specified, all section or exhibit references in the Combined Plan and Disclosure Statement are to the respective section in, or exhibit to, the Combined Plan and Disclosure Statement, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained herein.  The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless

2

otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

## SECTION 2
## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES

2.1    Summary of Classification and Treatment of Claims and Interests.

All Claims against or Interests in the Debtors, other than Administrative Claims and Priority Tax Claims, are classified for purposes of voting and distributions under the Combined Plan and Disclosure Statement.  A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| Unclassified: Administrative Claims, estimated to total approx. $_____<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash and/or the proceeds of other Liquidating Trust Assets payable by the Liquidating Trust, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or the Liquidating Trust, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. | Unimpaired | No |
| Unclassified: Priority Tax Claims, estimated to total approx. $_____<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, the Liquidating Trust shall pay each holder of an Allowed Priority Tax Claim, from Available Cash and/or the proceeds of other Liquidating | Unimpaired | No |

3

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| | Trust Assets, the full unpaid amount of such Allowed Priority Tax Claim on or as soon as practicable after the Effective Date or, if later, the date such Allowed Priority Tax Claim becomes an Allowed Claim; *provided that*, after becoming an Allowed Claim, such Allowed Priority Tax Claim may be paid at a later date pursuant to applicable non-bankruptcy law. | | |
| Class 1: Priority Non-Tax Claims, estimated to total approx. $_____<br><br>**Estimated Recovery: 100%** | The Liquidating Trust shall pay from Available Cash and/or the proceeds of other Liquidating Trust Assets, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Trust shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity. | Unimpaired | No |
| Class 2: Prepetition Lenders Secured Claims, estimated amount $_____<br><br>**Estimated Recovery: _____%** | The Holders of Class 2 Claims shall retain their Liens on the applicable Collateral (consisting of some or all of the Liquidating Trust Assets, but excluding the GUC Fund, the Liquidating Trust Expense Reserve, the Professional Fee Escrow, and the Administrative/Priority/Other Distributions Reserve) until such Collateral is disposed of or released, and the net proceeds of such disposition, after payment of or reserve for all Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims, shall be paid by the Liquidating Trust to such Holders to the maximum extent possible in satisfaction and release of such Allowed Class 2 Claims, on or as soon as practicable after the Effective Date or as otherwise agreed between the Holders of such Claims and the Debtors or the Liquidating Trust, subject to the terms of the Plan.  On account of the Prepetition Lenders Deficiency Claim, the Holders of Class 2 Claims also shall participate in recoveries from the Liquidating Trust of the net proceeds of the Liquidating Trust Assets excluding the GUC Fund. | Impaired | Yes |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| **Class 3: Other Secured Claims, estimated amount $_____**<br><br>**Estimated Recovery: 100%** | Except to the extent previously paid in full, at the option of the Debtors or the Liquidating Trust, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its Collateral until such Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such Collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or Liquidating Trustee, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the Collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim. | Unimpaired | No |
| **Class 4: Unsecured Claims, estimated amount $[_____]**<br><br>**Estimated Recovery: _____%, plus any net value generated from certain litigation** | Holders of Class 4 Claims shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims, which entitle the Beneficiaries thereof to a Pro Rata share of the GUC Fund and a Pro Rata Share of any net proceeds of the remaining Liquidating Trust Assets. Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, except as may be expressly provided otherwise, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date. On account of the Prepetition Lenders Deficiency Claim, the Holders of Class 2 Claims also shall participate in recoveries from the Liquidating Trust of the net proceeds of the Liquidating Trust Assets excluding the GUC Fund. | Impaired | Yes |
| **Class 5: Intercompany Claims**<br><br>**Estimated Recovery: 0%** | In full and final satisfaction of all Allowed Intercompany Claims, on the Effective Date, such Claims shall be, at the option of the Debtors or the Liquidating Trust, either reinstated, adjusted, converted to equity, otherwise set off, settled, | Impaired | No |

| | | | |
|---|---|---|---|
| | distributed, or contributed, or canceled, released, or discharged without any distribution on account of such Claims. | | |
| Class 6: Intercompany Interests<br><br>**Estimated Recovery: 0%** | In full and final satisfaction of the Intercompany Interests, on the Effective Date, all Intercompany Interests shall be, at the option of the Debtors or the Liquidating Trust, either reinstated, set off, settled distributed, contributed, merged, diluted cancelled, released or otherwise addressed or eliminated and receive no distribution under the Plan. | Impaired | No |
| Class 7: Interests<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Class 7 Interests.  Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist. | Impaired | No |

### 2.2    Important Dates and Deadlines

| Event | Proposed Date[2] |
|---|---|
| Voting Record Date | TBD |
| Solicitation Commences | TBD |
| Deadline for Creditors to File Rule 3018 Motions | TBD |
| Deadline for Debtor to Respond to Rule 3018 Motions | TBD |
| Deadline to file Plan Supplement | TBD |
| Voting Deadline | TBD |
| Combined Plan and Disclosure Statement Objection Deadline | TBD |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement | TBD |
| Deadline to File Voting Tabulation Affidavit | TBD |
| Confirmation Hearing | TBD |

## SECTION 3
## DEFINED TERMS

As used in the Combined Plan and Disclosure Statement, capitalized terms not otherwise defined have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

3.1    "Administrative Claim" means a Claim for an expense of administration of the Chapter 11 Cases arising under Sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date

---

[2]  All times noted are in prevailing Eastern Time.

of preserving the Estates; (b) the value of any goods received by the Debtors within 20 days before the Petition Date to the extent that goods were sold to the Debtors in the ordinary course of the Debtors' business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; (f) administrative claims that were timely filed prior to the Administrative Expense Bar Date; and (g) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

3.2     "Administrative Expense Bar Date" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date. **The Administrative Expense Bar Date shall be thirty (30) days after the Effective Date.**

3.3     "Administrative / Priority / Other Distributions Reserve" means a reserve fund established by the Liquidating Trustee on or as soon as reasonably practicable after the Effective Date, in an amount determined by the Liquidating Trustee, subject to consultation with the Debtors, to be needed to pay all administrative and priority claims (all Allowed and all Disputed until Allowed or Disallowed) and other payments necessary to be made on the Effective Date including any U.S. Trustee fees.

3.4     "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtors, the Liquidating Trustee or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been filed and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Liquidating Trustee on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtors and approved by the Bankruptcy Court, or (z) the Liquidating Trustee; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by Debtors in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed or Disallowed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the applicable rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan.  For the purpose of determining distributions pursuant to the Plan, allowance under subsections (a) and (b) only is applicable once any of the following occur (1) before the Claims Objection Deadline, the Debtors or the Liquidating Trustee, as applicable, determine not to object to the Claim, (2) the Claims Objection Deadline passes without an objection being filed, or (3) after the Debtor or the Liquidating Trustee timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.

3.5     "Allowed Claim" or "Allowed … Claim" means a Claim that has been Allowed.

3.6     "APP" means American Physician Partners, LLC, the lead Debtor in the Chapter 11 Cases.

3.7     "Available Cash" means the aggregate amount of all Cash held by the Debtors on the Effective Date.

3.8     "Avoidance Actions" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

3.9     "Ballots" means the ballots upon which the Holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

3.10     "Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq*. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

3.11     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

3.12     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General and Local Rules of the Bankruptcy Court.

3.13     "Bar Date" means, as applicable, the General Claims Bar Date, the Administrative Expense Bar Date, or any other applicable deadline to file Claims referenced in the Plan.

3.14     "Bar Date Order" means the [*Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Setting a Bar Date for the Filing of Proofs of Claim By Governmental Units, (III) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, (V) Approving Notice of Bar Dates, and (VII) Granting Related Relief* [Docket No. _____]], which established the General Claims Bar Date and certain other deadlines and procedures.

3.15     "Beneficiaries" means holders of Allowed Unsecured Claims in Class 4 entitled to receive Liquidating Trust Interests under the Plan, whether or not such Claims were Allowed on the Effective Date.

3.16     "Business Day" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

3.17     "Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

3.18    "Cash Collateral Orders" means, collectively, [the Interim Cash Collateral Order and Final Cash Collateral Order], each in form and substance acceptable to the Prepetition Lenders.

3.19    "Causes of Action" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtors and/or the Estates (unless the context expressly states that such Causes of Action belong to the another Entity) against Creditors, insiders, and/or any other Persons or Entities, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date.

3.20    "Chapter 11 Cases" means the Chapter 11 cases commenced when the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the Petition Date, being jointly administered under Case No. 23-_____.

3.21    "Claim" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors, including, but not limited to: (a) any right to payment from the Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

3.22    "Claimant" means the Holder of a Claim.

3.23    "Claims Agent" means Epiq Corporate Restructuring, LLC, which was appointed as the Debtors' claims, noticing, and balloting agent.

3.24    "Claims Objection Deadline" means, with respect to all Claims other than Professional Fee Claims, (a) **180 days after the Effective Date**, or (b) such other period as may be fixed by an order of the Bankruptcy Court for objecting to Claims upon request of the Liquidating Trustee.

3.25    "Class" means a category of Holders of Claims or Interests, as set forth in Section 9 of the Plan.

3.26    "Collateral" means any property or interest in property of the Debtors' Estates that is subject to a valid and enforceable Lien to secure a Claim.

3.24    "Combined Plan and Disclosure Statement" means this Plan and Disclosure Statement, as modified and/or amended from time to time.

3.25    "Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

3.26    "Company" means the Debtors.

3.27    "Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Section 17 hereof having been (a) satisfied or (b) waived pursuant to Section 17.

3.28    "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

3.29    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to the Prepetition Lenders.

3.30    "Consummation" or "Consummate" means the occurrence of the Effective Date.

3.31    "Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

3.32    "Creditor" means any Holder of a Claim against the Debtors as specified in Section 101(10) of the Bankruptcy Code.

3.33    "Debtors" means American Physician Partners, LLC and its affiliated debtors, debtors and debtors-in-possession in the Chapter 11 Cases.

3.34    "Debtor/Estate Release" has the meaning set forth in Section 16.2(a)(i) hereof.

3.35    "Debtor/Estate Releasors" has the meaning set forth in Section 16.2(a)(i) hereof.

3.36    "Disallowed Claim" means a Claim, or any portion thereof, that has been disallowed by a Final Order or by other agreement of a Claimant, any Claim that is listed by the Debtors in the Schedules as zero or as disputed and as to which no Proof of Claim has been timely filed, or any Claim that is deemed disallowed pursuant to the terms of the Plan.

3.37    "Disclosure Statement" means the portion of this Combined Plan and Disclosure Statement that satisfies the disclosure requirements of section 1125 of the Bankruptcy Code.

3.38    "Disputed" means, with respect to any Claim or Interest, any Claim or Interest: (a) listed on the Schedules as unliquidated, disputed, or contingent and as to which no Proof of Claim has been filed; or (b) as to which the Debtors, the Liquidating Trustee, or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtors or the Liquidating Trustee in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

3.39    "Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of any deadline fixed under the Plan or

by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim that is not a Disallowed Claim that is scheduled by the Debtors in the Schedules as disputed, contingent, or unliquidated and as to which no Proof of Claim has been timely filed; or (iii) any Claim that is not a Disallowed Claim that is not listed in the Schedules and as to which no Proof of Claim has been timely filed.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

3.40    "Disputed Claim Reserve" has the meaning set forth in Section 12.8 hereof.

3.41    "Distributable Assets" means any and all real or personal property of the Debtors of any nature as of the Effective Date (including the Available Cash, but excluding the Professional Fee Escrow) and any and all proceeds of the foregoing, which shall be transferred to the Liquidating Trust as of the Effective Date.

3.42    "Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

3.43    "Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

3.44    "Distribution(s)" means the distribution(s) of Cash to be made in accordance with the Plan and the Liquidating Trust Agreement.

3.45    "Effective Date" means the date selected by the Debtors which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 17 hereof have been satisfied, unless waived by the Debtors. Within five (5) business days after the occurrence of the Effective Date, notice of the Effective Date shall be filed with the Bankruptcy Court by the Liquidating Trustee.

3.46    "Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code and, where applicable, the Committee.

3.47    "Estate-Retained Causes of Action" means all Causes of Action of the Debtors and Estates that shall be assigned to the Liquidating Trust and constitute Liquidating Trust Assets as of the Effective Date.  The Liquidating Trust shall have the sole authority and discretion to control, pursue, enforce, prosecute, monetize, and collect upon the Estate-Retained Causes of Action.

3.48    "Estates" means the estates of the Debtors in the Chapter 11 Cases created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

3.49    "Exculpated Parties" has the meaning set forth in Section 16.1 hereof.

3.50    "Final Decree(s)" means the decree contemplated under Bankruptcy Rule 3022.

3.51    "Final Cash Collateral Order" means the [*Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting*

*Adequate Protection and (III) Granting Related Relief* [Docket No. ____], entered by the Court in the Chapter 11 Cases].

3.52    "Final Distribution" means the last payment to Holders of Allowed Claims in accordance with the provisions of the Plan and/or the Liquidating Trust Agreement.

3.53    "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

3.54    ["General Claims Bar Date" means _____, 2023, at 5:00 p.m. prevailing Eastern Time, which was the general deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims against the Debtors (excluding Claims of Governmental Units) that arose prior to the Petition Date.]

3.55    "Governmental Unit" means the United States; State; Commonwealth, District, Territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under Chapter 11), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

3.56    "GUC Fund" means $250,000 in Cash, free and clear from all other claims, which Cash may be used by the Liquidating Trustee to make distributions to Holders of Allowed Class 4 Claims, excluding any unsecured deficiency claims in Class 4 (including, without limitation, the Prepetition Lenders Deficiency Claim), in accordance with the Plan and Liquidating Trust Agreement.  The GUC Fund also may be used by the Liquidating Trustee to fund the administration of the Liquidating Trust pursuant to the Plan and Liquidating Trust Agreement, including payment of Liquidating Trust Expenses if and to the extent insufficient funds exist in the Liquidating Trust Expense Reserve.  The GUC Fund will be held and administered by the Liquidating Trustee.

3.57    "Huron" means Huron Consulting Services LLC.

3.58    "Huron Approval Order" means the order of the Court approving the Debtors' application for an order authorizing the employment and retention of Huron to provide the Debtors a Chief Restructuring Officer and certain additional Huron personnel [Docket No. ____].

3.59    "Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

3.60    "Indemnified Parties" has the meaning set forth in Section 16.4 hereof.

3.61    "Initial Distribution Date" means the Effective Date, or as soon as practicable thereafter when the initial Distribution shall be made to the Holders of Allowed Claims, as determined by the Liquidating Trustee.

3.62    "Insider" means an insider of the Debtors, as defined in Section 101(31) of the Bankruptcy Code.

3.63    "Insurance Policies" means all insurance policies maintained by the Debtors as of the Petition Date, specifically including, but not limited to, director and officer insurance and malpractice insurance policies.

3.64    "Intercompany Claim" means all any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor.

3.65    "Intercompany Interest" means other than an Interest in APP, any Interest in one Debtor held by another Debtor.

3.66    "Interest" means any equity interest in the Debtors other than Intercompany Interests, including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

3.67    "Interim Cash Collateral Order" means the [*Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* [Docket No. ___], entered by the Court in the Chapter 11 Cases].

3.68    ["Interim Fee Order" means the Order of the Court [Docket No. ___] establishing certain procedures for the interim compensation and reimbursement of expenses of Professionals in the Chapter 11 Cases.]

3.69    "Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

3.70    "Liquidation Proceeds" means any Cash or other consideration paid to or realized by the Debtors or the Liquidating Trustee, as applicable, upon the collection, sale, transfer, assignment, or other disposition of the Distributable Assets or the Liquidating Trust Assets, as applicable.

3.71    "Liquidating Trust" means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

3.72    "Liquidating Trust Agreement" means the agreement, substantially in the form included in the Plan Supplement governing the Liquidating Trust, in form and substance reasonably acceptable to the Prepetition Lenders, as it may be subsequently modified from time to time.

3.73    "Liquidating Trust Assets" means the assets held in the Liquidating Trust comprised of (i) Available Cash as of the Effective Date (including, without limitation, cash in the Liquidating Trust Expense Reserve but excluding cash in the Professional Fee Escrow and the Administrative/Priority/Other Distributions Reserve), (ii) the GUC Fund, (iii) the Estate-Retained

Causes of Action, and (iv) any and all other Distributable Assets (including, without limitation, any and all tax refunds to which the Debtors may be entitled), all of which shall constitute Liquidating Trust Assets as of the Effective Date; *provided that*, for the avoidance of doubt, as provided in Section 10.2, the Holders of Class 2 Prepetition Lenders Secured Claims shall continue to retain Liens against the applicable Liquidating Trust Assets other than the GUC Fund, the Liquidation Trust Expense Reserve, the Professional Fee Escrow, and the Administrative/Priority/Other Distributions Reserve, until the Allowed Class 2 Claims have been paid in full or otherwise satisfied and extinguished.

3.74    "Liquidating Trust Assets Account" means an interest-bearing bank account or money-market account to be established and held in trust by the Liquidating Trustee on or after the Effective Date for the purpose of holding any Cash that constitutes a Liquidating Trust Asset, other than the Liquidating Trust Expense Reserve. The Liquidating Trust Assets Account will be initially funded with the GUC Fund and Available Cash.

3.75    "Liquidating Trust Expense Reserve" means a reserve fund, subject to a cap of $75,000, established by the Liquidating Trustee on or as soon as reasonably practicable after the Effective Date, to pay Liquidating Trust Expenses (based on the Liquidating Trustee's estimates, as may be revised from time to time) in accordance with the Liquidating Trust Agreement without further order of the Court. The Liquidating Trust Expense Reserve will be initially funded with Available Cash and may be supplemented by the Liquidating Trustee in his or her discretion using Liquidation Proceeds. For the avoidance of doubt, the Liquidating Trust Expense Reserve is a Liquidating Trust Asset.

3.76    "Liquidating Trust Expenses" means any fees, costs, and expenses incurred by the Liquidating Trustee or the Liquidating Trust from and after the Effective Date.

3.77    "Liquidating Trust Interests" means the non-transferable interests in the Liquidating Trust, distributions of which will be made to the Beneficiaries of the Liquidating Trust.

3.78    "Liquidating Trustee" means the Person selected by the Debtors (to be identified in the Plan Supplement and be reasonably acceptable to the Prepetition Lenders), to act as trustee of the Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, or such successor appointed as the trustee in accordance with the Liquidating Trust Agreement.

3.79    "Litigation" means the interest of the Estates, the Debtors, or the Liquidating Trust, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtors or the Liquidating Trust, as applicable, except to the extent concerning any Released Parties. Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to Sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code; (ii) for the turnover of property to the Debtors or the Liquidating Trust, as applicable; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors or the Liquidating Trust, as applicable; (iv) for compensation for damages incurred by the Debtors or the Liquidating Trust; and (iv) equitable subordination actions against Creditors.

3.80    "Litigation Recovery" means any Cash or other property received by the Debtors or the Liquidating Trust from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest, and punitive damages, whether recovered by way of settlement, execution on judgment, or otherwise.  If any Litigation is pursued on a contingent-fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

3.81    "Person" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

3.82    "Petition Date" means September 18, 2023, the date on which the Debtors filed their respective voluntary petitions for relief commencing the respective Chapter 11 Cases.

3.83    "Plan" means the portion of this Combined Plan and Disclosure Statement that constitutes the chapter 11 plan for the Debtors.

3.84    "Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

3.85    "Plan Supplement" means the pleading or pleadings identified in the Plan or Disclosure Statement for filing with the Bankruptcy Court not later than [seven] [calendar days] prior to the Voting Deadline, which shall include certain exhibits and schedules to the Plan, as well as documents, agreements, and instruments evidencing and effectuating the Plan, including, without limitation, identification of the Liquidating Trustee, form of Liquidating Trust Agreement, and non-exclusive lists and descriptions of Causes of Action to be preserved and retained after the Effective Date.

3.86    "Prepetition Agent" means GS, as administrative agent and collateral agent under the Prepetition Credit Agreement or any successor thereto or assignee thereof.

3.87    "Prepetition Credit Agreement" means that certain Amended and Restated Credit and Guaranty Agreement dated as of December 31, 2016, as the same has been amended, restated, supplemented or modified from time to time, by and between the Debtors and the Prepetition Lenders.

3.88    "Prepetition Lenders Deficiency Claim" means any unsecured deficiency Claims of the Prepetition Lenders in relation to the Prepetition Lenders' Secured Class 2 Claims.

3.89    "Prepetition Lenders Secured Claims" means any and all Secured Claims of the Prepetition Lenders against the Debtors arising under the Prepetition Credit Agreement.

3.90    "Priority Non-Tax Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

3.91    "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

3.92    "Pro Rata" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of such Claim, and is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

3.93    "Professional" means an Entity:  (a) employed pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

3.94    "Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to Sections 330, 331, or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date, and any and all fees, charges and expenses of Huron on account of its provision of John DiDonato to serve as Chief Restructuring Officer of the Debtors and additional personnel to support him as set forth in the Huron Approval Order.

3.95    "Professional Fee Escrow" means an interest-bearing account held by counsel to the Debtors free and clear of all liens and claims (including without limitation those of the Prepetition Lenders), to be funded on the Effective Date by the Debtors based upon estimates of Professional Fee Claims, for the payment of Professional Fee Claims as further provided for in Section 8.2 hereof."Proof of Claim" means a proof of claim filed pursuant to Section 501 of the Bankruptcy Code or any order of the Bankruptcy Court, together with supporting documents.

3.96    "Record Date" has the meaning set forth in Section 19.14 hereof.

3.97    "Rejection Bar Date" means the last date for any Entity whose claims arise out of the Bankruptcy Court approved rejection of an executory contract or unexpired lease to file a proof of claim for damages related to such rejection.  The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Court order other than the Confirmation Order, the date provided by an order approving the rejection, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is thirty (30) days after the Effective Date.

3.98    "Related Persons" means, subject to any exclusions expressly set forth in the Plan, with respect to a specific Person, said Person's successors and assigns, and as applicable, said Person's current and former shareholders, affiliates, subsidiaries, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, and consultants, solely in their respective capacities as such.

3.99    "Released Parties" means, collectively, (a) the Debtors; (b) the Committee and the individual members thereof in their capacity as such; (c) the Prepetition Agent in its capacity as such; (d) the Prepetition Lenders in their respective capacity as such; and (e) each of such Entities' Related Persons; *provided however*, that all rights of the Debtors and/or Liquidating Trust to prosecute any Causes of Action against Persons who served prior to the Petition Date but not after

the Petition Date as directors or officers of the Debtors shall be fully preserved; provided further that James Frary and Lawrence Hirsh, former members of the Board of APP, are, in their capacities as such, "Released Parties" in all events.

3.100  "Releasing Parties" has the meaning set forth in Section 16.2(a).2 hereof.

3.101  "Schedules" means the respective schedules of assets and liabilities and statements of financial affairs filed by the Debtors pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

3.102  "Secured Claim" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under Sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

3.103  "Subsequent Distribution Date(s)" means any date(s) after the Initial Distribution Date, as determined by the Liquidating Trustee, upon which the Liquidating Trust makes a distribution to any Holders of Allowed Administrative, Secured, Priority, or Unsecured Claims.

3.104  "Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax.  "Tax" shall include any interest or additions attributable to, imposed on, or with respect to such assessments.

3.105  "Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtors.

3.106  "Third Party Release" has the meaning set forth in Section 16.2(a).2 hereof.

3.107  "Unimpaired Claim" means an unimpaired Claim within the meaning of Section 1124 of the Bankruptcy Code.

3.108  "Unsecured Claim" means any Claim against the Debtors or Estates that is not a Secured Claim, an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Prepetition Lenders Secured Claim, or a Prepetition Lenders Deficiency Claim.

3.109  "U. S. Trustee" means the Office of the United States Trustee for the District of Delaware.

3.110  "Voting Instructions" means the instructions for voting on the Plan contained on the Ballots.

3.111  "Voting Record Date" means the date as of which the identity of Holders of Claims is set for purposes of determining the Entities entitled to receive and vote on the Plan.

## SECTION 4
## BACKGROUND

4.1    General Background.

Founded in 2015, the Debtors were one of the fastest growing, scaled emergency department ("ED") and hospitalist management platforms in the U.S. Headquartered in Brentwood, Tennessee, prior to the Transition Related Activities (defined and discussed below), the Company had management and related contracts with more than 100 hospitals (including freestanding emergency departments) and other sites in fifteen states primarily in the southeastern, midwestern and southwestern United States, utilizing over 2,500 physicians who served over 4 million patients each year.  The physicians and other medical providers who the Company worked with typically delivered care in settings with the most acute and life-changing needs – emergency rooms (ED).  The ED outsourcing market has evolved over time to become a widely accepted practice: approximately 70% of the $17 billion ED market is outsourced.

Prepetition, before the Transition Related Activities, APP had a long history of strength, growth, and stability.  Particularly during 2016 through early 2020, the Company experienced significant organic growth reflective of the success of the Debtors' differentiated model, with a focus on collaborative management, high quality, and low cost and which bifurcated local and regional operational and clinical roles, to ensure the Company was not just a "staffing" company.  The COVID-19 pandemic (commencing in early 2020) produced significant industry challenges and placed significant pressure on the Company's operations and liquidity.

In this difficult setting, in 2022 and onward, the Debtors (advised by Jefferies Investment Banking) sought over a protracted period a replacement financing and restructuring events with Goldman Sachs Specialty Lending Group, L.P.,  the Prepetition Agent for the Prepetition Lenders (each capitalized term is defined below) that were ultimately unsuccessful.  Credit agreement amendments and forbearances were agreed to by the parties, and a restructuring support agreement and a restructuring term sheet were executed by the Debtors, the Prepetition Agent, and certain Prepetition Lenders.  However, as discussed below, the parties were unable to reach any consensual resolution, and the Debtors were forced to explore alternative strategies, including a potential sale of substantially all the Debtors' service contracts and other assets.  Such efforts by the Debtors proved to be unsuccessful, with the Debtors unable to come to agreement with any potential buyer in the prepetition period, despite extensive negotiations.  As is described in greater detail below, prior to the Transition Related Activities (primarily in July 2023), the Debtors engaged in extensive negotiations with both a stalking horse buyer for, among other things, a material portion of the Debtors' contracts, as well as a proposed debtor-in-possession lender.  Both of those negotiations failed to result in a transaction, leading to the implementation of the Transition Related Activities.

Thus, in July 2023, the Company made the difficult decision to begin transitioning substantially all of its service contracts to alternative service providers (competitors) and its healthcare/hospital partners (customers), to avoid any interruptions in its critical life-saving service to the patients.  Specifically, as described in greater detail below, the Company worked to facilitate, and was successful in facilitating, the orderly transitions of approximately 150 emergency department and hospital medicine contracts to alternative service providers and its health

system/hospital partners who provided insourced solutions by the end of July 2023 (the "Transition Related Activities").  This successful strategy also resulted in the Debtors being relieved of in excess tens of millions of dollars in obligations, as described below.  Through this process, the Company's priority was to minimize disruption for its health system/hospital and provider partners and create as seamless a hand off as possible for stakeholders with a goal of ensuring that patients received continuity of high-quality care.

After successfully transitioning all its medical service contracts without interruption, the Debtors have commenced these bankruptcy cases to facilitate and complete the wind-down process and liquidate their remaining assets in an orderly fashion.

### 4.2    Debtors' Business and Operations.

Founded in 2015, through the merger of Tennessee-based healthcare companies Align MD and Elite Emergency Physicians, the Company was a premier provider of a full range of management and staffing services for hospital emergency departments and hospitalist programs across the nation.  Prior to the Transition Related Activities, the Company had a large, diverse footprint of approximately 150 contracts across 15 states (Alabama, Arizona, Florida, Illinois, Indiana, Kentucky, Michigan, Mississippi, Missouri, New Mexico, Nevada, Oklahoma, South Carolina, Tennessee, and Texas).[3]  The Company's senior management team had developed (i) a highly successful growth strategy through new contract wins and tuck-in acquisitions, (ii) the dyad leadership model, separating the relationship management functions between operational and clinical domain experts, and (iii) cost optimization initiatives that drove increased profitability while maintaining industry-leading level of quality.  Throughout its history, the Company had strategically aligned with high quality health systems in attractive markets to support strong organic growth. Centralized shared services functions supported hospital partners operationally, enabling providers and local and regional leadership to focus on patient outcomes.

---

[3] The graphic and related statistics and information below represent the Company and its operations prior to the Transaction Related Activities (discussed herein) undertaken in July 2023.

| 15 States | 100+ Sites | 2,500+ Physicians |

| | |
|---|---|
| ∘ ~150 Contracts | ∘ ~ 130 Organic contracts won since 2015 |
| ∘ 4M+ Patient Visits | ∘ 96% Physician Retention |
| ∘ 95%+ Client Retention | ∘ <1% Locum tenen utilization |

The Debtors' business was comprised of two service lines: (1) Emergency Department, which included emergency department, freestanding emergency department and emergency department management staffing services, and (2) Hospital Management ("HM"), which included hospital management, intensive care unit and observation staffing services (APP provided these services to a select group of ED customers).

Revenues of the Company were derived from providing emergency department and hospitalist management and staffing services under contractual agreements, which provided for compensation under two models – (a) fee for service ("FFS") revenue or AR (patient receivables) contracts, or (b) management contracts.  During 2020-2022, most of the Company's revenue was attributable to agreements with emergency departments under the FFS model.  With respect to the FFS model, the form and extent of services provided varied by contract.  Generally, the Company provided the staffing and management services and was responsible for coding, billing, and collecting the fees billed for services from either Medicaid, Medicare, Blue Cross Blue Shield, commercial payors, insurance companies and/or the patient or a combination thereof.  In certain contracts, APP was also compensated through stipend subsidies from the hospital; the existence and amounts of stipends was dependent upon the payor mix and reimbursement rates available to the hospital and APP in the markets they served.  As discussed below, prepetition, prior to the Transition Related Activities, the Debtors contracted with and utilized a non-affiliate service provider – R1 (defined below) – to administer and process the coding, billing, and collections activity for arrangements under the AR contracts model.  With respect to the Debtors' management contracts, typically, the Company provided staffing and management services (directing the daily functions assigned to APP) and was responsible for billing, collections, and paying the costs of staffing and other items (typically with the managed company's deposits).  The applicable hospital was billed for these costs plus additional fees for management and director and leadership fees.

The Debtors' annual revenues had increased each year (on a consolidated basis): 2019 - $438 million; 2020 - $563 million; 2021 - $640 million; and 2022 - $645 million.  However, the

Debtors consistently suffered operating losses: 2019 - $148 million net loss; 2020 - $139 million net loss; 2021 - $101 million net loss; and 2022 - $140 million net loss (unaudited).

4.3    Debtors' Workforce and Employee Matters.

Prior to the July 2023 Transition Related Activities, the Debtors employed approximately 2,546 individuals in 29 states across the United States.  As of the Petition Date, the Debtors had reduced their workforce to 27 individuals who are employed, with a few exceptions, at the Debtors' headquarters providing support for the continuing wind-down of the Debtors' operations.  No employees are party to collective bargaining agreements or other similar labor agreements, and no employees are members of labor unions.

The Company sponsors a "top hat", non-qualified, deferred compensation plan: American Physician Partners, LLC Nonqualified Deferred Compensation Plan (effective as of November 1, 2018) (the "DCP") for select management or "highly compensated employees" (under applicable IRS rules).  The DCP holds funds and other financial assets having an aggregate vested balance of approximately $3.7 million as of August 31. 2023. Title to such assets is held by the Company in a "rabbi trust."  The Debtors anticipate shortly filing a motion relating to the DCP assets.

4.4    Corporate Growth and Significant Prepetition Transactions.

In 2016, a recapitalization transaction occurred that private equity investor Brown Brothers Harriman Capital Partners ("BBH") sponsored, a result of which, among other things, BBH became a majority owner of APP, ultimately providing the business with secondary or junior capital totaling approximately $105.0 million.

From 2016 to 2020, the Company completed nine substantial physician practice acquisitions during a time of significant acquisitions and consolidation in the ED services market segment: (i) the Company's 2016 acquisition of the DeGarA group, with locations in Michigan; (ii) the 2017 acquisition of Volunteer Medical Group, with locations in Tennessee; (iii) the 2018 acquisition of Northeast Tennessee Emergency Physicians, with locations in Tennessee and Virginia; (iv) the 2018 acquisition of Kalamazoo Emergency Associates, with locations in Michigan; (v) the 2018 acquisition of Progressive Medical Associates, with locations in Arizona; (vi) the 2019 acquisition of EmergiGroup Physician Associates LP, with numerous locations in Texas; (vii) the 2019 acquisition of Capital Emergency Physicians, with locations in Mississippi; (viii) the 2019 acquisition of Longview Emergency Medical Associates, with locations in Texas; and (ix) the 2019 acquisition of True Partners Emergency Physicians, LLC, with locations in Florida, Texas, Oklahoma, and Missouri.

During 2016 to 2020, the Company won more than 90 new contracts organically; expanded its footprint to 15 states; invested in corporate infrastructure and technology; and drove the business to be the leading provider of low-cost, high quality ED management services to hospitals in the U.S.  Annual revenue grew from $41 million in 2015 to $645 million in 2022.

4.5    Debtors' Organizational Structure.

American Physician Partners, LLC (APP), a Delaware limited liability company, is either the ultimate parent of the other Debtors or otherwise directly or indirectly (through other Debtors) manages the business and operations of the other Debtors. All the common equity units of APP are held by non-Debtor APP Holdco, LLC; preferred equity units are held by CPV APP Blocker, Inc and BBH. A chart detailing the Debtors' organizational structure is attached hereto as **Exhibit A**.

As reflected on **Exhibit A**, certain of the Debtors are owned by physicians who are not Debtors. The Debtors operated nationwide and were subject to various state laws regulating entities that administratively support medical providers or practice medicine or both. To comply with such laws, the Debtors utilized a structure pursuant to which the Debtors contracted with and provided a variety of management and administrative services to professional entities ("Professional Entities") that are owned exclusively by licensed physicians in accordance with applicable requirements. These Professional Entities are listed on **Exhibit A** are Debtors in these cases (the "Debtor Professional Entities"). By this structure, and pursuant to separate management agreements, generally APP or another Debtor higher in the Debtors' corporate structure manages the non-clinical business operations of the Debtor Professional Entities, allowing the applicable physicians to focus on providing high-quality medical services to patients.[4]

    4.6    Debtors' Debt Structure.

    (a)    Secured Debt.

The Debtors are party to that certain Amended and Restated Credit and Guaranty Agreement dated as of December 21, 2016 (as the same has been amended, restated, supplemented or modified from time to time, the "Prepetition Credit Agreement")[5] and collectively with any

---

[4] The Debtor Professional Entities are "affiliates" of APP under Bankruptcy Code section 101(2)(C) (affiliates include a "person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor").

[5] As amended by that certain First Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of May 17, 2017, that certain Second Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of August 15, 2017, that certain Third Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of September 8, 2017, that certain Fourth Amendment Fifth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of January 29, 2018, that certain Fifth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of March 9, 2018, that certain Letter Amendment and Consent, dated as of June 29, 2018, that certain Sixth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of November 13, 2018, that certain Seventh Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of January 7, 2019, that certain Letter Amendment and Consent, dated as of February 15, 2019, that certain Letter Amendment and Consent, dated as of June 18, 2019, that certain Letter Amendment, dated as of July 16, 2019, that certain Eighth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of October 25, 2019, that certain Ninth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of April 14, 2020, that certain Tenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of June 2, 2021, that certain Letter Amendment, dated as of October 20, 2021, that certain Eleventh Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of December 20, 2021, that certain Twelfth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of February 21, 2022, that certain Thirteenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of March 31, 2022, that certain Fourteenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of April 8, 2022, that certain Fifteenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of June 21, 2022, that certain Forbearance Agreement and

other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents"), by and among APP Holdco, LLC, American Physician Partners, LLC, as "Prepetition Borrower," the other company parties party thereto, Goldman Sachs Specialty Lending Group, L.P., as the administrative agent (in such capacity, the "Prepetition Agent"), and the lenders from time to time party thereto (the "Prepetition Lenders"; together with the Prepetition Agent, the "Prepetition Secured Parties"), the Prepetition Lenders provided loans and other financial accommodations to the Prepetition Borrower pursuant to the Prepetition Loan Documents (the "Prepetition Secured Facility").

Under the Prepetition Secured Facility, the Prepetition Lenders provided to the Debtors party thereto commitments in respect of term loans in the aggregate principal amount of up to $589,608,740 as of August 31, 2023.  Immediately prior to the Petition Date, the Prepetition Borrower and Prepetition Guarantors (as defined below) were justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount under the Prepetition Secured Facility on account of term loans of not less than $570,108,740.35 as of August 31, 2023 (the "Prepetition Term Loans") and on account of revolver loans of not less than $19,500,000 as of August 31, 2023 (the "Prepetition Revolver Loans") (such amounts on account of the Prepetition Term Loans and Prepetition Revolver Loans, together with any accrued and unpaid interest, fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Secured Facility, the "Prepetition Secured Obligations").

As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, pursuant to the Collateral Documents and that certain Pledge and Security Agreement (each, as defined in the Prepetition Credit Agreement) as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the Prepetition Borrower and each "Guarantor" thereunder (each, a "Prepetition Guarantor"; and together with Prepetition Borrower, collectively, the "Prepetition Credit Parties") jointly and severally guaranteed all of the Prepetition Secured Obligations, and granted to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, a lien on and security in all of its right, title and interest in (the "Prepetition Liens") substantially all of their respective assets (the "Prepetition Collateral"), subject to the relative priorities among the Prepetition Secured Parties set forth in the Prepetition Loan Documents.

Prior to the Petition Date, the Debtors were in default under the Prepetition Credit Facility. On December 9, 2022, the Prepetition Secured Parties exercised their proxy rights and appointed an independent Board of Managers over APP.

---

Sixteenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of September 8, 2022, that certain Forbearance Agreement and Seventeenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of December 16, 2022, that certain Eighteenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of January 13, 2023, and that certain Nineteenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of May 16, 2023, that certain Twentieth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of June 15, 2023.

      (b)     Unsecured Trade Debt.

As of the Petition Date, based on their books and records, the Debtors estimate they owe approximately $40 million in trade debt, staffing related claims, and other accounts payable, which figure excludes potentially substantial additional amounts of other contingent or unliquidated unsecured claims (including provider insurance and patient related claims), which may total in the millions of dollars.

4.7    Equity Structure.

As noted above, non-Debtor APP Holdco, LLC ("APP Holdco") owns all the common equity interests of APP, and CPV APP Blocker, Inc. ("CPV APP") and BBH hold preferred equity interests. The equity interests in APP Holdco and CPV APP are privately held. As of the Petition Date, the largest interest holders of APP Holdco include BBH, John Rutledge (founder, former President and CEO of APP) and Jeremy Finkelstein (member of the Company's Physician Leadership team, who sold EmergiGroup Physician Associates, which included APP's contracts with the Houston Methodist health system, to APP); and, based on information and belief, the largest interest holders of CPV APP are BBH affiliated or related entities.

4.8    Events and Circumstances Leading to the Bankruptcy Cases.

      (a)     COVID Pandemic and Its Aftermath.

The Debtors materially underperformed their projected financial performance in 2022 and early 2023 due to various circumstances including (i) actual collections per patient visit being materially lower than originally anticipated, (ii) lowered stipend revenues, (iii) greater than expected outsourced clinical team utilization (*i.e.*, locums), (iv) unanticipated increases in costs, including the costs associated with restructuring and insurance, and (v) an infrastructure that had been built from outsourcing key functions including revenue cycle management.

      1.     In General.

As part of the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), the U.S. government announced it would offer relief funding to eligible healthcare providers. During the years ended December 31, 2020, and 2021, the Company participated in certain relief programs offered through the CARES Act including distributions from the Public Health and Social Services Emergency Fund ("PHSSE Fund"). During 2020 and 2021, the Company received approximately $17 million and $13.6 million, respectively, in funding as replacement for lost revenues due to COVID-19 from the PHSSE Fund; and the Company has been following all reporting, audit and related requirements.

Broadly, the COVID-19 pandemic resulted in a general worsening of economic conditions, which placed significant pressure on hospital and health system budgets, which impacted APP's revenue from hospital stipends. Further, budget deficits at federal, state and local government

entities have had a negative impact on spending for many health and human service programs, including Medicare, Medicaid and similar programs.

During and after the pandemic, the Company was proactive in dealing with pandemic related challenges, and implemented operational and cost savings initiatives (for example, over $20 million in annual cost savings initiative were implemented in late 2022), and same-site volumes generally returned to pre-pandemic levels.

2.      Debtors' Worsening Position.

As part of the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), the U.S. government announced it would offer relief funding to eligible healthcare providers. During the years ended December 31, 2020, and 2021, the Company participated in certain relief programs offered through the CARES Act including distributions from the Public Health and Social Services Emergency Fund ("PHSSE Fund"). During 2020 and 2021, the Company received approximately $17 million and $13.6 million, respectively, in funding as replacement for lost revenues due to COVID-19 from the PHSSE Fund; and the Company has been following all reporting, audit and related requirements.

No Surprises Act / Regulatory Challenges:  Notably, during the last couple of years, the Company faced strong and unique regulatory headwinds.  At the end of 2020, as COVID vaccines were being rolled out and the response to the pandemic became more controlled, Congress passed the No Surprises Act, which ended the practice of "balance billing" (sometimes referred to as "surprise medical billing") - the practice of billing patients directly when health insurers underpay or refuse to pay the full cost of delivering care.  The Company supported the patient protections in the No Surprises Act legislation and, as a policy, did not engage in the practice of balance billing. Although the legislative policy behind the No Surprises Act is sound, the regulatory implementation of the No Surprises Act was problematic, effectively shifting the balance of power in payment disputes too far in the favor of insurance companies (payors) and enabling them to significantly delay and unilaterally reduce or deny payments. Of the eligible claims the Company submitted through the independent dispute resolution process, only a small portion has been resolved, and of those that were resolved, many remain unpaid by health insurers.

Labor Costs / Inflationary Pressures:  The Company also had to deal with other adverse financial factors – rising labor costs and inflationary pressures.  The COVID-19 pandemic left in its wake a nationwide health care labor shortage, directly affecting the healthcare services sector, as many part-time and retirement-age healthcare professionals exited the workforce and as the turnover rate substantially increased.  All this created significant upward pressure on such professionals' wages and salaries, in addition to forcing the Company's locum usage to materially increase, which in turn significantly increased labor costs.  In certain markets, the competition for providers was intense, and the Company was required to raise hourly rates as well as offer signing bonuses.  Moreover, inflationary pressures had increased the cost of equipment and other supplies necessary to run the Company's owned or managed sites.

Despite these adverse market conditions, as well as the regulatory challenges discussed above, the Company had remained steadfast in its belief in its business and mission, and continued to work with its healthcare partners to ensure patients receive high-quality care.

(b)     Unsuccessful Prepetition Negotiations and Developments with the
Prepetition Lenders, Lack of Funding, and Expedited Prepetition
Transition.

During certain periods in 2019 to 2022, with the assistance of investment bankers and other
advisors (including Moelis & Co. in 2019, Harris Williams in 2020 and 2021, Deutsche Bank in
2021, Brentwood Capital Advisors in 2021/2022, and Jefferies in 2022), the Company explored
potential recapitalization, sale, refinancing and/or other transactions, considering the Company's
tightened liquidity situation.  However, none of those previous efforts resulted in any viable offers
that could be consummated. In particular, the Company focused on a potential refinancing or
restructuring transaction during 2021, as the credit facility under the Prepetition Credit Agreement
was set to (originally) mature in December 2021.  And throughout 2022, the Company pursued a
potential refinancing and/or restructuring transaction with the Prepetition Lenders.

With no resolution in hand, the amounts due under the Prepetition Credit Agreement
matured in August 2022 (the maturity date having been previously extended from December
2021), with the Debtors acknowledging that they owed at least $486.0 million in principal amount
to the Prepetition Lenders at that time.  In mid-September 2022, pursuant to an engagement
agreement with the Company, Huron agreed to make John C. DiDonato's services available as the
Company's CRO and James Nugent as the Company's Deputy CRO, and shortly thereafter, Mr.
DiDonato was appointed as APP's CRO.

On December 9, 2022, citing the defaults of the Debtors under the Prepetition Credit
Agreement which were not waived by the Prepetition Agent, the Prepetition Lenders exercised
their proxy rights and appointed an advisory board that was ultimately transitioned into an
independent Board of Managers for APP.[6]

On January 30, 2023, the Debtors, the Prepetition Agent, and the Prepetition Lenders
entered into a Restructuring Term Sheet, pursuant to which the parties contemplated a restructuring
transaction whereby, *inter alia*, the Prepetition Lenders would receive 100% of the equity of the
reorganized entity and provide a replacement credit facility.  Subsequently, the parties entered into
a Restructuring Support Agreement dated as of March 2, 2023 (the "RSA"), which contemplated
a debt-to-equity swap and established a fresh credit facility which provided new money to the
business. Notwithstanding the foregoing, the Debtors were unable to reach a consensual resolution
with the Prepetition Agent and the Prepetition Lenders due in part to the Debtors' continued cash
consumption.

Then, in about late May 2023, management, the Board of Managers and Huron prepared a
review of strategic alternatives to evaluate a potential consensual restructuring to be considered,
and presented these alternatives to the Prepetition Lenders.  Through early June 2023, the
Company's management, together with the CRO team and the independent Board of Managers
(including its advisors), worked with the Prepetition Lenders to assess strategic alternatives

---

[6] One member of the Board, Lawrence Hirsh, left the Board in May 2023.  Also, James Frary, who had replaced Mr.
Hirsh on the Board, later resigned as a Board member as of July 1, 2023.

including pursuing sales transactions (enterprise wide or selective contracts), rapid cessation of services, and a long-term investment in the Company.

Throughout this process, the Company's management and the CRO team was focused on and informed the Prepetition Lenders that a cutoff of funding future resources that resulted in a rapid cessation of the Company's operations would have negative consequences in providing its critical lifesaving services causing a national health crisis.

As the Company and its advisors worked through an analysis of its business operations and the market as a whole and timely shared that work with the Prepetition Lenders throughout the first half of 2023, the Prepetition Lenders supported the restructuring efforts by deferring cash debt service, advancing the Company an additional $28.0 million through May, 2023.

In late May and early June, the Company presented various strategic alternatives to the Prepetition Lenders all of which showed the need for significant investment. As a result on June 9, 2023, the Prepetition Lenders notified the Company of their unwillingness to provide or commit to any further cash to be advanced in the business, which put in doubt the Company's ability to satisfy its clinical team provider obligations, other operating expenses in the short term. As discussed above, the parties entered the Twentieth Amendment on June 15, 2023, pursuant to which the Prepetition Lenders agreed to provide $3.0 M in new money (Tranche F) for the Debtors to satisfy the APP clinical provider obligations, which allowed the Debtors to continue to operate in the short term.

The foregoing circumstances put the Company and its management and Board in an incredibly difficult position as the Company had as few as 10 days to effectively transition its contracts to alternatives service providers or allow its health systems/hospital partners. The Company's operations critical life-saving services to the most vulnerable individuals and communities across the country, and more so than almost all other businesses, could not be wound down in a hasty or disorderly manner without a potential tremendous negative impact on national healthcare services

(c)     Unsuccessful Attempt to Sell the Company's Assets and Lack of Financing Alternatives.

Upon receiving notice from the Prepetition Lenders in early June 2023, the Company's management, CRO team and Board of Managers immediately began pursuing strategic options that would minimize disruption for its hospital and health system partners, physicians, advanced practice clinicians ("APC") and their respective patients. The Management, CRO team and the Board of Managers immediately identified the most likely potential strategic partners that might be interested in transitioning the Company's customer contracts in consideration for assuming certain obligations, including APP's clinical team liabilities, that would enable an accelerated transition and potentially limit the disruption of the critical lifesaving services that the Company provided to hospital emergency rooms throughout the country. A confidential teaser was sent to eight potential strategic partners, of which five executed non-disclosure agreements (each an "NDA"). For those parties that executed NDAs, access was provided to a virtual data room so those parties could review confidential financial and operational diligence materials. Given the critical liquidity position and the necessity for ongoing funding in the near-term, the potential

strategic partners, as well as the Prepetition Secured Parties, were approached to provide funding through the transition of the contracts. All strategic partners declined to provide incremental cash advances to the business. Certain of the Prepetition Lenders expressed a willingness to consider possibly providing the funding, subject to the receipt of additional information. After feverish negotiations, the Company executed a Letter of Intent ("LOI") with a potential buyer ("Prior Potential Buyer"), in late June 2023, through which the potential buyer indicated that it would transition the medical service contracts of substantially all of the Company's healthcare/hospital client partners, satisfy APP's clinical team providers and extend medical malpractice insurance for clinicians, including prior acts medical malpractice insurance, and keep almost all of the Company's Support Center employees. At the time, the LOI was viewed as a significant accomplishment which would provide continuity for all stakeholders and minimize disruption of patient care for healthcare/hospital partners. The respective senior management teams of APP and Prior Potential Buyer conducted Town Hall meetings with internal stakeholders, including APP employees, to announce the LOI. Prior Potential Buyer and APP leadership teams also held meetings with APP's key customers to ensure such customers of a smooth transition of services to Prior Potential Buyer. The news was well received by the Company's health system/hospital partners, who appreciated the Company's dedication to finding a solution for its hospital partners on such an expedited timeframe. In the weeks following the LOI, the Company's management and CRO teams, advisors, and Board of Managers engaged in around-the-clock negotiations with Prior Potential Buyer, its advisors, and its private equity sponsor to close the transaction. The team worked tirelessly to reach an agreement, but unfortunately, Prior Potential Buyer retracted its commitments regarding assuming contracts, providing wages, and offering medical malpractice insurance, and required an unacceptable level of conditions be met to close the deal. Thus, a value maximizing transaction that provided the necessary continuity could not be reached. While this transaction ultimately was not consummated, it provided the Company the opportunity to begin conversations with stakeholders about the Company's financial challenges and its intent to wind down operations with a solution in place, minimizing anxiety among healthcare/hospital partners and across the industry.

Without necessary additional financing support from the Prepetition Lenders, and given the accelerated nature of the situation, the Company reached out to a select set of three special situation private credit funds to explore alternative financing sources, including potential debtor in possession financing, that had the experience to underwrite the potential credit with limited diligence and within the accelerated timeframe. Additionally, a member of the Board of Managers reached out to contacts at an additional ten or more potential financing sources. Four expressly declined to participate and no response was received from the other inquiries. Only a single potential financing source executed an NDA and commenced initial diligence culminating in proposed financing terms. The proposed financing was ultimately deemed unacceptable by the Company's Board of Managers, CRO, management, and its advisors. The Company also discussed and considered potential additional funding from certain of the Prepetition Lenders, but terms (in both timing and dollars) offered by those Prepetition Lenders were insufficient to allow for the important service transition that the Company ultimately embarked upon and executed

        (d)      The Company's Extensive and Expedited Transition Efforts to Avoid Interruptions in Service to Patients.

Consequently, in early to mid-July 2023, the Company made the difficult decision to begin transitioning substantially all of its services for its clients' emergency departments and other healthcare providers, to avoid any interruptions in service, avoiding any impact on patient safety. Specifically, the Company worked to facilitate an orderly transition of approximately 150 emergency department and hospital medicine contracts to alternative service providers or insourced to their health system/hospital partners.  As part of such arrangements, the Company generally sought to have, and as to numerous locations, was able to have, the transition to these alternative service providers tens of millions of dollars of accrued, unpaid APP internal clinical team obligations, and certain medical malpractice prior acts insurance coverage, among other obligations.  Only limited transition assistance is now required (for example, the Company continues certain payroll services in some cases pending the transition completion for the applicable sites).  The transition efforts were primarily completed by September 2023, with services provided (in some cases retroactive) through July 31, 2023.  And the Company, with the Prepetition Lenders' consent, also sold select patient receivables to third parties (typically considered uncollectible patient receivables or charged off by the Debtors), as the Company has done in the ordinary course of business over the past several years (including under accounts purchase agreements).[7]

Through this transition related prepetition process, the Company's priority was to minimize disruption for its health system/hospital partners creating a seamless a hand off services as of July 31, 2023 and ensuring a continuity of high quality of care for the patients serviced by its contracts. Throughout this process (and notwithstanding the numerous events of default under the Prepetition Credit Facility), the Prepetition Lenders supported the Company's use of its cash collateral to facilitate a safe and orderly transfer of healthcare operations to third parties.

As discussed above, historically, most of the Company's revenue has been attributable to agreements with emergency departments under the AR contracts model, where typically the Company (1) provided the staffing/management services and (2) was responsible for coding, billing, and collecting the fees billed for services from Medicaid, Medicare, Blue Cross Blue Shield, commercial payors, insurance companies and/or the patients and related services ("Revenue Cycle Management" or "RCM Services").[8]  Prepetition, prior to the Transition Related Activities, commencing in September 2019, the Debtors contracted with and utilized a non-affiliate service provider – Medical Consultants, Inc. ("MCI"), a subsidiary of RI RCM Holdco, Inc. ("R1") – to provide the critical RCM Services for the Debtors.[9]  MCI has been the exclusive Revenue Cycle Management provider for the Company for the past several years.

MCI provided a cancellation notice to the Company effective July 26, 2023, and given the Company's critical need for the RCM Services, the Company entered a short-term services agreement with MCI until the parties could negotiate a consensual resolution.  After extensive,

---

[7]  The Debtors anticipate conducting additional A/R sales postpetition in the ordinary course.

[8]   Healthcare revenue cycle management is the financial process healthcare providers and facilities use to manage the administrative and other functions associated with claims processing, payment, and revenue generation, including identifying, managing, and collecting patient service revenue.  The process is crucial to ensuring healthcare organizations stay in operation to treat patients.

[9]  As discussed herein, in the ordinary course, the Company sells uncollectible or older accounts receivable to third parties for cash proceeds and expect to continue to do so postpetition.

good faith negotiations, the parties entered into a new agreement effective as of July 26, dated September 1, 2023, executed on September 15, 2023, providing for MCI to provide certain RCM Services (including critical customer service, help desk support, customer refund processing, management of patient receivables, billings, collections, and facilitating the efficient transfer of data to sell patient receivables) at least through October 31, 2023 (with potential extensions) ("New MCI Agreement").  The Prepetition Lenders support the Company's entry into the New MCI Agreement.

The Debtors have filed a motion for authority, out of an abundance of caution, to continue to operate under the New MCI Agreement (including, without limitation, the remittance of prepetition patient refunds).  During the sale/wind-down process, the Debtors' small remaining workforce is not equipped to handle the myriad RCM Services.  Indeed, even if the Company had additional personnel, the Company would not have the capacity and resources to replicate and implement the necessary RCM Services:

      (a)      The ability and resources to take control of and properly handle all of the voluminous records/documents with history and supporting and claims processing details.

      (b)      The necessary technological and practical infrastructure to, among other things, respond to and communicate with hundreds of patients, insurance companies, healthcare providers, potential accounts receivable buyers, and other parties, and handle and administer all collections, refunds and other payments and transfers.

      (c)      The Company lacks the institutional and experiential knowledge to properly render the RCM Services; as noted, MCI has been providing services to the Company for four years since September 2019.

All of the RCM Services and related services under the New MCI Agreement are necessary and critical for the Debtors to be able to maximize the value of the estates' assets for the benefit of stakeholders (including raising funds for the administration of these cases and a liquidating plan), including, for example, administering and billing a rebilling claims, which will likely increase customer collections, and preparing and providing information to potential accounts receivable purchasers, which purchases will likely result in millions of dollars of postpetition sale proceeds.

Prepetition, the Debtors secured medical malpractice insurance policies (the "MagMutual Policies") from Professional Security Insurance Co., a subsidiary of MagMutual, to cover thousands of APP internal clinical team providers.  On or about August 3, 2023, MagMutual sent a written notice to APP purportedly canceling the 2023 MagMutual Policy ab initio (as of June 30, 2023).  The Debtors contest the alleged cancellation and reserve all their rights against MagMutual.  The Debtors believe there is no contractual, legal or factual basis for such cancellation, and have attempted to work collaboratively with MagMutual to reach a solution that protects providers.  While the Debtors attempted to negotiate a consensual resolution with MagMutual prepetition, to date the parties have failed to reach an agreement.  The Debtors also endeavored to locate and obtain adequate replacement medical malpractice insurance coverage and other protective solutions for the providers requiring such coverage.  As part of the Transition Related Activities, and as a result of the Debtors' efforts, over 90% of active providers received medical malpractice insurance coverage from the management services providers to whom the Debtors transitioned their management functions.  Unfortunately, certain of the active and past

providers do not have medical malpractice insurance coverage. Postpetition, the Debtors anticipate continuing to negotiate with MagMutual and, if necessary, take other actions as the Debtors deem appropriate.

In sum, prior to bankruptcy filing, the Debtors having explored strategic options to replace their existing financing, or sell their business, transitioned their service contracts to capable providers to avoid a disruption in life saving services.  The Debtors have commenced these bankruptcy cases to facilitate the orderly sale and/or liquidation of their remaining assets and wind-down of their businesses, to preserve and maximize the value of the estates' assets for the benefit of all stakeholders.

## SECTION 5
## THE CHAPTER 11 CASES

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases.

5.1    <u>First Day and Other Early Relief.</u>

In order to facilitate the Chapter 11 Cases, minimize disruption to the Debtors' affairs, and preserve the value of the Estates, the Debtors filed motions with the Bankruptcy Court on or shortly after the Petition Date seeking certain relief, including, without limitation:

(a)    authority to honor and pay certain prepetition workforce compensation and expenses and other related obligations, subject to certain caps;

(b)    authority to pay (or use tax credits to offset) sales, use, income and other governmental taxes, as well as other governmental fees and assessments, in the ordinary course of business;

(c)    authority to continue using the Debtors' existing cash management system and the provision of other related relief;

(d)    approval of adequate assurance procedures for utility providers;

(e)    approval of certain procedures to maintain the confidentiality of customer information as required by the Health Insurance Portability and Accountability Act of 1996, while providing required disclosures in the Chapter 11 Cases;

(f)    authority to continue to maintain their insurance policies and programs, honor all insurance obligations, and renew, extend, supplement, or purchase and finance their insurance policies; and

(g)    the appointment of Epiq Corporate Restructuring, LLC as the claims and noticing agent in the Chapter 11 Cases.

5.2    <u>Cash Collateral.</u>

Pursuant to their first day cash collateral motion, the Debtors sought approval to use the cash collateral of the Prepetition Secured Parties subject to a proposed interim order and DIP budget, and the provision of adequate protection for their prepetition liens, including replacement liens and superpriority claims on the Collateral, to the extent of any diminution.  The Court entered an order granting the Debtors' motion on an interim basis on _____, 2023 [Docket No. ____].

5.3    Retention of Professionals.

The Debtors filed applications or motions, as applicable, to employ certain professionals, including Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel and Bass, Berry & Sims PLC as special counsel in the Chapter 11 Cases; and to approve the retention of Huron Consulting Group to provide the Debtors a CRO (John DiDonato) and supporting personnel as set forth in the Huron Approval Order.

5.4    Debtors' Schedules and Statements of Financial Affairs.

The Debtors filed with the Court their respective Schedules and Statements of Financial Affairs [Docket Nos. _____].

**SECTION 6**
**CONFIRMATION AND VOTING PROCEDURES**

6.1    Confirmation Hearing.

On [•], 2023, the Court entered an order conditionally approving the Combined Plan and Disclosure Statement (the "Conditional Approval and Procedures Order") for solicitation purposes only and authorizing the Debtors to solicit the Combined Plan and Disclosure Statement.  The Confirmation Hearing has been scheduled for **[•], 2023, at [•] (prevailing Eastern Time)** to consider (a) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Court.

6.2    Procedures for Objections.

Any objection to final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Plan and Disclosure Statement must be made in writing and filed with the Court by no later than **[•], 2023, at 4:00 p.m. (prevailing Eastern Time)**.  **Unless an objection is timely filed and served, it may not be considered by the Court at the Confirmation Hearing.**

6.3    Requirements for Confirmation.

The Court will confirm the Combined Plan and Disclosure Statement only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for

confirmation in the Chapter 11 Cases is that the Combined Plan and Disclosure Statement be: (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Combined Plan and Disclosure Statement "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible. The Court must also find that:

> (a) the Combined Plan and Disclosure Statement has classified Claims and Interests in a permissible manner;

> (b) the Combined Plan and Disclosure Statement complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

> (c) the Combined Plan and Disclosure Statement has been proposed in good faith.

The Debtors believe that the Combined Plan and Disclosure Statement complies, or will comply, with all such requirements.

6.4    <u>Classification of Claims and Interests.</u>

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Combined Plan and Disclosure Statement divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Combined Plan and Disclosure Statement creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, Unsecured Claims, and Interests. The Debtors believe that the Combined Plan and Disclosure Statement's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with such standard. If the Court finds otherwise, however, it could deny confirmation of the Combined Plan and Disclosure Statement if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined Plan and Disclosure Statement.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Combined Plan and Disclosure Statement only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Combined Plan and Disclosure Statement has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Court may find that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Combined Plan and Disclosure Statement, to make such permissible modifications to the Combined Plan and Disclosure Statement as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Plan and Disclosure Statement.

**EXCEPT AS SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein.  The Debtors believe that the consideration, if any, provided under the Combined Plan and Disclosure Statement to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests.  The Court must find, however, that a number of statutory tests are met before it may confirm the Combined Plan and Disclosure Statement.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Combined Plan and Disclosure Statement, or do not vote to accept the Combined Plan and Disclosure Statement, but who will be bound by the provisions of the Combined Plan and Disclosure Statement if it is confirmed by the Court.

6.5    <u>Impaired Claims or Interests.</u>

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Combined Plan and Disclosure Statement and receiving a payment or Distribution under the Combined Plan and Disclosure Statement may vote to accept or reject the Combined Plan and Disclosure Statement.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class.  The holders of Claims not Impaired by the Combined Plan and Disclosure Statement are deemed to accept the Combined Plan and Disclosure Statement and do not have the right to vote on the Combined Plan and Disclosure Statement.  The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote.  Finally, the holders of Claims or Interests whose Claims or Interests are not classified under the Combined Plan and Disclosure Statement are not entitled to vote on the Combined Plan and Disclosure Statement.

Under the Combined Plan and Disclosure Statement, Holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 3 (Other Secured Claims) are Unimpaired and, therefore, not entitled to vote on the Combined Plan and Disclosure Statement and are deemed to accept the Combined Plan and Disclosure Statement.  Holders of Claims in Class 2 (Prepetition Lenders Secured Claims) and Class 4 (Unsecured Claims) are Impaired and entitled to vote on the Plan.  Holders of Claims in Class 5 (Intercompany Claims) and Holders of Interests in Class 6 (Intercompany Interests) and Class 7 (Interests) will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement and, therefore, are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote.

**ACCORDINGLY, BALLOTS FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE BEING PROVIDED TO HOLDERS OF CLAIMS IN CLASSES 2 AND 4.**

6.6     Confirmation without Necessary Acceptances; Cramdown.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  Here, because holders of Claims in Class 5 and of Interests in Class 6 and Class 7 are deemed to reject the Combined Plan and Disclosure Statement, the Debtors will seek confirmation of the Combined Plan and Disclosure Statement from the Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes 5, 6 and 7 is entitled to receive any property under the Combined Plan and Disclosure Statement.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. Based upon their understanding of existing case law, the Debtors do not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

a.   <u>Secured Creditors</u>.   Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

b.   <u>Unsecured Creditors</u>.   Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c.   <u>Interests</u>.   Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Combined Plan and Disclosure Statement satisfy the absolute priority rule, where required.

6.7   <u>Feasibility.</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement). Because the Combined Plan and Disclosure Statement proposes a liquidation of all of the Debtors' remaining assets, for purposes of this test, the Debtors have analyzed the ability of the Debtors and the Liquidating Trust to meet their obligations under the Combined Plan and Disclosure Statement. Based on the Debtors' analysis, the Debtors and the Liquidating Trust will have sufficient assets to accomplish their tasks and satisfy their obligations under the Combined Plan and Disclosure Statement. Therefore, the Debtors believe that the Combined Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code.

6.8   <u>Best Interests Test and Liquidation Analysis.</u>

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to a case under chapter 7 (the "<u>Liquidation Analysis</u>"), which is attached hereto as **Exhibit B**. In this case, the $250,000 GUC Fund and a pro rata share of net proceeds from certain Litigation will be made available to general unsecured creditors pursuant to the Plan, which amounts likely would be distributed to the Prepetition Lenders and would not be available for general unsecured creditors of the Debtors in a Chapter 7 proceeding. Based upon the Debtors' current projections, Holders of Allowed administrative, priority, and Other Secured Claims will be paid in full under the Plan, while Holders of Prepetition Lenders Secured Claims and Unsecured Claims will receive less than full payments. *See* **Exhibit B** (Liquidation Analysis) attached hereto.

If the Chapter 11 Cases were converted to a Chapter 7 proceeding, first and foremost, the Estates would not have the benefit of the aforementioned assets (including the $250,000 GUC Fund) to provide a recovery for general unsecured creditors under the Plan, and thus, general unsecured creditors would likely receive no recovery in a Chapter 7 proceeding. Further, the Debtors' estates would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors in the Chapter 11 Cases. The Debtors contemplate an orderly administration and winding down of the Estates by parties that are already familiar with the Debtors, their remaining assets and affairs, and their creditors and liabilities. Such familiarity will allow the Debtors and the Liquidating Trust to complete liquidation of the remaining assets (including prosecution of the applicable Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee. Additionally, the Estates would suffer additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the

Estates (including the prosecution of the applicable Causes of Action). Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estates.

Based upon the foregoing and **Exhibit B** (Liquidation Analysis) attached hereto, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases.

### 6.9    Eligibility to Vote on the Combined Plan and Disclosure Statement.

Unless otherwise ordered by the Court, only holders of Allowed Claims in Classes 2 and 4 may vote on the Combined Plan and Disclosure Statement. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Plan and Disclosure Statement, you must hold an *Allowed* Claim in Classes 2 and 4, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

### 6.10    Solicitation Package / Release Opt-Out.

All holders of Allowed Claims in Classes 2 and 4 will receive a Solicitation Package. The Solicitation Packages will contain: (i) the Combined Plan and Disclosure Statement; (ii) the Conditional Approval Order and Procedures Order; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot, including voting instructions and a box to check for Holders of Class 4 Unsecured Claims to opt out of being a Releasing Party in connection with the Debtors' release and the third-party releases contained in Section 16.2(a).2; and (v) such other materials as the Court may direct or approve or that the Debtors deem appropriate.

All other Creditors and parties in interest not entitled to vote on the Combined Plan and Disclosure Statement will receive only a copy of the notice of Confirmation Hearing.

Copies of the Combined Plan and Disclosure Statement shall be available on the Claims and Balloting Agent's website at https://dm.epiq11.com/case/AmericanPhysicianPartners/info. Any creditor or party-in-interest can request a hard copy of the Combined Plan and Disclosure Statement be sent to them by regular mail by calling the Claims and Balloting Agent at (____) _____ (U.S. & Canada) during regular business hours.

### 6.11    Voting Procedures, Voting Deadline, and Applicable Deadlines.

The Voting Record Date for determining which holders of Claims in Classes 2 and 4 may vote on the Combined Plan and Disclosure Statement is [•], 2023.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Balloting Agent by either (a) mailing the Ballot to the Claims and Balloting Agent at the following address:  APP Ballot Processing c/o _____; or (b) uploading the Ballot on the Claims and Balloting Agent's online balloting platform at _____.  Instructions for casting a Ballot will be available on the Claims and Balloting Agent's website.

Ballots must be submitted electronically, or the Claims and Balloting Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **[•], 2023 at 4:00 p.m. (prevailing Eastern Time)**.  Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Claims and Balloting Agent receives your original paper Ballot.  Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Plan and Disclosure Statement.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR PROCEDURES FOR VOTING ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT BY (I) TELEPHONE AT (_____) _____ (U.S./CANADA) OR (II) EMAIL AT _____@_____.COM.  THE CLAIMS AND BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

6.12    Acceptance of the Combined Plan and Disclosure Statement.

If you are a holder of a Claim in Classes 2 or 4, your acceptance of the Combined Plan and Disclosure Statement is important.  In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement.  At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtors urge that you vote to accept the Combined Plan and Disclosure Statement.

**SECTION 7**
**CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES**

7.1    Certain Risk Factors to be Considered.

THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING

WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION.

7.2     The Combined Plan and Disclosure Statement May Not Be Accepted.

The Debtors can make no assurances that the requisite acceptances of the Combined Plan and Disclosure Statement will be received, and the Debtors may need to obtain acceptances of an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Combined Plan and Disclosure Statement.

7.3     The Combined Plan and Disclosure Statement May Not Be Confirmed.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Plan and Disclosure Statement. Even if the Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation had not been met. As is described in greater detail in Section 6.3, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. While, as more fully set forth Section 6, the Debtors believe that the Combined Plan and Disclosure Statement complies with or will comply with all such requirements, there can be no guarantee that the Court will agree.

Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Plan and Disclosure Statement.

7.4     Distributions to Holders of Allowed Claims Under the Combined Plan and Disclosure Statement May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Combined Plan and Disclosure Statement are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to

such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

7.5    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As is described in greater detail in Section 6.4, the Debtors believe that the classification of Claims and Interests under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance the Court will reach the same conclusion.

To the extent that the Court finds that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed, the Debtors would seek to (i) modify the Combined Plan and Disclosure Statement to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Combined Plan and Disclosure Statement, by changing the composition of such Class and the vote required for approval of the Combined Plan and Disclosure Statement. There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined Plan and Disclosure Statement based upon such reclassification. Except to the extent that modification of classification in the Combined Plan and Disclosure Statement requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Combined Plan and Disclosure Statement by any holder of Claims pursuant to this solicitation will constitute a consent to the Combined Plan and Disclosure Statement's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Combined Plan and Disclosure Statement only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Combined Plan and Disclosure Statement provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with the requirement of equal treatment. To the extent that the Court finds that the Combined Plan and Disclosure Statement does not satisfy such requirement, the Court could deny confirmation of the Combined Plan and Disclosure Statement. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined Plan and Disclosure Statement and could increase the risk that the Combined Plan and Disclosure Statement will not be consummated.

7.6    Failure to Consummate the Combined Plan and Disclosure Statement.

Although the Debtors believe that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 7.7    The Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Section 16.2, will be granted. Failure of the Court to grant such relief may result in a plan that differs from the Combined Plan and Disclosure Statement or the Plan not being confirmed.

### 7.8    Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the monetization of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

### 7.9    Certain U.S. Federal Income Tax Consequences.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Combined Plan and Disclosure Statement. This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies;  S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part

of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)).  Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code (generally property held for investment).  This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.  A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Plan and Disclosure Statement.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

7.10    Tax Consequences for U.S. Holders of Certain Claims.

Generally, a holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim.  The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g*., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest.  A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim.  A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor

realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the holders of certain Claims, including Unsecured Claims in Class 4, will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors.

7.11   <u>Tax Consequences in Relation to Liquidating Trust.</u>

As of the Effective Date, the Liquidating Trust will be established for the benefit of the holders of Allowed Unsecured Claims. The tax consequences of the Plan in relation to the Liquidating Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among holders of Unsecured Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "<u>Trust Claims Reserve</u>") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the holders of Allowed Unsecured Claims are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries thereof could materially vary from those discussed herein.

In general, each creditor who is a Beneficiary of the Liquidating Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Beneficiary in satisfaction of its Allowed Unsecured Claim, and (ii) such Beneficiary's adjusted tax basis in such Claim. The "amount realized" by a Beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a Beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust). Where gain or loss is recognized by a Beneficiary in respect of its Allowed Unsecured Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Unsecured Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a Beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any Beneficiary will be allocated first to the original principal portion of the Beneficiary's Allowed Unsecured Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will treat the transfer of assets to the

Liquidating Trust, in accordance with the terms of the Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Unsecured Claims followed by the transfer of such assets by such holders to the Liquidating Trust. Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The Liquidating Trust's taxable income will be allocated to the Beneficiaries in accordance with each such Beneficiary's Pro Rata share. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

7.12    Information Reporting and Withholding.

In connection with the Combined Plan and Disclosure Statement, the Debtors will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Combined Plan and Disclosure Statement will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Plan and Disclosure Statement.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Plan and Disclosure Statement. Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to Distributions made pursuant to the

Combined Plan and Disclosure Statement, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Plan and Disclosure Statement would be subject to these regulations and require disclosure on the holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT**.

7.13    Releases, Exculpations, and Injunctions.

This Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

7.14    Alternatives to the Combined Plan and Disclosure Statement.

If the requisite acceptances are not received or the Combined Plan and Disclosure Statement is not confirmed and consummated, the theoretical alternatives to the Combined Plan and Disclosure Statement would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases. The Debtors do not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what is provided by the Combined Plan and Disclosure Statement.

If the Combined Plan and Disclosure Statement is not confirmed, then the Debtors or any other party in interest could attempt to formulate a different plan.  The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7.  At this time, the Debtors do not believe that there are viable alternative plans available to the Debtors.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtors' remaining assets in accordance with the priorities established by the Bankruptcy Code.  As discussed above and indicated in the Liquidation Analysis, the Debtors believe that the Combined Plan and Disclosure Statement provides a better outcome for holders of Claims than a chapter 7 liquidation would provide.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases also could be dismissed.  Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtors and their assets, likely to the detriment of other creditors.  While it is impossible to predict precisely what would happen in the event the Chapter 11 Cases are dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtors' assets among creditors as provided in the Combined Plan and Disclosure Statement.  Thus, the vast majority of creditors, including general unsecured creditors, could expect to receive less in the dismissal scenario than they would receive under the Combined Plan and Disclosure Statement.

## SECTION 8
## UNCLASSIFIED CLAIMS

8.1    <u>Unclassified Claims.</u>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified for purposes of voting or receiving Distributions.  Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the holders thereof are not entitled to vote on the Combined Plan and Disclosure Statement.

8.2    <u>Administrative Claims.</u>

(a)    Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash and/or the proceeds of other Liquidating Trust Assets, payable by the Liquidating Trust, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or Liquidating Trust, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the

ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

          (i)     Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, which filing requirements are set forth below) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtors, the Estates, the Liquidating Trust, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

          (ii)     All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

          (b)     Professional Fees.

          (i)     Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses **no later than sixty (60) days after the Effective Date**. All such applications for final allowance of compensation and reimbursement of expenses of Professionals will be subject to the authorization and approval of the Bankruptcy Court. For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

          (ii)     Upon approval of the fee applications by the Bankruptcy Court, the Debtors shall pay Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date, plus reasonable fees for services rendered, and actual and necessary costs incurred, in connection with the preparation, filing, service and prosecution of any applications for allowance of Professional Fees pending on the Effective Date or filed and/or served after the Effective Date.

          On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow, which shall not be a Liquidating Trust Asset, in an amount equal to the total estimated amount (based on the applicable professionals' good faith estimates) of accrued and unpaid (a) Professional Fee Claims incurred by a Professional and which have not yet been approved by the Bankruptcy Court; (b) Professional Fee Claims approved by the Bankruptcy Court; and (c) fees, charges and expenses of Huron on account of its provision of John DiDonato to serve as Chief Restructuring Officer of the Debtors and additional personnel to support him as set forth in the Huron Approval Order. The Professional Fee Escrow shall be held in trust by Debtors' counsel for the applicable professionals until all allowed fee and expense claims have been paid in full. The amounts deposited into the Professional Fee Escrow shall be free and clear of all liens, claims and encumbrances of any Persons or Entities except to the extent that any excess amounts remain

in the Professional Fee Escrow after payment in full of all Allowed Claims in the preceding categories (a) – (c), such excess amounts to be transferred to the Liquidating Trust and distributed in accordance with the Plan and the Liquidating Trust Agreement.  For the avoidance of doubt, the Professional Fee Escrow does not constitute a cap or limitation upon the obligation to pay Professional Fee Claims pursuant to this Plan.

    (c)  Priority Tax Claims.

    Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Debtors or the Liquidating Trust shall pay each holder of an Allowed Priority Tax Claim, from Available Cash and/or the proceeds of other Liquidating Trust Assets the full unpaid amount of such Allowed Priority Tax Claim on or as soon as practicable after the Effective Date or, if later, the date such Allowed Priority Tax Claim becomes an Allowed Claim; *provided that*, after becoming an Allowed Claim, such Allowed Priority Tax Claim may be paid at a later date pursuant to applicable non-bankruptcy law.

## SECTION 9
## CLASSIFICATION OF CLAIMS AND INTERESTS

  9.1  <u>Summary of Classification.</u>

    The provisions of this Section 9 govern Claims against and Interests in the Debtors.  Any Class that is vacant will be treated in accordance with Section 9.3.

    The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Combined Plan and Disclosure Statement.  A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Prepetition Lenders Secured Claims | Impaired | Yes |
| 3 | Prepetition Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | No (presumed to reject) |
| 6 | Intercompany Interests | Impaired | No (presumed to reject) |
| 7 | Interests | Impaired | No (presumed to reject) |

9.2     Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Combined Plan and Disclosure Statement, nothing under the Combined Plan and Disclosure Statement shall affect the rights of the Debtors or the Liquidating Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

9.3     Vacant and Abstaining Classes.

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined Plan and Disclosure Statement for purposes of voting to accept or reject the Combined Plan and Disclosure Statement and for purposes of determining acceptance or rejection of the Combined Plan and Disclosure Statement by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## SECTION 10
## TREATMENT OF CLAIMS AND INTERESTS

10.1     Class 1—Priority Non-Tax Claims.

(a)     Classification.  Class 1 consists of all Priority Non-Tax Claims.

(b)     Treatment.  The Liquidating Trustee shall pay in Cash from Available Cash and/or the proceeds of other Liquidating Trust Assets, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law).  The Liquidating Trustee shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

(c)     Impairment and Voting.  Class 1 is Unimpaired.  Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.2     Class 2—Prepetition Lenders Secured Claims.

(a)     Classification.  Class 2 consists of Prepetition Lenders Secured Claims.

(b)     Treatment.  The Holders of Class 2 Claims shall retain their Liens on the applicable Collateral (consisting of applicable Liquidating Trust Assets as of the Effective Date, but excluding the GUC Fund, the Liquidating Trust Expense Reserve, the Professional Fee Escrow and the Administrative/Priority/Other Distributions Reserve) until such Collateral is disposed of or released, and the net proceeds of such disposition, after payment of or reserve for all Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims,

shall be paid by the Liquidating Trustee to such Holder to the maximum extent possible in satisfaction and release of such Allowed Class 2 Claims, on or as soon as practicable after the Effective Date or as otherwise agreed between the Holder of such Claims and the Debtors or Liquidating Trustee, subject to the terms of the Plan.  The Holders of Class 2 Claims shall participate in recoveries from the Liquidating Trust on account of any unsecured deficiency Claims, except as to any distributions of the GUC Fund.

(c)     Impairment and Voting.  Class 2 is Impaired, and the Holders thereof are entitled to vote on the Plan.

10.3     Class 3—Other Secured Claims.

(a)     Classification.  Class 3 consists of all Other Secured Claims.  For purposes of distributions under the Plan, each Holder of an Other Secured Claim in Class 3 is considered to be in its own separate subclass within Class 3 (i.e., Class 3A, Class 3B, etc.), and each such subclass is deemed to be a separate Class for purposes of the Plan.

(b)     Treatment.  Except to the extent previously paid in full, to the extent any Other Secured Claims exist, at the option of the Debtors or the Liquidating Trust, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its Collateral until such Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such Collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or Liquidating Trust, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the Collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim.

(c)     Impairment and Voting. Class 3 is Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.4     Class 4—Unsecured Claims.

(a)     Classification.  Class 4 consists of all Unsecured Claims.  Class 4 includes the Prepetition Lenders Deficiency Claims.

(b)     Treatment.  Holders of Class 4 Claims shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims, which entitle the Beneficiaries thereof to a Pro Rata share of the GUC Fund and a Pro Rata Share of any net proceeds of the remaining Liquidating Trust Assets.  Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, except as may be expressly provided otherwise, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(c)      Impairment and Voting.  Class 4 is Impaired, and the Holders thereof are entitled to vote on the Plan.

10.5    Class 5—Intercompany Claims.

(a)      Classification.  Class 5 consists of all Intercompany Claims.

(b)      Treatment.  In full and final satisfaction of all Allowed Intercompany Claims, on the Effective Date, such Claims shall be, at the option of the Debtors or the Liquidating Trust, either reinstated, adjusted, converted to equity, otherwise set off, settled, distributed, or contributed, or canceled, released, or discharged without any distribution on account of such Claims.

(c)      Impairment and Voting.  Holders of Intercompany Claims are deemed to have rejected the Plan, and are not entitled to vote.

10.6    Class 6—Intercompany Interests.

(d)      Classification.  Class 6 consists of all Intercompany Interests.

(e)      Treatment.  In full and final satisfaction of the Allowed Intercompany Interests, on the Effective Date, all Allowed Intercompany Interests shall, at the option of the Debtors or the Liquidating Trust, either reinstated, set off, settled distributed, contributed, merged, diluted cancelled, released or otherwise addressed or eliminated and receive no distribution under the Plan.

(f)      Impairment and Voting.  Holders of Intercompany Claims are deemed to have rejected the Plan, and are not entitled to vote.

10.7    Class 7—Interests.

(a)      Classification.  Class 7 consists of all Interests other than Intercompany Interests.

(b)      Treatment.  There shall be no Distribution on account of Class 7 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist.

(c)      Impairment and Voting.  Holders of Interests are deemed to have rejected the Plan, and are not entitled to vote.

## SECTION 11
## DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS

11.1    Distribution Dates.

The Liquidating Trustee shall make Distributions to Holders of Claims.  Subject to the terms of the Plan and the Liquidating Trust Agreement, the Liquidating Trustee may, in the Liquidating Trustee's sole discretion, make a full or partial Pro Rata Distribution to the Holders

of Claims on the Initial Distribution Date or Subsequent Distribution Date(s), which dates shall be determined by the Liquidating Trustee.

### 11.2    Subsequent Distributions.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Liquidating Trustee for Distribution on any Subsequent Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any Distribution.

### 11.3    Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date.  The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.  In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Liquidating Trustee as of the Distribution Record Date.

### 11.4    Manner of Cash Payments Under the Plan or Liquidating Trust Agreement.

Cash payments made pursuant to the Plan or Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Liquidating Trustee or by wire transfer from a domestic bank, at the option of the Liquidating Trustee. Any and all Distributions and/or written communications pertaining to Distributions shall be made to Creditors or Beneficiaries at each Creditor or Beneficiary's respective address listed in the Claims Register, as reported pursuant Section 12.7, unless the Liquidating Trustee receives a written change of address form from a Creditor or Beneficiary consistent with the terms of the Plan or the Liquidating Trust Agreement, as applicable.

### 11.5    Time Bar to Cash Payments by Check.

Distribution checks issued to Creditors or Beneficiaries shall be null and void if not negotiated within **ninety (90) days** after the date of issuance thereof.  The Liquidating Trustee shall not reissue any check except upon directly receiving a request in writing from the Creditor or Beneficiary that was originally issued such check within **one-hundred and eighty (180) days** of the disbursement of the Distribution. If the 180-day period elapses without the Creditor requesting the check be reissued, the unresponsive holder's Distribution shall be deemed unclaimed property as provided in the Plan or the Liquidating Trust Agreement, as applicable.  The foregoing notwithstanding, **ninety (90) days** after the final Distribution under section 1194 of the Bankruptcy Code, the Liquidating Trustee shall stop payment on any check remaining unpaid, the corresponding Distribution shall be deemed unclaimed property, and all unclaimed property shall

be redistributed to Creditors or Beneficiaries or, as may be necessary, donated to a qualifying charity in accordance with the provisions of the Plan or the Liquidating Trust Agreement.

11.6    Liquidating Trust Assets Account.

Unless otherwise provided in the Confirmation Order, the Liquidating Trust Assets Account shall be invested by the Liquidating Trustee in a manner consistent with the objectives of Section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of discretion. The Liquidating Trustee shall have no obligation or liability to Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of any financial institution where such funds are held.

11.7    Tax Identification Numbers.

The Liquidating Trustee may require any Creditor or Beneficiary to furnish its taxpayer identification number as assigned by the Internal Revenue Service by submitting a Form W-8, Form W-9, or other form completed in writing to the Liquidating Trustee, and may condition any Distribution to any Creditor or Beneficiary upon receipt of such completed form. If a Creditor or Beneficiary does not timely provide the Liquidating Trustee with its taxpayer identification number in the manner and by the deadline established by the Liquidating Trustee—to be not less than **forty-five (45) days** from the service of the request to the Creditor or Beneficiary for its tax identification information—then the Liquidating Trustee may set aside the holder's Distribution for a period of **one-hundred-and-eighty (180) days** following service of the request. If the Creditor or Beneficiary of the Distribution set aside provides the information in the manner requested in the 180-day period, the Liquidating Trustee shall disburse the set aside Distribution, without interest, to the Creditor or Beneficiary. However, if the Creditor or Beneficiary fails to provide the requested information within the 180-day period, then the unresponsive Creditor's Distribution or Beneficiary's Distribution shall be irreversibly deemed "unclaimed property" and redistributed to the other Creditors or Beneficiaries in accordance with the provisions of the Plan or the Liquidating Trust Agreement, as applicable.

# SECTION 12
# PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND REDISTRIBUTIONS

12.1    No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.  Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

12.2    Resolution of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims.  The costs of pursuing the objections to Claims shall be borne by the Liquidating Trust.  From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to

the extent, the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the Claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

12.3    Authority to Object to, Settle, and Resolve Claims.

The Liquidating Trustee shall have sole authority to object to and compromise, settle, or otherwise resolve any Unsecured Claims, and may object to and compromise, settle, or otherwise resolve any Claims that are not Unsecured Claims.

12.4    Objection Deadline.

All objections to Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by order of the Bankruptcy Court.

12.5    Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtors, and (b) after the Effective Date, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trust has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdraw, or resolved by any mechanism of the Bankruptcy Court.

12.6    Disallowance of Claims.

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all proofs of claim filed after the Bar Date shall be treated as a Disputed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed; *provided however*, that such Claims' status as disputed shall not prohibit payment of such Claims after complete payment and satisfaction of all timely Allowed Unsecured Claims and payment of Liquidating Trust expenses.

On the Confirmation Date, any Claim that is scheduled by the Debtors in the Schedules as disputed or listed at zero and as to which no Proof of Claim has been timely filed (or deemed timely filed by Final Order entered by the Bankruptcy Court) shall be deemed a Disallowed Claim.

Any Claims held by Entities from which property is recoverable under Sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Liquidating Trust shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtors hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Debtors or Liquidating Trust.

12.7    Claims Register

At the Effective Date or as soon after as practicable, the Debtors' Claims Agent shall file a complete copy of the Claims Register into the docket of the Chapter 11 Cases.  After the Effective Date, the Liquidating Trustee shall be responsible for maintaining a register of Beneficiaries' interests in the Liquidating Trust which shall be commensurate with the Holders' Allowed Unsecured Claims as reported in the Claims Register. The Liquidating Trustee shall be entitled to initially rely on the Claims Register as reported in the Claim's Agent's filing on the Effective Date for all purposes as an accurate ledger of the status, amount, and class of all Unsecured Claims. The Liquidating Trustee may engage a claims agent (including the Debtors' Claims Agent) to continue to maintain and update the Claims Register throughout the administration of the Liquidating Trust, and such claims register may serve as the Liquidating Trustee's register of beneficial interests held by Beneficiaries.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Debtors or the Liquidating Trustee, as applicable, without an objection filed and without further notice to or action, order, or approval of the Bankruptcy Court.

12.8    Reserve Provisions for Disputed Claims.

Before making any Distribution, the Liquidating Trustee shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee (the "Disputed Claim Reserve").  On each Distribution date after the Effective Date in which the Liquidating Trustee makes Distributions to Holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata Share of such Distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee.

The Liquidating Trustee shall hold property in the Disputed Claim Reserve in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed.  Each Disputed Claim Reserve shall be closed and extinguished by the Liquidating Trustee when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan.  Upon closure of a Disputed Claim Reserve, all Cash or other property held in that Disputed Claim Reserve shall revest in and become

unrestricted property of the Liquidating Trust. All funds or other property that vest or revest in the Liquidating Trust pursuant to this paragraph shall be used to pay by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

Except as expressly set forth in the Plan, neither the Debtors nor the Liquidating Trustee shall have any duty to fund any Disputed Claim Reserve except from the Distributable Assets or the Liquidating Trust Assets, as applicable.

12.9   *De minimis* Distributions, Rounding.

Notwithstanding anything herein to the contrary, the Liquidating Trustee shall not be required to make: (i) partial Distributions or payments of fractions of dollars or (ii) a Distribution if the amount to be distributed is or has an economic value of less than one hundred dollars ($100). Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions.

12.10   Unclaimed and Undeliverable Distributions.

If any Distribution to a Creditor or Beneficiary is returned to the Liquidating Trustee as undeliverable or is unclaimed, no further Distributions to such Creditor or Beneficiary shall be made unless and until the Creditor or Beneficiary claims the missed Distribution by timely notifying the Liquidating Trustee in writing of its current address along with any other information necessary to make the Distribution to the Creditor or Beneficiary in accordance with this Plan, the Liquidating Trust Agreement, and applicable law. If the Creditor or Beneficiary provides the Liquidating Trustee with its current address and such other information necessary to make the Distribution within **one-hundred and eighty (180) days** of the original disbursement, the missed Distribution shall be made to the Creditor or Beneficiary as soon as is practicable, without interest. However, if any Distribution that is undeliverable or otherwise unclaimed is not claimed within **one-hundred-and-eighty (180) days** of the original disbursement, such Distribution shall be deemed "unclaimed property" under Bankruptcy Code section 347(b) and forfeited, and the forfeiter shall consequentially lose his status as a Creditor or Beneficiary of the Liquidating Trust. After the 180-day period to claim property has elapsed, the unclaimed property or interests in property shall revert to the Liquidating Trust for redistribution to Creditors or Beneficiaries or other disposition in accordance with the terms of the Plan and the Liquidating Trust Agreement; the Claim to such unclaimed property or interest in property shall be forever barred, expunged, and deemed Disallowed; and the holder of said claim deemed Disallowed shall be enjoined from receiving any Distributions under this Agreement and from asserting such Disallowed Claim against the Liquidating Trustee.

The Liquidating Trustee may, in the Liquidating Trustee's sole discretion, attempt to determine a Creditor's or Beneficiary's current address or otherwise locate a Creditor or Beneficiary, but nothing in this Plan or the Liquidating Trustee Agreement shall require the Liquidating Trustee to do so.

12.11   Books and Records and Vesting of Privileges.

The Debtors shall transfer complete electronic copies of their books and records, including, without limitation, those books and records relating to the Liquidating Trust Assets, subject to

appropriate restrictions on privileged matters, regardless of original form, manner or media, to the Liquidating Trustee on the Effective Date, in a form accessible and viewable by the Liquidating Trustee. The Debtors shall provide any and all digital account information, including passwords, necessary for the Liquidating Trustee to access the Debtors' books and records. Upon and after such transfer, the Debtors may destroy and/or otherwise discard and dispose of their books and records, unless the Liquidating Trustee requests the Debtors to retain and transfer to the Liquidating Trustee such records as soon as reasonably practicable after the Effective Date. The Liquidating Trustee shall preserve all such books and records until the earlier of (i) such time as the Liquidating Trustee determines that such records are no longer required to be preserved or (ii) the termination of the Liquidation Trust; *provided that* in the case of the preceding clause (i), the Liquidating Trustee shall file a notice of his, her or its intention to destroy and discard the relevant records and serve said notice on the U.S. Trustee and any other parties requesting notice of filings in the Chapter 11 Cases under Bankruptcy Rule 2002; in the event that any party objects within 14 days of service, the objection shall be heard on an expedited basis and adjudicated by the Bankruptcy Court; in the event no objection is timely filed, the Liquidating Trustee may proceed with the document disposal. The collection and preservation of such records by the Liquidating Trustee shall be at the expense of the Liquidation Trust.

For the avoidance of doubt, as provided in Section 14.6, on the Effective Date, the attorney-client privilege, the attorney work product doctrine and any similar privilege against disclosure, and all other similar immunities (all together, "Privileges") belonging to the Debtors or the Estates that concern or in any way relate to any of the Liquidating Trust Assets, or that would apply to communications, documents, or records recorded in magnetic, optical, or other form of electronic medium concerning or in any way relating to any Liquidating Trust Assets, shall vest in the Liquidating Trust. The Liquidating Trustee shall have the sole right to waive Privileges that concern or in any way relate to any of the Liquidating Trust Assets or that would apply to communications, documents, or electronic records concerning or in any way relating to any Liquidating Trust Assets.

## SECTION 13
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

13.1    Rejection.

Except with respect to: (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, and (ii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject, pursuant to Section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided however,* that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, managers and directors, and/or the Liquidating Trust. Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The

non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtors nor the Liquidating Trust shall bear any liability for costs associated with such matters.

### 13.2   Rejection Claims.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Unsecured Claims.

### 13.3   Insurance Policies.

Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Insurance Policies. To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtors hold or may hold against any Entity, the Debtors shall, to the extent permissible under each Insurance Policy, assign all rights thereunder with respect to such Causes of Action to the Liquidating Trustee. All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Liquidating Trustee shall be treated as proceeds of such Causes of Action for all purposes under the Plan. The Debtors shall take no action to or otherwise impair the Insurance Policies. Nothing herein shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtors or any other Entity.

## SECTION 14
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 14.1   Global Settlement of Claims.

Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan and the Settlement Term Sheet.

### 14.2   Establishment and Administration of Liquidating Trust Assets Account; GUC Fund.

On or as soon as reasonably practicable following the Effective Date, the Liquidating Trust shall open the Liquidating Trust Assets Account, the Liquidating Trust Expense Reserve, the Professional Fee Escrow, and the Administrative/Priority/Other Distributions Reserve, and fund said accounts or reserves with Available Cash on the Effective Date, as well as in the case of the Liquidating Trust Assets Account, the GUC Fund, all of which accounts and reserves shall

constitute Liquidating Trust Assets. Notwithstanding the foregoing, the Liquidation Trustee, in its discretion, may step in and use any of Debtors' current accounts for purposes of the Plan. Thereafter, from time to time, upon receipt of any other Liquidation Proceeds or any Causes of Action recoveries, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and they shall become part of the Liquidating Trust Assets. The Liquidating Trust Assets shall be used by the Liquidating Trust to fund distributions to Creditors (including holders of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims and Unsecured Claims) and other payments to be made pursuant to or otherwise consistent with the Plan.

The GUC Fund may be used by the Liquidating Trustee to make distributions to Holders of Allowed Class 4 Claims, excluding any unsecured deficiency claims in Class 4 (including, without limitation, the Prepetition Lenders Deficiency Claim), in accordance with the Plan and Liquidating Trust Agreement. The GUC Fund also may be used by the Liquidating Trustee to fund the administration of the Liquidating Trust pursuant to the Plan and Liquidating Trust Agreement, including payment of Liquidating Trust Expenses if and to the extent insufficient funds exist in the Liquidating Trust Expense Reserve.

14.3    Dissolution of Debtors; Corporate Action by Debtors.

On the Effective Date, the matters under the Plan involving or requiring any corporate actions of the Debtors, including but not limited to actions requiring a vote or other approval of the board of directors, managers, members, partners, or other equity holders of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the managers, members, directors, or officers of the Debtors.

From and after the Effective Date, (i) the Debtors, for all purposes, shall be deemed to have withdrawn their business operations from any states in which they were previously conducting or are registered or licensed to conduct business operations, and the Debtors shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtors shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

From and after the Effective Date, the Liquidating Trustee may immediately or subsequently dissolve all or some of the Debtors, without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, members, partners, equity holders, and/or any other parties; provided, however, the Liquidating Trustee in his or her discretion shall be authorized to take any and all actions necessary or desirable in relation to dissolution of the Debtors.

14.4    Limited Substantive Consolidation.

Under the Plan, there shall be limited substantive consolidation of the Debtors' Estates solely for the purposes of voting on the Plan by the Holders of Claims and making Distributions to Holders of Claims. Specifically, on the Effective Date, (i) all assets and liabilities of the Debtors

will, solely for voting and Distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims filed or to be filed in the Chapter 11 Cases will be deemed single Claims against all of the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims entitled to Distributions under the Plan shall be entitled to their share of assets available for Distribution to such Claim without regard to which Debtor was originally liable for such Claim.  Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Disclosure Statement and Plan) affect the legal and corporate structures of the Debtors.

The Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases for distribution and voting purposes as provided above.  Unless an objection to substantive consolidation is made in writing by any Creditor or Interest holder affected by the Plan on or before the applicable objection deadline set by the Court, an order substantively consolidating the Chapter 11 Cases for distribution and voting purposes (which order may be the Confirmation Order) may be entered by the Bankruptcy Court.

Notwithstanding the limited substantive consolidation herein, substantive consolidation shall not affect the obligation of each and every one of the Debtors under 28 U.S.C. § 1930(a)(6) until a particular case is closed, converted, or dismissed.

14.5    Appointment of the Liquidating Trustee.

The identity of the Liquidating Trustee, who shall be selected by the Debtors, and reasonably acceptable to the Prepetition Lenders, will be disclosed in the Plan Supplement.  From and after the Effective Date, professionals may be retained by the Liquidating Trustee as set forth in the Liquidating Trust Agreement, without further need for documentation or Bankruptcy Court approval.  All fees and expenses incurred by the professionals retained by the Liquidating Trustee following the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Assets (after payment in full of all Allowed Administrative Claims) in accordance with the Liquidating Trust Agreement.

14.6    The Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (a) administering the Liquidating Trust Assets, (b) prosecuting and/or resolving all Disputed Unsecured Claims, (c) investigating and pursuing any Causes of Action that constitute Liquidating Trust Assets, and (d) making all Distributions to the Beneficiaries provided for under the Plan.  The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Accordingly, the Liquidating Trustee shall, in an orderly manner, liquidate and convert to Cash the Liquidating

Trust Assets, and make timely Distributions to the Beneficiaries, and not unduly prolong the duration of the Liquidating Trust.  Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust.  The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief.  The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Unsecured Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust.  The Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets.  For the avoidance of doubt, after they vest in the Liquidating Trust, the Debtors shall have no interest in or control over the Liquidation Trust Assets or any distributions therefrom to Beneficiaries.

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the Beneficiaries) for all federal income tax purposes.

14.7    <u>Rights and Powers of the Liquidating Trustee.</u>

The Liquidating Trustee shall be deemed the Estates' representative with respect to the Liquidating Trust Assets in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Liquidating Trust.  Without limiting the foregoing, the Liquidating Trustee will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtors hold or may hold against any Entity that constitute Liquidating Trust Assets; (4) make all Distributions to Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement; (5) administer the Liquidating Trust and pursue Causes of Action that constitute Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement; (6) establish and administer any necessary reserves for Disputed Unsecured Claims that may be required; (7) object to Disputed Unsecured Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (8) assert or waive

any attorney-client privilege on behalf of the Debtors and Estates with regard to the Liquidating Trust Assets; and (9) employ and compensate professionals and other agents, including, without limitation, Professionals previously employed by the Debtors or the Committee, in accordance with the Liquidating Trust Agreement or the Plan, *provided however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

Any abatement, interruption, or tolling of the statutes of limitation pertaining to the Liquidating Trust Assets in favor of the Debtors or the Estates shall also apply to the benefit of the Liquidating Trustee; for the avoidance of doubt, the Liquidating Trustee shall be construed to be a "trustee" for purposes of 11 U.S.C. § 108.

14.8    Fees and Expenses of the Liquidating Trust.

Subject to payment in full of all Allowed Administrative Claims, and except as otherwise ordered by the Bankruptcy Court, Liquidating Trust Expenses incurred on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

14.9    Transfer of Beneficial Interests in the Liquidating Trust.

Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Interests occurring after the Distribution Record Date.

14.10    Litigation.

Except as otherwise provided herein and except as to Causes of Action assigned to third parties prior to the Effective Date, all Litigation is retained, vested in the Liquidating Trustee and preserved pursuant to Section 1123(b) of the Bankruptcy Code. From and after the Effective Date, all Litigation will be prosecuted or settled by the Liquidating Trustee in accordance with the terms of the Plan and the Liquidating Trust Agreement, as applicable. To the extent any Litigation is already pending on the Effective Date, the Liquidating Trustee, as successor to the Debtors or the Committee (in any derivative capacity or as an intervening party), may in the Liquidating Trustee's discretion continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtors or the Committee pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter.

14.11    Dissolution of the Committee.

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee

after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date.  Nothing in the Plan shall prohibit or limit the ability of the Debtors' or Committee's Professionals to represent the Liquidating Trustee or to be compensated or reimbursed per the Plan and the Liquidating Trust Agreement in connection with such representation.

14.12   Termination After Five Years and Extension.

If on the fifth anniversary of the Effective Date the Liquidating Trust has not been previously terminated in accordance with the terms of the Liquidating Trust Agreement because all Liquidating Trust expenses have not been paid and/or all Liquidating Trust Assets have not been distributed, then the Liquidating Trustee shall immediately distribute all Liquidating Trust Assets to the Beneficiaries in accordance with this Plan; immediately thereafter, the Liquidating Trust shall terminate and the Liquidating Trustee shall have no further responsibility in connection therewith except as otherwise set forth in the Liquidating Trust Agreement.

Notwithstanding the foregoing, within 30 days of the expiration of the five-year period, the Liquidating Trustee may file a motion with the Bankruptcy Court requesting an extension of the term of the Liquidating Trust. An extension shall only be granted if the Bankruptcy Court determines that: (i) an extension is necessary to facilitate or complete the recovery on Liquidating Trust Assets and (ii) further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes. For purposes of this Section, a favorable letter ruling from the Internal Revenue Service shall be conclusive proof that further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes.

**SECTION 15**
**EFFECT OF CONFIRMATION**

15.1   Binding Effect of the Plan.

The provisions of the confirmed Plan shall bind the Debtors, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan.  The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code Section 1146(a).

15.2   Vesting of Liquidating Trust Assets in the Liquidating Trust.

Upon the Effective Date, title to all Liquidating Trust Assets shall vest in the Liquidating Trust and shall be retained by the Liquidating Trust for the purposes contemplated under the Plan pursuant to the Liquidating Trust Agreement.  Without limiting the generality of the foregoing, all

Causes of Action the Debtors hold or may hold against any Entity that constitute Liquidating Trust Assets, Litigation Recoveries that constitute Liquidating Trust Assets, rights to Liquidation Proceeds that constitute Liquidating Trust Assets, and all resulting proceeds of the foregoing shall vest in the Liquidating Trust upon the Effective Date and shall no longer constitute property of the Estates.

### 15.3    Property Free and Clear.

Except as otherwise provided in the Plan (including, without limitation, Section 10.2 relating to the Prepetition Lenders Secured Claims) or the Confirmation Order, all property that shall vest in the Liquidating Trust shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances of Creditors or Interest Holders.  Following the Effective Date, the Liquidating Trustee may transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

### SECTION 16
### EXCULPATIONS, INJUNCTIONS, AND RELEASES

### 16.1    Exculpation.

The Debtors, the Debtors' Related Persons that served during the Chapter 11 Cases (including, without limitation, Huron), the Committee and its attorneys, advisors and other professionals and the members of the Committee, each solely in their capacities as such (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not exculpate any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided however,* that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability.  Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.

### 16.2    Releases.

(a)    Debtor Related Releases.

1.    Debtor/Estate Release of Released Parties.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after and**

subject to the occurrence of the Effective Date, the Debtors and the Estates (collectively, the "**Debtor/Estate Releasors**") shall release (the "**Debtor/Estate Release**") each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' business(es) or assets, the Debtors' pre and postpetition liquidation, sale, alternative transaction, transition, and operational efforts, the transition or termination of any prepetition contracts and related matters, the Transition Related Activities, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence; *provided however*, the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.

2.    Third Party Release.

On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, each Claimant (collectively, the "**Releasing Parties**") who (i) is not Impaired under the Plan or (ii) affirmatively votes to accept the Plan and who does not elect to "opt-out" by marking the appropriate box on such Releasing Party's respective Ballot or opt-out form, for themselves and their respective successors, assigns, transferees, and such Claimants' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), shall release (the "**Third Party Release**") each Released Party, and each of the Debtors, the

67

Estates, and the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' liquidation, the Transition Activities, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence; *provided however*, the foregoing Third Party Release shall not release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.

      16.3   <u>Injunction.</u>

      **In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, or the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Liquidating Trust under the Plan.**

      16.4   <u>Post-Confirmation Liability of Liquidating Trustee.</u>

The Liquidating Trustee, together with its consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties"), shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent, fraudulent, or which constitute willful misconduct (in each case, liability shall be subject to determination by final order of a court of competent jurisdiction). However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, fraud, or willful misconduct. In addition, the Liquidating Trust and the Estates shall, as applicable and to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust and the Estates or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Trust and the Estates. To the extent the Liquidating Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses. All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

16.5    Preservation of Rights of Action.

(a)    Vesting of Causes of Action.

Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors hold or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust.

Except as otherwise provided in the Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Debtors hold or may hold against any Entity, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as applicable, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.

Liquidating Trust Assets and recoveries therefrom shall remain the sole property of the Liquidating Trust for the ratable benefit of the Beneficiaries of the Liquidating Trust, and holders of Unsecured Claims shall have no direct right or interest in to any such Liquidating Trust Assets or recovery therefrom.

(b)    Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such retained Cause of Action for later adjudication by the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtors may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order).  In addition, the Debtors and the Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtors are defendants or interested parties against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtors or a transfer of money or property of the Debtors, or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtors have identified any potential claim or Cause of Action against such Entity herein or in the Disclosure Statement.

16.6     No Discharge.

Nothing contained in the Combined Plan and Disclosure Statement shall be deemed to constitute a discharge of the Debtors under Bankruptcy Code section 1141(d)(3).

## SECTION 17
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

17.1     Conditions to Confirmation of the Plan.

Confirmation of the Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors: (i) the Bankruptcy Court shall have approved this Combined Disclosure Statement and Plan in form and substance

acceptable to the Debtors; (ii) the Debtors shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan) Allowed Administrative Claims, Non-Tax Priority Claims, Priority Tax Claims, and, if applicable, Other Secured Claims; (iii) the Debtors and the Liquidation Trustee believe that the funding of the Liquidating Trust as of the Effective Date (including the funding of the GUC Fund) is sufficient to pay for anticipated or projected Liquidating Trust Expenses; and (iv) the Confirmation Order to be presented to the Bankruptcy Court at the Confirmation Hearing shall be acceptable to the Debtors.

17.2    Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors: (i) a Confirmation Order in form and substance acceptable to the Debtors shall have been entered by the Bankruptcy Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the Liquidating Trust shall have been created pursuant to the terms of the Plan, the Liquidating Trustee shall have been appointed by order of the Bankruptcy Court (which may be the Confirmation Order), and the Liquidating Trust Agreement shall have been executed by the Liquidating Trustee; (iii) the GUC Fund, the Liquidating Trust Expense Reserve, the Professional Fee Escrow and the Administrative/Priority/Other Distributions Reserve shall have been fully funded and released to the Liquidating Trustee upon the Effective Date; and (iv) all other actions and documents determined by the Debtors to be necessary to implement the Plan shall have been effected and executed.

17.3    Waiver of Conditions Precedent.

To the fullest extent permitted by law, the conditions to the Effective Date set forth in Section 17.2 may be waived or modified in whole or in part at any time in writing by the Debtors without leave from or an order of the Court.

**SECTION 18**
**RETENTION OF JURISDICTION**

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

(a)    To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, or any controversy as to the classification of a Claim in a particular Class under the Plan;

(b)    To administer the Plan, the Liquidating Trust, the Liquidating Trust Assets and the proceeds thereof;

(c)    To estimate or liquidate any Disputed Claims;

(d)    To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in

connection with the Litigation; *provided however*, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

(e)     To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

(f)     To hear and determine any and all applications by Professionals for an award of on account of any Professional Fee Claims;

(g)     To enable the Liquidating Trustee, as applicable, to commence and prosecute any Litigation which may be brought after the Effective Date;

(h)     To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document, or instrument contemplated by the Plan;

(i)     To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

(j)     To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(k)     To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(l)     To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding pursuant or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable; and

(m)     To close the Chapter 11 Cases when the administration of the Chapter 11 Cases has been completed.

## SECTION 19
## MISCELLANEOUS PROVISIONS

19.1     <u>Payment of Statutory Fees / Closing of Chapter 11 Cases.</u>

All fees due and payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or as soon as practicable thereafter, by the Debtors or the Liquidating Trustee.  Quarterly fees owed to the U.S. Trustee following the Effective Date shall be paid when due, if and to the extent payable in accordance with applicable law, and the Liquidating Trustee shall continue to file reports to show the calculation of such fees (if any) based on distributions made by the Liquidating Trust until the Chapter 11 Cases are closed (whether singly or in combination with other Debtors' Chapter 11 Cases) under section 350 of the

Bankruptcy Code. For the avoidance of doubt, in the Liquidating Trustee's discretion, the Liquidating Trustee may request the Court at any particular time to close one specific Chapter 11 Case, more than one at a time, or all of the Chapter 11 Cases other than one Debtor's Chapter 11 Case. The Liquidating Trustee may seek to close the Chapter 11 Cases, in his, her or its discretion, on motion to the Bankruptcy Court.

19.2    Revocation of the Combined Plan and Disclosure Statement.

The Debtors reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement at any time on or before the Confirmation Date. If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

19.3    Severability of Plan Provisions.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

19.4    Exhibits.

All exhibits attached to the Combined Plan and Disclosure Statement and the Plan Supplement are, by this reference, hereby incorporated herein. The Debtors reserve the right to make non-substantive changes and corrections to such Exhibits in advance of the Confirmation Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

19.5    Notices.

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

Counsel for Debtor and Reorganized Debtor:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor

P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel. 302-652-4100, Fax 302-652-4400
Attn: Laura Davis Jones, Esq.
ljones@pszjlaw.com

Liquidating Trustee:

[To be determined at later date.]

19.6    Reservation of Rights.

Neither the filing of the Combined Plan and Disclosure Statement nor any statement or provision contained in the Combined Plan and Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Combined Plan and Disclosure Statement nor any statement contained in the Combined Plan and Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

19.7    Defects, Omissions and Amendments.

The Debtors may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan. The Plan may be altered or amended before or after Confirmation as provided in Section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with Section 1125 of the Bankruptcy Code. With the prior written consent of the Prepetition Lenders, the Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the Plan, as modified, complies with Bankruptcy Code Sections 1122 and 1123, the Debtors have complied with Bankruptcy Code Section 1125 and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under Bankruptcy Code Section 1129.

19.8    Filing of Additional Documents.

The Debtors shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

19.9    Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

19.10    Setoffs and Recoupments.

The Liquidating Trust may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtors, the Liquidating Trust, or the Estates, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Liquidating Trust, or the Estates, against such Holder.

19.11    Tax Exemption.

Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an  instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

19.12    Securities Exemption.

To the extent the Liquidating Trust Interests are deemed or asserted to constitute securities, the Liquidating Trust Interests and the issuance and distribution thereof shall be exempt from Section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, Section 1145 of the Bankruptcy Code.

19.13    Implementation.

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

19.14    Record Date.

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be the voting record date established by the Bankruptcy Court in the order conditionally approving the Disclosure Statement or such other date as the Bankruptcy Court may set.

19.15   Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of directors, members, managers or other Interest Holders of the Debtor under the Plan, including, without limitation, (i) the Distribution of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without any requirement of further action by the directors, members, managers or other Interest Holders of the Debtors, irrespective of whether the Confirmation Order specifically authorizes any such action.

Effective upon the Effective Date, the Debtors' formation documents shall be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under Section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Debtors and the Liquidating Trust shall be authorized to cancel, annul, and extinguish all Interests.

19.16   Substantial Consummation.

On the Effective Date, the Plan shall be deemed substantially consummated under Bankruptcy Code Sections 1101 and 1127(b).

19.17   Waiver of Fourteen-Day Stay.

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

19.18   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

19.19   Entire Agreement.

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## SECTION 20
## RECOMMENDATION

The Debtors strongly recommend that all creditors receiving a Ballot vote in favor of the Plan. The Debtors believe that the Plan is in the best interests of creditors. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

**FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. EASTERN TIME ON _____, 2023.**

Dated: September 18, 2023       Respectfully submitted,

AMERICAN PHYSICIAN PARTNERS, LLC
AND ITS DEBTOR AFFILIATES

*/s/*_____
John C. DiDonato
Chief Restructuring Officer