**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| AMERICAN PHYSICIAN PARTNERS, LLC, *et al.*,[1] | Case No. 23-11469 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, John C. DiDonato, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") of American Physician Partners, LLC ("APP"), the lead Debtor in the above-captioned chapter 11 cases (together with its debtor affiliates, the "Debtors" or the "Company"). As discussed further below, APP is either the ultimate parent of the other Debtors or otherwise directly or indirectly (through other Debtors) manages the business and operations of the other Debtors.

2.      I am a Managing Director of Huron Consulting Services LLC ("Huron"), a consulting firm that specializes in, among other things, restructuring, operational, and financial consulting, and interim management to financially troubled companies. I have more than 30 years of experience counseling companies through operational transformations, capital raising, buy and sell side advisories, and merger integrations, primarily in special situations serving as a lead advisor in both out-of-court and court-supervised situations. I have served more than 100 debtors,

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/AmericanPhysicianPartners. The location of American Physician Partners, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 5121 Maryland Way Suite 300, Brentwood, TN 37027.

functioning for many as a chief restructuring strategist.  My expertise encompasses a wide range of industries, including healthcare physician management, logistics, distribution, transportation, automotive suppliers, aerospace suppliers, engineering and construction, metals, equipment leasing, and retail.

3.      I became APP's CRO in mid-September 2022.  In such capacity, I am familiar with the Debtors' businesses, financial affairs, and day-to-day operations.

4.      On the date hereof (the "Petition Date"), the Debtors each commenced a case (together, the "Chapter 11 Cases") by filing a petition for relief under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      I submit this Declaration to provide an overview of the Debtors' business and the Chapter 11 Cases and support for the Debtors' "first day" applications and motions (collectively, the "First Day Pleadings").  I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors.

6.      Except as otherwise noted, I have personal knowledge of the matters set forth herein.  All facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and the Huron's CRO team including James Nugent, APP's interim Chief Executive Officer and Deputy CRO, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition.  In making the Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in

preparing the Declaration. If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

7.      Founded in 2015, the Debtors were one of the fastest growing, scaled emergency department ("ED") and hospitalist management platforms in the U.S. Headquartered in Brentwood, Tennessee, prior to the Transition Related Activities (defined and discussed below), the Company had management and related contracts with more than 100 hospitals (including freestanding emergency departments) and other sites in fifteen states primarily in the southeastern, midwestern and southwestern United States, utilizing over 2,500 physicians who served over 4 million patients each year. The physicians and other medical providers who the Company worked with typically delivered care in settings with the most acute and life-changing needs – emergency rooms (ED). The ED outsourcing market has evolved over time to become a widely accepted practice: approximately 70% of the $17 billion ED market is outsourced.

8.      Prepetition, before the Transition Related Activities, APP had a long history of strength, growth, and stability. Particularly during 2016 through early 2020, the Company experienced significant organic growth reflective of the success of the Debtors' differentiated model, with a focus on collaborative management, high quality, and low cost and which bifurcated local and regional operational and clinical roles, to ensure the Company was not just a "staffing" company. The COVID-19 pandemic (commencing in early 2020) produced significant industry challenges and placed significant pressure on the Company's operations and liquidity.

9.      In this difficult setting, in 2022 and onward, the Debtors (advised by Jefferies Investment Banking) sought over a protracted period a replacement financing and restructuring events with Goldman Sachs Specialty Lending Group, L.P., the Prepetition Agent for the

Prepetition Lenders (each capitalized term is defined below) that were ultimately unsuccessful. Credit agreement amendments and forbearances were agreed to by the parties, and a restructuring support agreement and a restructuring term sheet were executed by the Debtors, the Prepetition Agent, and certain Prepetition Lenders.  However, as discussed below, the parties were unable to reach any consensual resolution, and the Debtors were forced to explore alternative strategies, including a potential sale of substantially all the Debtors' service contracts and other assets.  Such efforts by the Debtors proved to be unsuccessful, with the Debtors unable to come to agreement with any potential buyer in the prepetition period, despite extensive negotiations.  As is described in greater detail below, prior to the Transition Related Activities (primarily in July 2023), the Debtors engaged in extensive negotiations with both a stalking horse buyer for, among other things, a material portion of the Debtors' contracts, as well as a proposed debtor-in-possession lender.  Both of those negotiations failed to result in a transaction, leading to the implementation of the Transition Related Activities.

10.     Thus, in July 2023, the Company made the difficult decision to begin transitioning substantially all of its service contracts to alternative service providers (competitors) and its healthcare/hospital partners (customers), to avoid any interruptions in its critical life-saving service to the patients.  Specifically, as described in greater detail below, the Company worked to facilitate, and was successful in facilitating, the orderly transitions of approximately 150 emergency department and hospital medicine contracts to alternative service providers and its health system/hospital partners who provided insourced solutions by the end of July 2023 (the "Transition Related Activities").  This successful strategy also resulted in the Debtors being relieved of in excess tens of millions of dollars in obligations, as described below.  Through this process, the Company's priority was to minimize disruption for its health system/hospital and provider partners

and create as seamless a hand off as possible for stakeholders with a goal of ensuring that patients received continuity of high-quality care.

11.    After successfully transitioning all its medical service contracts without interruption, the Debtors have commenced these bankruptcy cases to facilitate and complete the wind-down process and liquidate their remaining assets in an orderly fashion.  As discussed further below and in the First Day Pleadings, because of the nature of the Debtors' business and its role in the United States' healthcare system, the relief sought by the Debtors is integral and necessary for the Company to preserve and maximize the value of the estates' assets to ensure key stakeholders are treated equitably.

12.    To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these Chapter 11 Cases, this Declaration is organized in three sections. The first section provides background information with respect to the Debtors' businesses and corporate history, as well as their prepetition capital structure. The second section describes the circumstances surrounding the commencement of these Chapter 11 Cases. The last section sets forth the relevant facts in support of each of the First Day Pleadings.

## GENERAL BACKGROUND

### I.    Debtors' Business and Operations

13.    Founded in 2015, through the merger of Tennessee-based healthcare companies Align MD and Elite Emergency Physicians, the Company was a premier provider of a full range of management and staffing services for hospital emergency departments and hospitalist programs across the nation.  Prior to the Transition Related Activities, the Company had a large, diverse footprint of approximately 150 contracts across 15 states (Alabama, Arizona, Florida, Illinois, Indiana, Kentucky, Michigan, Mississippi, Missouri, New Mexico, Nevada, Oklahoma, South

Carolina, Tennessee, and Texas).[2]  The Company's senior management team had developed (i) a highly successful growth strategy through new contract wins and tuck-in acquisitions, (ii) the dyad leadership model, separating the relationship management functions between operational and clinical domain experts, and (iii) cost optimization initiatives that drove increased profitability while maintaining industry-leading level of quality.  Throughout its history, the Company had strategically aligned with high quality health systems in attractive markets to support strong organic growth. Centralized shared services functions supported hospital partners operationally, enabling providers and local and regional leadership to focus on patient outcomes.

| 15 States | 100+ Sites | 2,500+ Physicians |
| --- | --- | --- |



| ◦ ~150 Contracts | ◦ ~ 130 Organic contracts won since 2015 |
| --- | --- |
| ◦ 4M+ Patient Visits | ◦ 96% Physician Retention |
| ◦ 95%+ Client Retention | ◦ <1% Locum tenen utilization |

14.    The Debtors' business was comprised of two service lines: (1) Emergency Department, which included emergency department, freestanding emergency department and emergency department management staffing services, and (2) Hospital Management ("HM"),

---

[2] The graphic and related statistics and information below represent the Company and its operations prior to the Transaction Related Activities (discussed herein) undertaken in July 2023.

which included hospital management, intensive care unit and observation staffing services (APP provided these services to a select group of ED customers).

15.    Revenues of the Company were derived from providing emergency department and hospitalist management and staffing services under contractual agreements, which provided for compensation under two models – (a) fee for service ("FFS") revenue or AR (patient receivables) contracts, or (b) management contracts.  During 2020-2022, most of the Company's revenue was attributable to agreements with emergency departments under the FFS model.  With respect to the FFS model, the form and extent of services provided varied by contract.  Generally, the Company provided the staffing and management services and was responsible for coding, billing, and collecting the fees billed for services from either Medicaid, Medicare, Blue Cross Blue Shield, commercial payors, insurance companies and/or the patient or a combination thereof.  In certain contracts, APP was also compensated through stipend subsidies from the hospital; the existence and amounts of stipends was dependent upon the payor mix and reimbursement rates available to the hospital and APP in the markets they served.  As discussed below, prepetition, prior to the Transition Related Activities, the Debtors contracted with and utilized a non-affiliate service provider – R1 (defined below) – to administer and process the coding, billing, and collections activity for arrangements under the AR contracts model.  With respect to the Debtors' management contracts, typically, the Company provided staffing and management services (directing the daily functions assigned to APP) and was responsible for billing, collections, and paying the costs of staffing and other items (typically with the managed company's deposits).  The applicable hospital was billed for these costs plus additional fees for management and director and leadership fees.

16.    The Debtors' annual revenues had increased each year (on a consolidated basis): 2019 - $438 million; 2020 - $563 million; 2021 - $640 million; and 2022 - $645 million.  However,

the Debtors consistently suffered operating losses: 2019 - $148 million net loss; 2020 - $139 million net loss; 2021 - $101 million net loss; and 2022 - $140 million net loss (unaudited).

17.     Prior to the July 2023 Transition Related Activities, the Debtors employed approximately 2,546 individuals in 29 states across the United States.  As of the Petition Date, the Debtors had reduced their workforce to 27 individuals who are employed, with a few exceptions, at the Debtors' headquarters providing support for the continuing wind-down of the Debtors' operations.  No employees are party to collective bargaining agreements or other similar labor agreements, and no employees are members of labor unions.

18.     The Company sponsors a "top hat", non-qualified, deferred compensation plan: American Physician Partners, LLC Nonqualified Deferred Compensation Plan (effective as of November 1, 2018) (the "DCP") for select management or "highly compensated employees" (under applicable IRS rules).  The DCP holds funds and other financial assets having an aggregate vested balance of approximately $3.7 million as of August 31. 2023. Title to such assets is held by the Company in a "rabbi trust."  The Debtors anticipate shortly filing a motion relating to the DCP assets.

II.     **Corporate Growth and Significant Prepetition Transactions**

19.     In 2016, a recapitalization transaction occurred that private equity investor Brown Brothers Harriman Capital Partners ("BBH") sponsored, a result of which, among other things, BBH became a majority owner of APP, ultimately providing the business with secondary or junior capital totaling approximately $105.0 million.

20.     From 2016 to 2020, the Company completed nine substantial physician practice acquisitions during a time of significant acquisitions and consolidation in the ED services market segment: (i) the Company's 2016 acquisition of the DeGarA group, with locations in Michigan;

(ii) the 2017 acquisition of Volunteer Medical Group, with locations in Tennessee; (iii) the 2018 acquisition of Northeast Tennessee Emergency Physicians, with locations in Tennessee and Virginia; (iv) the 2018 acquisition of Kalamazoo Emergency Associates, with locations in Michigan; (v) the 2018 acquisition of Progressive Medical Associates, with locations in Arizona; (vi) the 2019 acquisition of EmergiGroup Physician Associates LP, with numerous locations in Texas; (vii) the 2019 acquisition of Capital Emergency Physicians, with locations in Mississippi; (viii) the 2019 acquisition of Longview Emergency Medical Associates, with locations in Texas; and (ix) the 2019 acquisition of True Partners Emergency Physicians, LLC, with locations in Florida, Texas, Oklahoma, and Missouri.

21.     During 2016 to 2020, the Company won more than 90 new contracts organically; expanded its footprint to 15 states; invested in corporate infrastructure and technology; and drove the business to be the leading provider of low-cost, high quality ED management services to hospitals in the U.S.  Annual revenue grew from $41 million in 2015 to $645 million in 2022.

**III.**     **Debtors' Organizational Structure**

22.     American Physician Partners, LLC (APP), a Delaware limited liability company, is either the ultimate parent of the other Debtors or otherwise directly or indirectly (through other Debtors) manages the business and operations of the other Debtors.  All the common equity units of APP are held by non-Debtor APP Holdco, LLC; preferred equity units are held by CPV APP Blocker, Inc and BBH.   A chart detailing the Debtors' organizational structure is attached hereto as **Exhibit A**.

23.     As reflected on **Exhibit A**, certain of the Debtors are owned by physicians who are not Debtors.  The Debtors operated nationwide and were subject to various state laws regulating entities that administratively support medical providers or practice medicine or both.  To comply

with such laws, the Debtors utilized a structure pursuant to which the Debtors contracted with and provided a variety of management and administrative services to professional entities ("Professional Entities") that are owned exclusively by licensed physicians in accordance with applicable requirements.  These Professional Entities as listed on **Exhibit A** are Debtors in these cases (the "Debtor Professional Entities").  By this structure, and pursuant to separate management agreements, generally APP or another Debtor higher in the Debtors' corporate structure manages the non-clinical business operations of the Debtor Professional Entities, allowing the applicable physicians to focus on providing high-quality medical services to patients.[3]

## IV.    Debtors' Debt Structure

### A.    Secured Debt

24.    The Debtors are party to that certain Amended and Restated Credit and Guaranty Agreement dated as of December 21, 2016 (as the same has been amended, restated, supplemented or modified from time to time, the "Prepetition Credit Agreement")[4] and collectively with any

---

[3] The Debtor Professional Entities are "affiliates" of APP under Bankruptcy Code section 101(2)(C) (affiliates include a "person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor").

[4] As amended by that certain First Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of May 17, 2017, that certain Second Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of August 15, 2017, that certain Third Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of September 8, 2017, that certain Fourth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of January 29, 2018, that certain Fifth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of March 9, 2018, that certain Letter Amendment and Consent, dated as of June 29, 2018, that certain Sixth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of November 13, 2018, that certain Seventh Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of January 7, 2019, that certain Letter Amendment and Consent, dated as of February 15, 2019, that certain Letter Amendment and Consent, dated as of June 18, 2019, that certain Letter Amendment, dated as of July 16, 2019, that certain Eighth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of October 25, 2019, that certain Ninth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of April 14, 2020, that certain Tenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of June 2, 2021, that certain Letter Amendment, dated as of October 20, 2021, that certain Eleventh Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of December 20, 2021, that certain Twelfth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of February 21, 2022, that certain Thirteenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of March 31, 2022, that certain Fourteenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of April 8, 2022, that certain Fifteenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of June 21, 2022, that certain Forbearance Agreement and

other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents"), by and among APP Holdco, LLC, American Physician Partners, LLC, as "Prepetition Borrower," the other company parties party thereto, Goldman Sachs Specialty Lending Group, L.P., as the administrative agent (in such capacity, the "Prepetition Agent"), and the lenders from time to time party thereto (the "Prepetition Lenders"; together with the Prepetition Agent, the "Prepetition Secured Parties"), the Prepetition Lenders provided loans and other financial accommodations to the Prepetition Borrower pursuant to the Prepetition Loan Documents (the "Prepetition Secured Facility").

25.     Under the Prepetition Secured Facility, the Prepetition Lenders provided to the Debtors party thereto commitments in respect of term loans in the aggregate principal amount of up to $589,608,740 as of August 31, 2023.  Immediately prior to the Petition Date, the Prepetition Borrower and Prepetition Guarantors (as defined below) were justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount under the Prepetition Secured Facility on account of term loans of not less than $570,108,740.35 as of August 31, 2023 (the "Prepetition Term Loans") and on account of revolver loans of not less than $19,500,000 as of August 31, 2023 (the "Prepetition Revolver Loans") (such amounts on account of the Prepetition Term Loans and Prepetition Revolver Loans, together with any accrued and unpaid interest, fees, expenses and disbursements

---

Sixteenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of September 8, 2022, that certain Forbearance Agreement and Seventeenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of December 16, 2022, that certain Eighteenth Amendment and Waiver to Amended and Restated Credit and Guaranty Agreement, dated as of January 13, 2023, and that certain Nineteenth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of May 16, 2023, that certain Twentieth Amendment to Amended and Restated Credit and Guaranty Agreement, dated as of June 15, 2023.

(including, without limitation, any accrued and unpaid attorneys' fees, and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Secured Facility, the "Prepetition Secured Obligations").

26.     As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, pursuant to the Collateral Documents and that certain Pledge and Security Agreement (each, as defined in the Prepetition Credit Agreement) as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the Prepetition Borrower and each "Guarantor" thereunder (each, a "Prepetition Guarantor"; and together with Prepetition Borrower, collectively, the "Prepetition Credit Parties") jointly and severally guaranteed all of the Prepetition Secured Obligations, and granted to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, a lien on and security in all of its right, title and interest in (the "Prepetition Liens") substantially all of their respective assets (the "Prepetition Collateral"), subject to the relative priorities among the Prepetition Secured Parties set forth in the Prepetition Loan Documents.

27.     Prior to the Petition Date, the Debtors were in default under the Prepetition Credit Facility.  On December 9, 2022, the Prepetition Secured Parties exercised their proxy rights and appointed an independent Board of Managers over APP.

**B.     Unsecured Trade Debt**

28.     As of the Petition Date, based on their books and records, the Debtors estimate they owe approximately $40 million in trade debt, staffing related claims, and other accounts payable, which figure excludes potentially substantial additional amounts of other contingent or

unliquidated unsecured claims (including provider insurance and patient related claims), which may total in the millions of dollars.

## V.     Equity Structure

29.     As noted above, non-Debtor APP Holdco, LLC ("APP Holdco") owns all the common equity interests of APP, and CPV APP Blocker, Inc. ("CPV APP") and BBH hold preferred equity interests.  The equity interests in APP Holdco and CPV APP are privately held. As of the Petition Date, the largest interest holders of APP Holdco include BBH, John Rutledge (founder, former President and CEO of APP) and Jeremy Finkelstein (member of the Company's Physician Leadership team, who sold EmergiGroup Physician Associates, which included APP's contracts with the Houston Methodist health system, to APP); and, based on information and belief, the largest interest holders of CPV APP are BBH affiliated or related entities.

## VI.     Events and Circumstances Leading to the Bankruptcy Cases

### A.     COVID Pandemic and Its Aftermath

30.     The Debtors materially underperformed their projected financial performance in 2022 and early 2023 due to various circumstances including (i) actual collections per patient visit being materially lower than originally anticipated, (ii) lowered stipend revenues, (iii) greater than expected outsourced clinical team utilization (*i.e.*, locums), (iv) unanticipated increases in costs, including the costs associated with restructuring and insurance, and (v) an infrastructure that had been built from outsourcing key functions including revenue cycle management.

### 1.    **In General**

31.    As part of the Coronavirus Aid, Relief and Economic Security Act (the "<u>CARES Act</u>"), the U.S. government announced it would offer relief funding to eligible healthcare providers. During the years ended December 31, 2020, and 2021, the Company participated in certain relief programs offered through the CARES Act including distributions from the Public Health and Social Services Emergency Fund ("<u>PHSSE Fund</u>"). During 2020 and 2021, the Company received approximately $17 million and $13.6 million, respectively, in funding as replacement for lost revenues due to COVID-19 from the PHSSE Fund; and the Company has been following all reporting, audit and related requirements.

32.    Broadly, the COVID-19 pandemic resulted in a general worsening of economic conditions, which placed significant pressure on hospital and health system budgets, which impacted APP's revenue from hospital stipends. Further, budget deficits at federal, state and local government entities have had a negative impact on spending for many health and human service programs, including Medicare, Medicaid and similar programs.

33.    During and after the pandemic, the Company was proactive in dealing with pandemic related challenges, and implemented operational and cost savings initiatives (for example, over $20 million in annual cost savings initiative were implemented in late 2022), and same-site volumes generally returned to pre-pandemic levels.

### 2.    **Debtors' Worsening Position**

34.    As part of the Coronavirus Aid, Relief and Economic Security Act (the "<u>CARES Act</u>"), the U.S. government announced it would offer relief funding to eligible healthcare providers. During the years ended December 31, 2020, and 2021, the Company participated in certain relief programs offered through the CARES Act including distributions from the Public

Health and Social Services Emergency Fund ("PHSSE Fund"). During 2020 and 2021, the Company received approximately $17 million and $13.6 million, respectively, in funding as replacement for lost revenues due to COVID-19 from the PHSSE Fund; and the Company has been following all reporting, audit and related requirements.

35.    No Surprises Act / Regulatory Challenges:  Notably, during the last couple of years, the Company faced strong and unique regulatory headwinds.  At the end of 2020, as COVID vaccines were being rolled out and the response to the pandemic became more controlled, Congress passed the No Surprises Act, which ended the practice of "balance billing" (sometimes referred to as "surprise medical billing") - the practice of billing patients directly when health insurers underpay or refuse to pay the full cost of delivering care.  The Company supported the patient protections in the No Surprises Act legislation and, as a policy, did not engage in the practice of balance billing.  Although the legislative policy behind the No Surprises Act is sound, the regulatory implementation of the No Surprises Act was problematic, effectively shifting the balance of power in payment disputes too far in the favor of insurance companies (payors) and enabling them to significantly delay and unilaterally reduce or deny payments. Of the eligible claims the Company submitted through the independent dispute resolution process, only a small portion has been resolved, and of those that were resolved, many remain unpaid by health insurers.

36.    Labor Costs / Inflationary Pressures:  The Company also had to deal with other adverse financial factors – rising labor costs and inflationary pressures.  The COVID-19 pandemic left in its wake a nationwide health care labor shortage, directly affecting the healthcare services sector, as many part-time and retirement-age healthcare professionals exited the workforce and as the turnover rate substantially increased.  All this created significant upward pressure on such professionals' wages and salaries, in addition to forcing the Company's locum usage to materially

increase, which in turn significantly increased labor costs.  In certain markets, the competition for providers was intense, and the Company was required to raise hourly rates as well as offer signing bonuses.  Moreover, inflationary pressures had increased the cost of equipment and other supplies necessary to run the Company's owned or managed sites.

37.     Despite these adverse market conditions, as well as the regulatory challenges discussed above, the Company had remained steadfast in its belief in its business and mission, and continued to work with its healthcare partners to ensure patients receive high-quality care.

**B.     Unsuccessful Prepetition Negotiations and Developments with the Prepetition Lenders, Lack of Funding, and Prepetition Transition**

**1.     Prepetition Lenders' Unwillingness to Advance Incremental Funding**

38.     During certain periods in 2019 to 2022, with the assistance of investment bankers and other advisors (including Moelis & Co. in 2019, Harris Williams in 2020 and 2021, Deutsche Bank in 2021, Brentwood Capital Advisors in 2021/2022, and Jefferies in 2022), the Company explored potential recapitalization, sale, refinancing and/or other transactions, considering the Company's tightened liquidity situation.  However, none of those previous efforts resulted in any viable offers that could be consummated. In particular, the Company focused on a potential refinancing or restructuring transaction during 2021, as the credit facility under the Prepetition Credit Agreement was set to (originally) mature in December 2021.  And during all of 2022, the Company pursued a potential refinancing transaction with certain of the Prepetition Lenders, and after that process failed, pursued a restructuring transaction with all of the Prepetition Lenders.

39.     With no resolution in hand, the amounts due under the Prepetition Credit Agreement matured in August 2022 (the maturity date having been previously extended from December 2021), with the Debtors acknowledging that they owed at least $486.0 million in principal amount to the Prepetition Lenders at that time.  In mid-September 2022, pursuant to an

engagement agreement with the Company, Huron agreed to make available my services as the Company's CRO and James Nugent as the Company's Deputy CRO, and shortly thereafter, I was appointed as APP's CRO.

40.     On December 9, 2022, citing the events of default of the Debtors under the Prepetition Credit Agreement which were not waived by the Prepetition Agent, the Prepetition Lenders exercised their proxy rights and appointed an advisory board that was ultimately transitioned into an independent Board of Managers for APP, as a result of BBH's unwillingness to advance new monies in the Debtors, as reported by the Lenders to the Board and CRO team.[5]

41.     On January 30, 2023, the Debtors, the Prepetition Agent, and the Prepetition Lenders entered a Restructuring Term Sheet, pursuant to which the parties contemplated a restructuring transaction whereby, *inter alia*, the Prepetition Lenders would receive 100% of the equity of the reorganized entity and provide a replacement credit facility.  Subsequently, the parties entered into a Restructuring Support Agreement dated as of March 2, 2023 (the "RSA"), which contemplated a debt-to-equity swap and established a fresh credit facility which provided new money to the business. Notwithstanding the foregoing, the Debtors were unable to reach a consensual resolution with the Prepetition Agent and the Prepetition Lenders due in part to the Debtors' continued cash consumption.

42.     Then, in late May 2023, the Board of Managers and the CRO and management teams prepared a review of strategic alternatives for a potential consensual restructuring to be considered.  Through early June 2023, the Company's management, together with the CRO team and the independent Board of Managers (including its advisors), worked with the Prepetition

---

[5]   One member of the Board, Lawrence Hirsh, left the Board in May 2023.  Also, James Frary, who had replaced Mr. Hirsh on the Board, later resigned as a Board member as of July 1, 2023.

Lenders to assess strategic alternatives including pursuing sales transactions (enterprise wide or selective contracts), rapid cessation of services, and a long-term investment in the Company.

43.    As the Company and its advisors worked through an analysis of its business operations and the market as a whole and timely shared that work with the Prepetition Lenders throughout the first half of 2023, the Prepetition Lenders supported the restructuring efforts by deferring cash debt service, and by advancing the Company an additional $28.0 million in new money loans from January 2023 through May 2023.

44.    In late May and early June, the Company presented those various strategic alternatives to the Prepetition Lenders all of which showed the need for significant additional investment by the Prepetition Lenders.  As a result, on June 9, 2023, the Prepetition Lenders notified the Company of their unwillingness to provide or commit to any further cash to be advanced to the business, which put in doubt the Company's ability to satisfy its clinical team provider obligations, and other operating expenses in the short term.  As discussed above, the parties entered into the Twentieth Amendment on June 15, 2023, pursuant to which certain of the Prepetition Lenders agreed to provide $3.0 M in new money (Tranche F) for the Debtors to satisfy the APP clinical provider obligations and permitted the Debtors to continue to use their cash collateral, both of which allowed the Debtors to continue to operate and execute the Transition Related Activities.

45.    The foregoing circumstances put the Company and its management and Board of Managers in an incredibly difficult position as the Company had limited cash resources without stretching vendor payments to effectively transition its contracts to alternative service providers or its health systems/hospital partners.  The Company's operations supported critical life-saving services to the most vulnerable individuals and in certain instances communities across the country

and could not be wound down in a hasty or disorderly manner without a potential negative impact on national healthcare services.

> ### 2. Unsuccessful Attempt to Sell the Company's Assets and Lack of Financing Alternatives

46.    Upon receiving notice from the Prepetition Lenders in early June 2023, the Company's management, CRO team and Board of Managers immediately began pursuing strategic options that would minimize disruption for its hospital and health system partners, physicians, advanced practice clinicians ("APC") and their respective patients.  The Management, CRO team and the Board of Managers immediately identified the most likely potential strategic partners that might be interested in transitioning the Company's customer contracts in consideration for assuming certain obligations, including APP's clinical team liabilities, that would enable an accelerated transition and potentially limit the disruption of the critical lifesaving services that the Company provided to hospital emergency rooms throughout the country.  A confidential teaser was sent to eight potential strategic partners, of which five executed non-disclosure agreements (each an "NDA").  For those parties that executed NDAs, access was provided to a virtual data room so those parties could review confidential financial and operational diligence materials. Given the critical liquidity position and the necessity for ongoing funding in the near-term, the potential strategic partners, as well as the Prepetition Secured Parties, were approached to provide funding through the transition of the contracts.  All strategic partners declined to provide incremental cash advances to the business.  Certain of the Prepetition Lenders expressed a willingness to consider possibly providing the funding, subject to the receipt of additional information. After feverish negotiations, the Company executed a Letter of Intent ("LOI") with a potential buyer ("Prior Potential Buyer"), in late June 2023, through which the potential buyer indicated that it would transition the medical service contracts of substantially all of the

Company's healthcare/hospital client partners, satisfy APP's clinical team providers and extend medical malpractice insurance for clinicians, including prior acts medical malpractice insurance, and keep almost all of the Company's Support Center employees.  At the time, the LOI was viewed as a significant accomplishment which would provide continuity for all stakeholders and minimize disruption of patient care for healthcare/hospital partners.   The respective senior management teams of APP and Prior Potential Buyer conducted Town Hall meetings with internal stakeholders, including APP employees, to announce the LOI.  Prior Potential Buyer and APP leadership teams also held meetings with APP's key customers to ensure such customers of a smooth transition of services to Prior Potential Buyer. The news was well received by the Company's health system/hospital partners, who appreciated the Company's dedication to finding a solution for its hospital partners on such an expedited timeframe.  In the weeks following the LOI, the Company's management and CRO teams, advisors, and Board of Managers engaged in around-the-clock negotiations with Prior Potential Buyer, its advisors, and its private equity sponsor to close the transaction.  The team worked tirelessly to reach an agreement, but unfortunately, Prior Potential Buyer retracted its commitments regarding assuming contracts, providing wages, and offering medical malpractice insurance, and required an unacceptable level of conditions be met to close the deal.  Thus, a value maximizing transaction that provided the necessary continuity could not be reached.  While this transaction ultimately was not consummated, it provided the Company the opportunity to begin conversations with stakeholders about the Company's financial challenges and its intent to wind down operations with a solution in place, minimizing anxiety among healthcare/hospital partners and across the industry.

47.    Without necessary additional financing support from the Prepetition Lenders, and given the accelerated nature of the situation, we reached out to a select set of three special situation

private credit funds to explore alternative financing sources, including potential debtor in possession financing, that had the experience to underwrite the potential credit with limited diligence and within the accelerated timeframe.  Additionally, a member of the Board of Managers reached out to contacts at an additional ten or more potential financing sources.  Four expressly declined to participate and no response was received from the other inquiries.  Only a single potential financing source executed an NDA and commenced initial diligence culminating in proposed financing terms. The proposed financing was ultimately deemed unacceptable by the Company's Board of Managers, CRO, management, and its advisors. The Company also discussed and considered potential additional funding from certain of the Prepetition Lenders, but terms (in both timing and dollars) offered by those Prepetition Lenders were insufficient to allow for the important service transition that the Company ultimately embarked upon and executed.

### 3.    The Company's Extensive and Expedited Transition Efforts to Avoid Interruptions in Service to Patients

48.    Consequently, in early to mid-July 2023, the Company made the difficult decision to begin transitioning substantially all of its services for its clients' emergency departments and other healthcare providers, to avoid any interruptions in service, avoiding any impact on patient safety.  Specifically, the Company worked to facilitate an orderly transition of approximately 150 emergency department and hospital medicine contracts to alternative service providers or insourced to their health system/hospital partners.  As part of such arrangements, the Company generally sought to have, and as to numerous locations, was able to have, the transition to these alternative service providers tens of millions of dollars of accrued, unpaid APP internal clinical team obligations, and certain medical malpractice prior acts insurance coverage, among other obligations.  Only limited transition assistance is now required (for example, the Company continues certain payroll services in some cases pending the transition completion for the

applicable sites).   The transition efforts were primarily completed by September 2023, with services provided (in some cases retroactive) through July 31, 2023.  And the Company, with the Prepetition Lenders' consent, also sold select patient receivables to third parties (typically considered uncollectible patient receivables or charged off by the Debtors), as the Company has done in the ordinary course of business over the past several years (including under accounts purchase agreements).[6]

49.    Through this transition related prepetition process, the Company's priority was to minimize disruption for its health system/hospital partners creating a seamless a hand off services as of July 31, 2023 and ensuring a continuity of high quality of care for the patients serviced by its contracts.  Throughout this process (and notwithstanding the numerous events of default under the Prepetition Credit Facility), the Prepetition Lenders supported the Company's use of its cash collateral to facilitate a safe and orderly transfer of healthcare operations to third parties.

50.    As discussed above, historically, most of the Company's revenue has been attributable to agreements with emergency departments under the AR contracts model, where typically the Company (1) provided the staffing/management services and (2) was responsible for coding, billing, and collecting the fees billed for services from Medicaid, Medicare, Blue Cross Blue Shield, commercial payors, insurance companies and/or the patients and related services ("Revenue Cycle Management" or "RCM Services").[7]  Prepetition, prior to the Transition Related Activities, commencing in September 2019, the Debtors contracted with and utilized a non-affiliate service provider – Medical Consultants, Inc. ("MCI"), a subsidiary of RI RCM Holdco,

---

[6]  The Debtors anticipate conducting additional A/R sales postpetition in the ordinary course.

[7]   Healthcare revenue cycle management is the financial process healthcare providers and facilities use to manage the administrative and other functions associated with claims processing, payment, and revenue generation, including identifying, managing, and collecting patient service revenue.  The process is crucial to ensuring healthcare organizations stay in operation to treat patients.

Inc. ("R1") – to provide the critical RCM Services for the Debtors.[8]  MCI has been the exclusive Revenue Cycle Management provider for the Company for the past several years.

51.    MCI provided a cancellation notice to the Company effective July 26, 2023, and given the Company's critical need for the RCM Services, the Company entered a short-term services agreement with MCI until the parties could negotiate a consensual resolution.  After extensive, good faith negotiations, the parties entered into a new agreement effective as of July 26, dated September 1, 2023, executed on September 15, 2023, providing for MCI to provide certain RCM Services (including critical customer service, help desk support, customer refund processing, management of patient receivables, billings, collections, and facilitating the efficient transfer of data to sell patient receivables) at least through October 31, 2023 (with potential extensions) ("New MCI Agreement").  The Prepetition Lenders support the Company's entry into the New MCI Agreement.

52.    The Debtors have filed a motion for authority, out of an abundance of caution, to continue to operate under the New MCI Agreement (including, without limitation, the remittance of prepetition patient refunds).  During the sale/wind-down process, the Debtors' small remaining workforce is not equipped to handle the myriad RCM Services.  Indeed, even if the Company had additional personnel, the Company would not have the capacity and resources to replicate and implement the necessary RCM Services:

(a)    The ability and resources to take control of and properly handle all of the voluminous records/documents with history and supporting and claims processing details.

---

[8]    As discussed herein, in the ordinary course, the Company sells uncollectible or older accounts receivable to third parties for cash proceeds and expect to continue to do so postpetition.

(b)      The necessary technological and practical infrastructure to, among other things, respond to and communicate with hundreds of patients, insurance companies, healthcare providers, potential accounts receivable buyers, and other parties, and handle and administer all collections, refunds and other payments and transfers.

(c)      The Company lacks the institutional and experiential knowledge to properly render the RCM Services; as noted, MCI has been providing services to the Company for four years since September 2019.

All of the RCM Services and related services under the New MCI Agreement are necessary and critical for the Debtors to be able to maximize the value of the estates' assets for the benefit of stakeholders (including raising funds for the administration of these cases and a liquidating plan), including, for example, administering and billing a rebilling claims, which will likely increase customer collections, and preparing and providing information to potential accounts receivable purchasers, which purchases will likely result in millions of dollars of postpetition sale proceeds.

53.      Prepetition, the Debtors secured medical malpractice insurance policies (the "MagMutual Policies") from Professional Security Insurance Co., a subsidiary of MagMutual, to cover thousands of APP internal clinical team providers.  On or about August 3, 2023, MagMutual sent a written notice to APP purportedly canceling the 2023 MagMutual Policy ab initio (as of June 30, 2023). The Debtors contest the alleged cancellation and reserve all their rights against MagMutual.  The Debtors believe there is no contractual, legal or factual basis for such cancellation, and have attempted to work collaboratively with MagMutual to reach a solution that protects providers.  While the Debtors attempted to negotiate a consensual resolution with MagMutual prepetition, to date the parties have failed to reach an agreement.  The Debtors also endeavored to locate and obtain adequate replacement medical malpractice insurance coverage

and other protective solutions for the providers requiring such coverage.  As part of the Transition

Related Activities, and as a result of the Debtors' efforts, over 90% of active providers received

medical malpractice insurance coverage from the management services providers to whom the

Debtors transitioned their management functions.  Unfortunately, certain of the active and past

providers do not have medical malpractice insurance coverage. Postpetition, the Debtors anticipate

continuing to negotiate with MagMutual and, if necessary, take other actions as the Debtors deem

appropriate.

54.     In sum, prior to bankruptcy filing, the Debtors having explored strategic options to

replace their existing financing, or sell their business, transitioned their service contracts to capable

providers to avoid a disruption in life saving services.  The Debtors have commenced these

bankruptcy cases to facilitate the orderly sale and/or liquidation of their remaining assets and wind-

down of their businesses, to preserve and maximize the value of the estates' assets for the benefit

of all stakeholders.

### RELIEF SOUGHT IN THE FIRST DAY PLEADINGS

I.     **Administrative Motions**

A.     ***Debtors' Motion For Order Directing Joint Administration Of Related Chapter 11 Cases For Procedural Purposes Only ("Joint Administration Motion")*[9]**

55.     The Debtors request entry of an order directing joint administration of their Chapter

11 Cases, for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of

---

[9] Capitalized terms in this Section that are not defined shall have the meanings ascribed to the capitalized terms in the applicable motion.

Bankruptcy Procedure providing for the Court to maintain one file and one docket for all the Debtors' Chapter 11 Cases under the lead case, *American Physician Partners, LLC, et al.*

56.     As discussed above, I understand that the Debtor entities are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  Accordingly, joint administration of these Chapter 11 Cases will allow for the efficient administration of the Debtors' interrelated Chapter 11 Cases, will yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

57.     I believe that entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

   **B.**     ***Debtors' Motion For Entry Of An Order:  (I) Authorizing The Debtors To (A) File A Consolidated List Of Creditors In Lieu Of Submitting A Separate Mailing Matrix For Each Debtor, (B) File A Consolidated List Of The Debtors' Thirty Largest Unsecured Creditors, And (C) Redact Certain Personally Identifiable Information For Individual Creditors; And (II) Granting Related Relief* ("Creditor Matrix Motion")**

58.     In the Creditor Matrix Motion, the Debtors seek an order (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor, and (iii) redact certain personally identifiable information for the Debtors' individual creditors; and (b) granting related relief.

59.     The Debtors submit that permitting them to maintain a single consolidated list of creditors (the "Creditor Matrix"), in lieu of maintaining a separate creditor matrix for each Debtor,

is warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings.

60.    Further, the Debtors request authority to file a single list of their thirty largest general unsecured creditors on a consolidated basis (the "Top 30 List").  Because the top creditors of the Debtors overlap, and certain Debtors may have fewer than twenty significant unsecured creditors, the Debtors submit that filing separate Top 30 Lists for each Debtor would be of limited utility.  In addition, the exercise of compiling separate Top 30 Lists for each Debtor could consume an excessive amount of the Company's limited time and resources.  Further, the Debtors believe that a single consolidated list of the Debtors' thirty largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

61.    Additionally, I believe that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of individual creditors—including the Debtors' current and former employees— and interest holders because such information could be used, among other things, to perpetrate identity theft or to locate survivors of domestic violence, or for purposes of harassment or stalking.

62.    Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Creditor Matrix Motion.

C.    ***Debtors' Application For Entry Of An Order (I) Approving The Retention And Appointment Of Epiq Corporate Restructuring, LLC As The Claims And Noticing Agent To The Debtors, Effective Nunc Pro Tunc To The Petition Date, And (II) Granting Related Relief* ("Epiq Application")**

63.    The Debtors request approval to employ Epiq to serve as Claims and Noticing Agent in their chapter 11 cases to provide the services outlined in the Epiq Application.  The

Debtors believe that Epiq's rates are competitive and reasonable, Epiq has the expertise required in a complex chapter 11 case, and Epiq's employment is in the best interest of the estates.

**D.** ***Debtors' Motion For Entry Of An Order Authorizing Certain Procedures To Maintain Confidentiality Of Protected Health Information As Required By Applicable Privacy Rules* ("Confidential Health Information Motion")**

64.     By this Motion, the Debtors seek approval of certain procedures (the "Privacy Procedures") to maintain the confidentiality of protected health information as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), while providing required disclosures in these Chapter 11 Cases.

65.     The Debtors believe that the relief requested appropriately balances the need to maintain confidential PHI under HIPAA with the need for adequate disclosure under the Bankruptcy Code.  Given the nature of any information that may reveal even the identity of patients, confidentiality in this context is of paramount importance, and approval of the Privacy Procedures is critical for the Debtors and the bankruptcy estates to protect patient information in accordance with HIPPA and related regulations and avoid the significant penalties for any health care provider that uses or discloses protected health information.

**II.     Operational Motions Requesting Immediate Relief**

**A.** ***Motion Of The Debtors Pursuant To Sections 105, 361, 362, 363, And 507 Of The Bankruptcy Code, Bankruptcy Rule 4001, And Local Rule 4001-2 For Interim And Final Orders (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection To Prepetition Secured Parties, (C) Modifying The Automatic Stay, And (D) Scheduling A Final Hearing* ("Cash Collateral Motion")**

66.     By the Cash Collateral Motion, the Debtors request authority to use Cash Collateral and provide adequate protection to their Prepetition Secured Parties.  The Debtors believe that only the Prepetition Secured Parties assert an interest in the Cash Collateral. The Debtors have negotiated the terms of the proposed Interim Order in good faith and at arms' length with the Prepetition Secured Parties and are informed that the Prepetition Secured Parties will support entry

of the Interim Order (substantially in the form attached to the Motion) on a consensual basis (with all rights reserved with respect to any final or further interim cash collateral order).

67.    The Debtors have an urgent and immediate need for access to funds available from the use of Cash Collateral. Such funding is necessary for the Debtors to have sufficient liquidity to wind down their business and satisfy accruing administrative obligations to effectuate an orderly liquidation. Without immediate access to Cash Collateral, the Debtors would not be able to fund finalizing the winding down of their business operations. Accordingly, the Debtors request that the Court authorize their continued use of Cash Collateral on the terms contemplated herein, initially on an interim basis and, following the Final Hearing, on a final basis.

68.    I understand that the Adequate Protection Liens, Adequate Protection Superpriority Claim and the adequate protection payments contemplated in the Cash Collateral Orders are consistent with the Bankruptcy Code and are of the type and scope customarily provided by bankruptcy courts in this district. The Debtors believe that the proposed adequate protection components described in the Cash Collateral Motion are fair and reasonable under the circumstances.

69.    The Adequate Protection Liens, the Adequate Protection Superpriority Claim, and the contemplated adequate protection payments are subject and subordinate to the Carve-Out. The Carve-Out contains similar terms to others that this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their advisors. Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted.

70.    The urgent need to avoid immediate and irreparable harm to the Debtors' estates makes it imperative that the Debtors be authorized to use Cash Collateral pending the Final Hearing to allow the Debtors to operate and administer these Chapter 11 Cases on a postpetition

basis.  Without the ability to use Cash Collateral, the Debtors would be unable to satisfy accruing postpetition obligations, including payroll, and would not be able to conduct the contemplated orderly liquidation, thus causing irreparable harm to the Debtors and the value of these estates.

**B.**  ***Debtors' Motion For Entry Of Interim And Final Orders Authorizing The Debtors To (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, And (D) Granting Related Relief (__"Cash Management Motion"__)***

71.    By the Cash Management Motion, the Debtors request authority to (a) continue operating the Cash Management System, including continued performance of the Intercompany Transactions and honoring of any Intercompany Claims; (b) honor and pay the Bank Fees in the normal course, including any prepetition Bank Fees, and (c) maintain existing Business Forms, and (ii) granting related relief.

72.    In the ordinary course of business, the Debtors utilize a centralized cash management system (the "__Cash Management System__") to collect, manage, and disburse funds used in their business.  The Cash Management System is essential to the stability of the Debtors' assets and business objectives, and to maximizing the value of their estates.

73.    As of the Petition Date, the Debtors maintain 65 bank accounts (the "__Bank Accounts__") at Cadence Bank, Legends Bank, Fifth Third Bank, Bank of America, Frost Bank, Texas Bank and Trust, U.S. Bank, Flagstar Bank, and Wells Fargo (each, a "__Bank__" and together, the "__Banks__").  Payments to creditors are made from the Bank Accounts, in a variety of ways, including checks, wire transfers, credit card, and automated clearinghouse transfers.  A general diagram of the movement of funds within the Cash Management System is attached to the Cash Management Motion as Exhibit C, and a summary of bank accounts and description of the purpose of each account is attached to the Cash Management Motion as Exhibit D.

74.     In the ordinary course of business, the Debtors engage in intercompany transactions ("Intercompany Transactions") with each other in the ordinary course of their business.  American Physician Holdings LLC is a party to various management services agreements with certain of the other operating Debtors (collectively, the "Management Services Agreements").   In general, American Physician Holdings LLC provides managerial and professional services to the operating Debtors (other than services relating to the practice of medicine) and pays substantially all of their operating expenses, other than Bank Fees.  The Debtors' operating companies transfer deposits made into their applicable Collection Accounts to the Concentration Account.  The Debtors maintain records of the deposits related to these Intercompany Transactions.

75.     Through the relief requested by the Cash Management Motion, the Debtors intend to continue undertaking Intercompany Transactions on account of obligations arising on a postpetition basis as between Debtors in the ordinary course of business consistent with prepetition practice.  The Debtors will maintain records of the Intercompany Transactions in the ordinary course of business consistent with prepetition practices.

76.     Each of the Debtors' banks are insured by Banks participating in the Federal Deposit Insurance Corporation ("FDIC").  In addition, American Physician Partners, LLC is a party to an *ICS Deposit Placement Agreement* provided through IntraFi Network LLC ("IntraFi"). Each of the participating banks in the IntraFi network are also FDIC insured.   Under this arrangement, cash in the Concentration Account is swept and then deposited into demand deposit accounts at multiple participating banks in the IntraFi network.  The Debtors maintain immediate access to the funds swept into the IntraFi network.  The amounts swept and deposited into a participating IntraFi financial institution do not exceed $250,000 per bank.  Thus, under this arrangement, the entirety of Debtors' cash deposits are protected within FDIC limits because none

of the individual deposits at any participating IntraFi institution exceeds $250,000 at any given time.  As noted above, several of the Bank Accounts are maintained at Fifth Third Bank, Bank of America, Texas Bank and Trust, Flagstar Bank, U.S. Bank, and Wells Fargo Bank, which have each executed Uniform Depository Agreement ("UDA") with, and is designated as an authorized depository by the U.S. Trustee.  With respect to Banks that have not executed a UDA (Legends Bank, Frost Bank, and Cadence Bank, which is the Debtors' primary financial institution), the Debtors request interim approval to continue their Cash Management System with such Banks, subject to final approval at a continued hearing.

77.     In sum, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest.

**C.**      ***Motion Of Debtors For Entry Of Interim And Final Orders (I) Authorizing Debtors To (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, And Other Obligations On Account Of Compensation And Benefits Programs And (B) Continue Compensation And Benefits Programs And (II) Granting Related Relief ("Wages Motion")***

78.     By the Wages and Benefits Motion, the Debtors seek entry of interim and final orders granting them (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Compensation and Benefits Programs in the ordinary course of business as provided herein and (b) continue to administer the Compensation and Benefits Programs and (ii) granting related relief.

79.     Prior to the transition of management of their client emergency departments and the services of other healthcare providers, the Debtors employed approximately 2,546 individuals in 29 states across the United States, including approximately 1,447 on a full-time basis and

approximately 1,099 on a part-time basis. As of the Petition Date, the Debtors had reduced their workforce to 27 individuals who are employed, with a few exceptions, at the Debtors' headquarters and provide support for the continuing wind down of the Debtors' operations. No employees are party to collective bargaining agreements or other similar labor agreements, and no employees are members of labor unions.

80. In addition to the Employees, the Debtors also utilize the services of a limited number of independent contractors and temporary workers sourced from various staffing agencies to provide critical temporary support services to their Care Providers (the "Supplemental Workforce" and, with Employees, the "Workforce"). The Supplemental Workforce is an important complement to the efforts of the Debtors' Employees.

81. As with similarly situated companies, the Debtors maintain various compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined in the Wages Motion and, collectively, the "Compensation and Benefits Programs"), including: (a) Compensation; (b) Supplemental Workforce Compensation; (c) Payroll Processing Fees; (d) Withholding Obligations; (e) Employee Expenses; (f) Health Insurance Programs; and (g) Life Insurance and Disability Programs.

82. The Debtors believe that their Workforce members rely exclusively or primarily on the compensation and/or benefits they receive through the Compensation and Benefits Programs to pay their daily living expenses and support their families. Employees will face significant financial consequences if the Debtors are not permitted to continue to administer the Compensation and Benefits Programs in the ordinary course of business. Further, the Debtors' failure to honor their obligations in connection with the Compensation and Benefits Programs likely may result in attrition at a time when the Debtors need their Workforce to perform at peak efficiency or, more

ominously, in a risk to the health and safety of the patients serviced by the Care Providers. Therefore, it is essential that the Debtors maintain and promote loyalty and morale among their Employees and Care Providers at this critical time.

83.     The Workforce performs a wide variety of functions that are critical to the Debtors' operations and to maximizing the value of the Debtors' assets.  Several of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot easily be replicated.  I believe that failure to maintain the continued, uninterrupted services of their Workforce could upend the Debtors' wind down efforts and jeopardize the goal to maximize their remaining assets for the benefit of all stakeholders.

84.     Accordingly, for the reasons set forth herein and expanded on in the Wage Motion, on behalf of the Debtors, I believe that the relief requested in the Wage Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**D.**     ***Motion Of Debtors For Entry Of Interim And Final Orders Authorizing The Debtors To (I) Continue To Perform Under Services Agreement With Medical Consultants, Inc. For Certain Transition Services, (II) Pay And Reimburse Related Fees And Expenses, And (III) Granting Related Relief ("MCI Agreement Motion")***

85.     By the MCI Agreement Motion, the Debtors request interim and final orders (a) authorizing the Debtors to continue to perform under that certain Services Agreement dated September 1, 2023 and executed on September 15, 2023, by and between Debtor American Physician Holdings, LLC and Medical Consultants, Inc. (MCI), a subsidiary of RI RCM Holdco, Inc. (R1) providing for certain healthcare revenue cycle management services (the "New MCI Agreement") (including the remittance by MCI of prepetition patient refunds); (b) pay and

reimburse related fees and expenses under the New MCI Agreement on a postpetition basis; and (c) granting related relief.

86.    As explained above, commencing in September 2019, the Debtors contracted with and utilized MCI to provide critical RCM Services for the Debtors.  Prepetition, MCI provided a cancellation notice with respect to its services to the Company effective July 26, 2023, and given the Company's critical need for the RCM Services, the Company negotiated and entered into a short term services agreement with MCI until the parties could negotiate a consensual resolution.  After extensive negotiations, on September 1, 2023, the parties entered into the New MCI Agreement.

87.    The Debtors filed the MCI Agreement Motion for authority, out of an abundance of caution, to continue to operate under the New MCI Agreement.  During their remaining wind-down process, the Debtors' small remaining workforce is not equipped to handle the myriad RCM Services.  Indeed, even if the Company had additional personnel, the Company would not have the capacity and resources to replicate and implement the necessary RCM Services:  The Company lacks:

- The ability and resources to take control of and properly handle all the voluminous records/documents with history and supporting and claims processing details.

- The necessary technological and practical infrastructure to, among other things, respond to and communicate with hundreds of patients, insurance companies, healthcare providers, potential accounts receivable buyers, and other parties, and handle and administer all collections, refunds and other payments and transfers.

- The institutional and experiential knowledge to properly render the RCM Services; as noted, MCI has been providing services to the Company for four years since September 2019.

88.    All of the RCM Services and related services under the New MCI Agreement are necessary and critical for the Debtors to be able to maximize the value of the estates' assets for the benefit of stakeholders (including raising funds for the administration of these cases and a liquidating plan), including, for example, administering and billing and rebilling claims, which

will likely increase customer collections, and preparing and providing information to potential accounts receivable purchasers, which purchases will likely result in millions of dollars of postpetition sale proceeds. In addition, MCI's services are critical to making patient refunds, including those arising prepetition, and continuing to remit refunds to patients on a postpetition basis.

89.     Based on the foregoing and the reasons set forth in the MCI Agreement Motion, I believe the relief sought by the MCI Agreement Motion is critical and in the best interests of the estates.

**E.**     ***Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing Debtors To (A) Continue To Maintain Their Insurance Policies And Programs, (B) Honor All Insurance Obligations, (C) Renew, Amend, Supplement, Extend, Or Purchase And Finance Insurance Policies And (II) Granting Related Relief ("Insurance Motion")***

90.     By the Insurance Motion, the Debtors request the entry of an order authorizing the Debtors to continue their existing Insurance Policies (as defined below); authorizing the Debtors to pay certain prepetition Insurance Obligations and postpetition Insurance Obligations in the ordinary course of business; authorizing the Debtors to honor Surety Obligations to the extent necessary; authorizing the Debtors to renew, amend, supplement, extend, or purchase and finance insurance policies in the ordinary course; and granting related relief.

91.     In the ordinary course of business, the Debtors are the beneficiaries of certain insurance policies (collectively, the "Insurance Policies," and each individually an "Insurance Policy") that provide coverage for, among other things, physician and entity liability, nurses' professional liability, employment practices, property, business automobile, directors' and officers' liability, general professional liability and network risk, crime coverage, cyber liability, excess and workers' compensation liability.  The Debtors obtain the Insurance Policies through

various third-party insurance carriers (collectively, the "Insurance Carriers").    A list of the Insurance Policies is attached to the Insurance Motion as Exhibit C.  As part of maintaining their Insurance Policies in the ordinary course of business, the Debtors pay premiums and other obligations related thereto, including any broker or advisor fees, assessments, or other fees, collectively, the "Insurance Obligations").

92.    The Debtors utilize Willis Tower Watson, CAC Specialty and Marsh (the "Brokers") as their insurance brokers to assist with the procurement and negotiation of certain Insurance Policies and the Brokers assesses certain fees or commissions ("Brokers' Fees") that are included and paid as part of the applicable Insurance Policies.

93.    The Debtors finance certain of the Insurance Obligations through BankDirect Capital Finance and AFCO (the "Premium Financiers").  Among the potential remedies available to the Premium Financiers for non-payment is the ability to cancel the Insurance Policies and seek a refund of the Insurance Premiums it financed.  As of the Petition Date, the Debtors are current on their Premium Financing Obligations, but seek authority to continue making the required periodic payments to satisfy any outstanding Premium Financing Obligations in the ordinary course of business.

94.    In the ordinary course of business, the Debtors provide Medicaid Provider surety bonds to the State of Florida, Agency for Health Care Administration ("AHCA") to secure the Debtors' payment or performance of certain obligations (each a "Surety Bond"). A schedule of the outstanding Surety Bonds is attached the Insurance Motion as Exhibit D.  To continue their business operations during the chapter 11 process, the Debtors must be able to provide the financial assurance required to AHCA.  This requires the Debtors to maintain the existing Surety Bonds, including satisfying any applicable obligations thereunder, renewing, executing agreements and

related matters.  Failing to provide, maintain or timely replace Surety Bonds could prevent the Debtors from performing essential operations.  No amounts are currently due with respect to any Surety Bonds.

95.    The Insurance Policies provide the Debtors with essential insurance coverage.  Any lapse in the coverage to be provided under the Insurance Policies could expose the Debtors to substantial liability, monetary and otherwise, for injuries, damages, and penalties for failing to maintain proper insurance.  Therefore, in light of the importance of the Insurance Policies, the Debtors should be permitted to exercise their reasonable business judgment to continue and/or renew the Insurance Policies as they expire.  In addition, the Surety Bonds provide critical assurance to certain parties to secure the Debtors' payment or performance of certain obligations, without which the Debtors may not be able to operate or maintain appropriate licenses in certain states. Thus, I believe the relief sought by the Insurance Motion is essential to the preservation of the value of the Debtors' businesses and operations.

**F.    *Debtors' Motion Pursuant To 11 U.S.C. §§ 105(A) And 366 And Fed. R. Bankr. P. 6003 And 6004 For Entry Of Interim And Final Orders:  (I) Approving Debtors' Proposed Form Of Adequate Assurance Of Payment To Utility Companies; (II) Establishing Procedures For Resolving Objections By Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, Or <u>Discontinuing Service; And (IV) Granting Related Relief</u> ("Utilities Motion")***

96.    By the Utilities Motion, the Debtors seek entry of interim and final orders: (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined below); (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance provided by the Debtors; (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these Chapter 11 Cases

and/or any outstanding prepetition debts; and (iv) granting related relief, all as more fully set forth in the Utilities Motion.

97.    In the ordinary course of business, the Debtors obtain various essential utility services (collectively, the "Utility Services"), including electricity, water, and network/internet, from a number of utility companies (collectively, the "Utility Companies"). A nonexclusive list of the Utility Companies is attached to the Utilities Motion as Exhibit C (the "Utility Services List"). The Debtors rely on the Utility Companies to provide Utility Services at their business locations. In locations with Utility Services, the Debtors rely on the Utility Companies to provide necessary support to their employees, vendors, and customers. Preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtors' business.

98.    The Debtors have a good historical payment record with the Utility Companies. To the best of the Debtors' knowledge, there are no defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of the Chapter 11 Cases. Based on historical averages for Utility Services, the Debtors estimate that their cost of Utility Services for the next thirty days will be approximately $12,239.00.

99.    The Debtors have proposed to provide Utility Companies with Adequate Assurance of payment for Utility Services and customary procedures for resolving any disputes. I understand such procedures are routinely approved in this district and would request the Court approve the Utilities Motion to ensure the Debtors maintain uninterrupted Utility Services.

**G.    Debtors' Motion For Entry Of Interim And Final Orders:    (I) Authorizing The Payment Of Certain Taxes And Fees; And (II) Granting Related Relief ("Tax Motion")**

100.    By the Tax Motion, the Debtors request authority to remit and pay (or use tax credits to offset) Taxes and Fees (as defined below) in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date); and granting related relief.

101.    In the ordinary course of business, the Debtors incur local, state and federal income taxes, as well as other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").    The Debtors pay or remit, as applicable, Taxes and Fees to various governmental authorities (each, an "Authority," and collectively, the "Authorities") on a periodic basis (monthly, quarterly, semi-annually, annually, and on an ad hoc basis depending on the Debtors' reporting calendar), based on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.    A schedule identifying the Authorities is attached to the Tax Motion as Exhibit C.    The Debtors generally pay and remit Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.    From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes or Fees.    The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees, or have the amount of such credits refunded to the Debtors.

102.    Additionally, the Debtors are and may become subject to routine audit investigations on account of tax returns or tax obligations in respect of prior years ("Audits") during the cases.    Audits may result in additional prepetition Taxes and Fees being assessed against

the Debtors (such additional Taxes and Fees, "Assessments").  The Debtors seek authority to pay or remit tax obligations on account of the Audits as they arise in the ordinary course of the Debtors' business, including as a result of any resolutions of issues addressed in an Audit.

103.    Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to):  (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the Chapter 11 Cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, or pursue other remedies that will harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring.  Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  Accordingly, the Debtors seek authority to pay, in their reasonable discretion, the Taxes and Fees in the ordinary course as they become due.

## CONCLUSION

104.    I have reviewed each of the First Day Pleadings.  All of the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition.  Accordingly, the Debtors respectfully request that the relief requested in each of the First Day Pleadings be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases.

105.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of

my knowledge and after reasonable inquiry, the foregoing is true and correct.


Dated: September 18, 2023                 _____*/s/ John C DiDonato*_____
                                                              John C. DiDonato
                                                              Chief Restructuring Officer of American Physician
                                                              Partners, LLC, on Behalf of All Debtors