**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN PHYSICIAN PARTNERS, LLC, *et al.*,[1] | ) | Case No. 23-11469 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

Hearing Date: January 5, 2024 at 10:00 a.m. (ET))
Objection Deadline: December 29, 2023 at 4:00 p.m. (ET)

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING (A) PRIVATE SALE AND (B) TRANSFER OF CERTAIN ACCOUNTS RECEIVABLE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING THE TERMS OF THE ACCOUNT PURCHASE AGREEMENT; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") seeking entry of an order substantially in the form attached hereto as **Exhibit 1** (the "Sale Order"): (i) authorizing the private sale and transfer (the "Sale") of certain of the Debtors' patients services accounts receivable, as further defined below (the "Accounts" or "Assets"); (ii) approving the terms of that certain *Account Purchase Agreement* (the "Sale Agreement") attached to the proposed Sale Order as **Exhibit A** by and between Debtor American Physician holdings, LLC and affiliated parties (collectively, the "Seller"), and Cascade Capital Funding, LLC (the "Buyer"); and (iii) granting further relief.  In support of this Motion, the Debtors respectfully state as follows:

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/AmericanPhysicianPartners. The location of American Physician Partners, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 5121 Maryland Way, Suite 300, Brentwood, TN 27027.

## JURISDICTION AND VENUE

1.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and, 363 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1 and 9013-1.

## BACKGROUND

### A.      General Case Background

4.      On September 18, 2023 and continuing September 19,2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing their properties as debtors-in-possession pursuant to Bankruptcy Code

sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases.  On October 2, 2023, the Office of the United States Trustee (the "U.S. Trustee") formed the Official Committee of Unsecured Creditors (the "Committee").

5.      Founded in 2015, the Debtors were one of the fastest growing, scaled emergency department and hospitalist management platforms in the U.S. Headquartered in Brentwood, TN, the Debtors had management and related contracts with more than 100 hospitals (including freestanding emergency departments) and other sites in fifteen states primarily in the southeastern, midwestern and southwestern United States, utilizing over 2,500 physicians who served over 4 million patients each year. Prior to the Petition Date, the Debtors explored alternative strategies to address cash shortfalls, including the refinancing of existing secured indebtedness and potential sale of substantially all the Debtors' service contracts and other assets. Such efforts by the Debtors proved to be unsuccessful despite extensive negotiations with multiple parties. In July 2023, the Debtors made the difficult decision to begin transitioning substantially all of their medical service contracts to alternative service providers (competitors) and their health system/hospital partners (customers), in order to avoid any interruptions in its critical life-saving service to the patients. After successfully transitioning all its medical service contracts without experiencing a service interruption, the Debtors have commenced these bankruptcy cases to facilitate and complete the wind-down process and liquidate their remaining assets in an orderly and timely fashion.

6.      Additional factual background regarding the Debtors, including their historical business operations and the events leading to the filing of these chapter 11 cases is set forth in the

*Declaration of John C. DiDonato in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18] and fully incorporated herein by reference.[2]

**B.     The Accounts**

7.      The Accounts consist of various categories of accounts receivables consistent with numerous other provider management companies and other healthcare businesses. In the ordinary course of business, APP outsources its revenue cycle management ("RCM") services with respect to the Accounts to Medical Consultants, Inc., a subsidiary of R1 RCM, Inc. ("MCI"), and in addition utilizes well-known, experienced collection agencies Wakefield & Associates ("Wakefield") and Certified Revenue Management Executive "CRME"), and specialty RCM providers for billing and follow-up for workers compensation and motor vehicle accident healthcare claims. In addition, APP has active independent dispute resolution ("IDR") claims in the arbitration process under the federal No Surprises Act ("NSA").

8.      In the ordinary course of business prepetition, the Debtors would from time to time, in lieu of continuing collection efforts of aged receivables, identify groupings of such receivables and sell them in a group to one of three buyers including Cascade Capital Funding, LLC after a short competitive private bid process. The liquidity generated by such private prepetition sales would ensure a more regular income stream than if collection agencies pursued individuals for payment of such aged receivables. The Accounts to be sold in the instant transaction expands on the Debtors' prepetition ordinary course practice by also including receivables that are earlier in the collections cycle and thus are likely to have a higher average collection rate.

---

[2] Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

9.      To obviate any privacy concerns the proposed transaction builds in substantial protections of protected health information ("PHI") consistent with Privacy Regulations of the Health Insurance Portability and Accountability Act ("HIPAA"). APP and the Buyer have entered into a business associate agreement ("BAA"). Accordingly, the Buyer has agreed to comply with the requirements of HIPAA and manage and maintain any PHI (as defined in HIPAA) obtained from APP always in compliance with, the HIPAA Privacy Regulations. The protections built into the transaction are consistent with industry practice relating to sales of patient services receivables like those proposed to be sold pursuant to this Motion.  Such sales are commonplace in the Debtors' industry.

10.      The Debtors' Accounts and/or proceeds from Accounts to be sold can be categorized or pooled separately as set forth below:

•      "*Pool 1 Accounts*". The Pool 1 Accounts consist of approximately $60 million gross face balance of aged patient services receivables that have been previously sent for collection to CMRE;

•      "*Pool 2 Accounts*". The Pool 2 Accounts consist of approximately $242 million gross face balance of aged patient services receivables that have been previously sent for collections to Wakefield;

•      "*Pool 3 Accounts*". The Pool 3 Accounts consist of approximately $274 million gross face balance of active patient services accounts receivables managed by MCI, comprised of Blue Cross and other managed care claims; private pay claims; Medicare, Medicaid and Tricare claims; and Workers Compensation ("WC") and motor vehicle accident ("MVA") healthcare claims.

- "*Pool 4 Accounts*". The Pool 4 Accounts consist of a pool of accounts that are in the NSA / IDR process.

## C.    The Debtors' Marketing of the Accounts

11.    The Debtors have appropriately marketed the Accounts.  As described in more detail below, the Debtors began marketing the Accounts in early October 2023.  Ultimately, on December 7, 2023, the Buyer offered a bid that, in the Debtors' opinion, represented the best available offer. Given the Debtors' marketing of the Accounts, the Debtors believe that the proposed private sale of the Assets to the Buyer represents the highest and best purchase price and is in the best interests of the Debtors' estates.

12.    The Debtors' initial list of potential buyers was compiled based upon the Debtors' historic practice of periodically bundling and selling aged patient services accounts receivables resulting from emergency department and hospitalist provider services that had previously been sent for collection to Wakefield or CMRE to enhance the Debtors' liquidity, as discussed above. There are a limited number of buyers for receivables of this magnitude in this industry. The Debtors contacted all of the significant prospective purchasers of emergency department and hospitalist provider services accounts receivable.

13.    On November 14 and 15, 2023, the Debtors commenced formal discussions with potential buyers regarding the Debtors' intended sale process[3] and on November 17, 2023 formally announced an offering for the purchase of the Accounts (the "Offering"), subject to approval of the Court.   After preliminary discussions with five (5) potential buyers, the Offering was transmitted to approximately four (4) known industry buyers of emergency department and

---

[3] The Debtors had conducted informal discussions with certain potential buyers as early as September 2023 and commenced marketing of the Accounts in October 2023.

hospitalist provider accounts receivable that signed an NDA and BAA governing protection of PHI, with a bid deadline of November 22, 2023, which was extended to December 13, 2023 in order to allow for bids to be included after the Thanksgiving holiday.  The timeframe for such discussions is consistent with industry practice. The Offering required all potential purchasers to describe in their bids any applicable adjustments, restrictions, and other material economic terms and conditions in order for the Debtors to ascertain the highest and best bid for the Assets.  The Offering disclosed that the Assets were for sale "as is, where is, and with all faults".  The Debtors received three bids by the bid deadline, as extended. Two bids were for all of the Accounts and one bid was for only a portion of the portfolio. On December 4, 2023, after initial discussions regarding the first round of bids, the Debtors received a second round of "highest and best" bids from the same three bidders.

14.     The Debtors, with the assistance of their advisors, analyzed each of the bids and determined that the offer submitted by the Buyer constituted the highest and best bid for the Accounts. This determination was reached based upon several factors. First, the Buyer's bid is an "all in" bid for the entire portfolio of APP's Accounts. This bid for the entirety of the Accounts eliminates the requirement to conduct further piecemeal sales of Accounts, which would be more costly and require additional time and resources to complete.   The Debtors' also considered the likelihood of closing.  Additionally, the Buyer is also a "single entity" purchaser, which eliminates the time constraints and uncertainty of negotiating a Sale Agreement with multiple parties bidding for separate lots of the Accounts.  The Buyer also has a proven track record in the industry of timely closing similar deals, which provides additional assurances that the Sale will close by the proposed Closing Date.  The Debtors have done prior deals with the Buyer, as a major purchaser

of emergency department and hospitalist provider accounts, which has demonstrated the ability to fund transactions timely.

15.     Following the selection of the Buyer as the highest and best bidder for the Assets, the Debtors then negotiated and entered into the proposed Sale Agreement with the Buyer, which was executed effective December 14, 2023.

16.     The Debtors believe that private sale of the Accounts to the Buyer is in the best interests of the estates because a prolonged sale process and another auction for the Assets is not likely to obtain a higher and better purchase price for several reasons.  As noted above, the market of potential buyers of the Assets is relatively limited and, as the Debtors engaged in the sale of its aged receivables in the ordinary course of business prepetition, these potential buyers are well-known to the Debtors.  The Debtors considered multiple offers that likely drive the price to the highest point. Even if the Debtors conducted a public auction, it is unlikely that they would receive a higher and better bid than the one currently offered by the Buyer.  The Debtors believe that the likely best case scenario in an auction would be that previous bidders would either submit the same bid, or would not be willing to conduct the necessary diligence to go through the process again. By the time an auction is held, some of the receivables will have aged further and thereby lose value. It is also unlikely that an auction would yield additional market participants given the Debtors' "distressed" status within the industry. The Debtors' prepetition secured lenders have consented to the Sale Agreement.

17.     The material terms of the proposed sale contemplated by the Sale Agreement are summarized below.

## RELIEF REQUESTED

18.     Pursuant to sections 105 and 363 of the Bankruptcy Code and Rules 6004, 9007, and 9014 of the Bankruptcy Rules, the Debtors seek entry of the proposed Sale Order, substantially in the form annexed as **Exhibit 1** hereto, approving the Sale Agreement and authorizing the sale of the Assets to the Buyer free and clear of all liens, claims, interests and encumbrances, pursuant the private sale contemplated thereby.

## MATERIAL TERMS OF THE SALE AGREEMENT

19.     The following chart summarizes the key terms and conditions of the Sale Agreement:[4]

| Provision | Summary Description |
|---|---|
| **Parties** | "Seller": American Physician Holdings, LLC ("APPHL") on behalf of itself and those persons and/or entities listed on Schedule 1 attached to the Sale Agreement (such persons and entities other than APPHL, the "Affiliated Parties" and along with APPHL, "APP")<br><br>"Buyer": Cascade Capital Funding, LLC (non-insider)<br><br>Preamble to Sale Agreement |
| **Assets to be Sold to Buyer** | "Assets": (a) accounts receivable owing to APP for services rendered to individuals in the ordinary course of business, including all rights to payment and collection from any payor including but not limited to commercial insurance, government insurance and patient self-pay, and any amounts awarded and fees refunded pursuant to the independent dispute resolution of the federal No Surprises Act ("Accounts") and (b) any payments ("Gap Payments") with respect to any Account sold under the Sale Agreement which is received by APP from any third party (including any payments received from any agents of APP) on or at any time between November 16, 2023 and the Closing Date<br><br>Recitals to Sale Agreement, Definitions, and Section 2.1 |

---

[4] This summary, including any references to the Sale Agreement contained herein (the "Summary"), are provided for the convenience of the Court and parties in interest. To the extent there is any conflict between the Summary and the Sale Agreement, the Sale Agreement shall govern in all respects. Capitalized terms used in the Summary shall have the meanings ascribed to them in the Sale Agreement. All references to sections in the Summary shall refer to sections of the Sale Agreement. Unless otherwise noted, any defined terms used in this section have the meanings ascribed in the Sale Agreement.

| | |
|---|---|
| **Purchase Price** | The Purchase Price is $7,710,000<br><br>Not later than two (2) business days following the mutual execution and delivery of the Sale Agreement, Buyer shall deliver the amount of $1,927,500.00 (25% of the Purchase Price) to be held in escrow (the "Deposit"), which shall be credited to the Purchase Price at closing.<br><br>On the Closing Date, (a) Buyer shall authorize the release of the Deposit to APP and (b) Buyer shall pay to APP the balance of the Purchase Price (i.e., the amount equal to the Purchase Price minus the Deposit) net of the amount of Gap Payments calculated as of the Closing Date.<br><br>Sale Agreement, Sections 2.3, 3.2.1 and 3.2.3 |
| **Buyer Release of Claims** | Effective upon the Closing, Buyer hereby irrevocably and unconditionally waives, discharges and releases any and all litigation and other rights and claims of Buyer against APP (including, without limitation, for all Direct Payments made to APP (whether during the pre-petition or post-petition periods)) in any way related to prior purchased accounts receivable transactions to which APP and Buyer were parties.<br><br>Sale Agreement, Section 2.3 |
| **Closing Date** | January 12, 2024, or such other date as may be agreed to in writing by the Parties, subject to extension by APP pursuant to Article 10 of the Sale Agreement (the "Closing Date").<br><br>Sale Agreement, Section 2.3.1 |
| **Gap Payment Date** | The Closing Date.<br><br>Sale Agreement, Section 2.4 |
| **Conditions to Closing** | Typical conditions, plus entry of Sale Order<br><br>Sale Agreement, Section 3.1 |

20.     In the Debtors' business judgment, the proposed sale is fair, reasonable, and the best available option to maximize value for the Debtors and all stakeholders under these circumstances, as more fully explained below.

**BASIS FOR RELIEF**

**A.    The Court Should Approve the Private Sale to the Buyer**

21.    The Debtors submit that the approval of a private sale of the Assets to the Buyer, pursuant to the terms of the Sale Agreement, is the best course of action under the circumstances to maximize the value of the Assets for the Debtors' estates.   As noted above, prior to the commencement of these chapter 11 cases, the Debtors had already had dealings with certain of the major players in the industry and have marketed the Assets to the known universe of potential buyers for these types of assets.   Additional marketing is unlikely to yield a higher and better Purchase Price.   The Assets are likely to diminish in value as they age, and the Debtors do not believe that anyone will offer a higher or better price for the Assets other than the Buyer; hence, the Debtors propose to proceed on the basis of a private sale.

22.    Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Thus, subject to court approval, the Bankruptcy Code permits a debtor to enter into a transaction outside the ordinary course of business as long as there are "sound business justifications" that support such action.  *Committee of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (citing *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) and concluding that the Third Circuit follows the "sound business purpose" rather than the only in "emergencies" rule and requires a "good faith" finding).

23.    In order to ascertain the existence of a sound business purpose for any sale out of the ordinary course of business, this Court must find "some articulated business justification" for

the proposed action. *Delaware & Hudson Ry. Co.*, 124 B.R. at 175-76; *see also In re Lionel Corp.*, 722 F.2d at 1070; *Titusville Country Club v. PennBank* (*In re Titusville Country Club*), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 19 (Bankr. E.D. Pa. 1987); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgement rule on the merits is a near-Herculean task").

24.     Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved:  (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided.  *See Lionel,* 722 F.2d at 1071-72 (setting forth the "sound business justifications" requirement); *Abbotts Dairies,* 788 F.2d at 145-57 (interpreted by courts as implicitly adopting the articulated business justification test and adding the "good faith" requirement); *Delaware & Hudson Ry.*, 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

25.     This fundamental analysis does not change if the proposed sale is private, rather than public.  *See, e.g.*, *In re Ancor Exploration Co.,* 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b).").  The bankruptcy court "has ample discretion to administer the estate, including the authority to conduct

public or private sales of estate property."); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); *accord*, *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).  Thus, a court-approved auction process is not required as long as the four-factor test is met.  *See, e.g.*, *In re Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49-50 (Bankr. S.D.N.Y. 2016) ("[E]ven asset sales are not conditioned on such a requirement [of a formal auction], which does not appear in the Bankruptcy Code or the Bankruptcy Rules.").  Here, the proposed private sale of the Assets to the Buyer meets all of these requirements and should be approved because the Assets have been adequately marketed and the Sale Agreement represents the highest and best offer therefor.

(i)        **There is a Sound Business Reason to Proceed with the Private Sale**

26.        The Debtors believe that consummating the sale of their Accounts on a private basis is appropriate in light of the facts and circumstances of these chapter 11 cases, and in the best interest of their estates.  The Debtors had already sold accounts similar to the Accounts in the ordinary course prior to the commencement of these chapter 11 cases.  Potential bidders are obviously aware that the Debtors are in chapter 11 and have limited funding to maintain operations.  As noted above, to the extent that potential bidders believe that the Assets are considered "distressed", they are likely to ascribe a lower purchase price.  The Debtors do not believe, based on their prepetition and postpetition marketing efforts, that they will be able to find an alternative viable buyer with the ability to close a transaction on the same or better terms as Buyer under the circumstances.

27.        Finally, the Debtors believe that their estates and creditors will benefit from the approval of the Sale Agreement without the need to incur added costs and delay associated with a

public auction and sale process, at which the Debtors are not guaranteed the commitment of the Buyer to adhere to the Sale Agreement at all, much less at the price to be provided through the Sale Agreement.  The financial terms of the Sale are relatively modest and unlikely to generate additional value sufficient to warrant the expense of another round of marketing and auction. Moreover, the Debtors' plan confirmation hearing is expected to be held concurrently with the hearing on the Sale.

      **(ii)**     **The Purchase Price is Fair and Reasonable Under the Circumstances**

28.     The Debtors believe the Purchase Price represents a fair and reasonable price for the Assets in light of the robust marketing efforts undertaken and the Debtors' economic and financial condition as set forth above.  No party has offered more consideration or indicated an intention to offer a higher price with certain and executable closing terms. Given the universe for the purchase of assets of this type and the marketing efforts made to date, the Debtors submit the price is fair and reasonable under the circumstances of this case.  *See e.g., In re Pursuit Cap. Mgmt.*, LLC, 874 F.3d 124, 128 (3d Cir. 2017) (trustee provided testimony that the offer represented a "fair and reasonable price").  Thus, the Debtors believe that the Buyer's offer is the highest and best offer under these circumstances.

      **(iii)**    **The Transaction is Proposed in Good Faith**

29.     The Debtors submit that the transaction has been proposed in good faith.  The terms of the Sale Agreement are the product of extensive arms-length negotiations with the Buyer.  The Buyer is not an affiliate of any of the Debtors or their officers, directors, or employees.  The Sale Agreement will also maximize the return on the Assets and minimize future administrative expenses.

### (iv)     Adequate Notice Has Been Provided

30.     With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that, the notice of a proposed use, sale or lease of property shall include the terms and conditions of any private sale and the deadline for filing objections. The notice of a proposed use, sale or lease of property is sufficient if it generally describes the property.  The Debtors have provided (or will timely provide) adequate notice of the proposed transaction to parties-in-interest.  *See* Fed. R. Bankr.P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also, Delaware & Hudson Ry.*, 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).  The Debtors submit that the information contained herein more than satisfies the notice requirements.

31.     The Debtors respectfully submit that, in their informed business judgment, there is nothing to be gained by conducting a formal auction of the Assets.  Even if there were other entities willing and able to overbid the Buyer (which the Debtors believe to be unlikely given marketing efforts made to date and the limited universe of buyers already known to and contacted by the Debtors), the likely diminishment in value associated with further delay is unlikely to yield higher and better offers.  For these reasons, the Debtors request that the Court not require the Debtors to conduct a public sale or to establish bidding procedures, but instead to approve the proposed transaction with the Buyer.

**B.      The Sale is Appropriate Pursuant to Bankruptcy Rule 6004(f)**

32.      Bankruptcy Rule 6004(f) authorizes a debtor to sell property outside of the ordinary course of business by private sale or public auction.   As discussed above, the proposed consideration represents a fair and reasonable value under the circumstances.  As previously noted, a court-approved auction process is not required to prove it so under the Bankruptcy Code, Bankruptcy Rules, or Local Rules.  *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49-50 (Bankr. S.D.N.Y. 2016).   Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold.  *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).

33.      The proposed Sale of the Accounts was already subject to an extensive negotiation process and resulted in a purchase price that is fair and reasonable under the circumstances.  In an exercise of their sound business judgment, the Debtors have determined that consummating the proposed sale on a private basis is appropriate in light of (i) the nature of the Assets being sold and (ii) the facts and circumstances chapter 11 cases and is in the best interest of their estates and all parties in interest.  The Debtors, therefore, respectfully submit that the Sale Agreement should be approved.

**C.      The Sale is Proposed in Good Faith Within the Meaning of 11 U.S.C. § 363(m)**

34.      As discussed above, the Sale Agreement was negotiated at arms-length and in good faith.  The Buyer is not affiliated with any of the Debtors or their representatives.  Accordingly, this Court should find that Buyer has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code.  *See generally*, *Marin v. Coated Sales, Inc.* (*In re Coated Sales, Inc.*), No.

89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also generally In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

**D.      The Sale Should Be Free and Clear of Any Liens, Claims, and Interests**

35.      In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)      such entity consents;

(c)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)      such interest is in bona fide dispute; or

(e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met). The proposed sale will satisfy at least one of the subsections of Section 363(f). The Debtors' secured lenders have consented to the transaction. Any other holder of alleged liens or security interests that raises a purported objection to the sale would be subject to bona fide dispute and/or could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. Moreover, the failure to object to the sale constitutes implied consent. Accordingly, the Debtors request that the

transfer be approved "free and clear," with any liens, claims, encumbrances and interests to attach to proceeds of the sale.

**E.     Relief Under Bankruptcy Rules 6004(h) is Appropriate**

36.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors' request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

37.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th rev. ed. 2022).

38.     To maximize the value received under the Sale Agreement, the Debtors seek to close the sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h).

**<u>NOTICE</u>**

39.     The Debtors will provide notice of this Motion to:  (a) the U.S. Trustee; (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) counsel to the Debtors' pre- and postpetition

lender; (e) counsel to the Committee; (f) Buyer; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

40.    No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Sale Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: December 15, 2023
       Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ *Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:     (302) 652-4400
Email:         ljones@pszjlaw.com
               dbertenthal@pszjlaw.com
               tcairns@pszjlaw.com
               pkeane@psjlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

**<u>EXHIBIT 1</u>**

**Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN PHYSICIAN PARTNERS, LLC, *et al.*,[1] | ) | Case No. 23-11469 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Ref. Docket No. __** |

**ORDER (I) AUTHORIZING (A) PRIVATE SALE AND (B) TRANSFER OF CERTAIN ACCOUNTS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING THE TERMS OF THE ACCOUNT PURCHASE AGREEMENT; AND (III) GRANTING RELATED RELIEF**

Upon the motion dated December 15, 2023 (the "Motion")[2] of the Debtors for an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, 9013, and 9014, (i) authorizing the private sale and transfer of certain of the Debtors' accounts receivable and for services rendered to individuals in the ordinary course of business, including all rights to payment and collection; (ii) approving the terms of that certain *Account Purchase Agreement* ("Sale Agreement") by and between Debtors American Physician Holdings, LLC ("APPHL"), on behalf of itself and those persons and/or entities listed on Schedule I to the Sale Agreement (the "Affiliated Parties" and along with APPHL, "APP"), and Cascade Capital Funding, LLC (the "Buyer"); and (iii) granting further relief; and the Court having jurisdiction to

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/AmericanPhysicianPartners. The location of American Physician Partners, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 5121 Maryland Way, Suite 300, Brentwood, TN 37027.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and

the *Amended Standing Order of Reference of the United States Court for the District of Delaware,*

dated February 29, 2012; and consideration of the Motion and the requested relief being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under

the circumstances; and it appearing that no other or further notice need be provided; and the Court

having reviewed the Motion; and the Court having determined that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief

requested is in the best interests of the Debtors, their estates, and all parties in interest; and after

due deliberation; and good and sufficient cause appearing therefor;

## THE BANKRUPTCY COURT HEREBY FINDS, ORDERS, ADJUDGES, AND DECREES that[3]:

1.      The Motion is GRANTED as set forth herein.

2.      The Sale Agreement annexed hereto as **Exhibit A** and the sale of the Assets are

hereby approved as being in the best interest of the Debtors' estates and their stakeholders. The

Debtors are hereby authorized and empowered to enter into, consummate, implement and perform

their obligations under the Sale Agreement, and to execute, deliver, and perform such agreements,

instruments, and documents and take any other actions that may be reasonably necessary and

desirable to implement and effectuate the terms of the Sale Agreement, this Sale Order, and the

Sale, without any further corporate action or orders of the Court.

---

[3] All findings of fact and conclusions of law set forth in this Sale Order or announced by the Court at the hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

3.      At the closing of the sale, the Debtors shall be, and hereby are, authorized and empowered by sections 105 and 363(b) and (f) of the Bankruptcy Code to sell and effectuate the transfer of the Assets to Buyer.  The sale of the Assets by the Debtors to Buyer shall constitute a legal, valid and effective transfer of the Assets, notwithstanding any requirement for approval or consent by any person, and vest Buyer with all rights, title, and interests of the Debtors in the Assets, subject to the terms of the Sale Agreement.

4.      The negotiation of the Sale Agreement was non-collusive, conducted in good faith, and is substantively and procedurally fair to all parties and interest.  None of the Debtors or the Buyer has engaged in any conducted that would cause or permit the Sale Agreement or the transaction contemplated thereby to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n).  The Buyer is a good faith purchaser within the meaning of Bankruptcy Code section 363(m), and is therefore granted and is entitled to all the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  Neither the Debtors nor the Buyer, nor any of their equity owners, officers, directors, employees, professionals or other agents have engaged in any action or inaction that would (a) cause the entry into the Sale Agreement, or consummation of the transactions contemplated thereby, to be avoided, or (b) result in costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  Entry into the Sale Agreement is undertaken by the parties thereto without collusion, and in good faith, as that term is used in 363(m) of the Bankruptcy Code.  All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed.  The Buyer is not an "insider" of any Debtor (as defined under section 101(31) of the Bankruptcy Code).  The reversal or modification on appeal of the authorization provided herein to

enter into the Sale Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions (including the Sale Agreement), unless such authorization is duly stayed pending such appeal.

5.      The sale is hereby approved pursuant to section 363(f) of the Bankruptcy Code. The Assets sold pursuant to the Sale Agreement shall be transferred free and clear of all liens (including without limitation, any statutory lien and any and all "liens" as that term is defined and used in the Bankruptcy Code), liabilities, interests, rights, claims, encumbrances, and interests the the fullest extent permissible pursuant to section 363(f) of the Bankruptcy Code; *provided that* with such liens, claims, encumbrances and interests to attach to the sale proceeds of the Assets. Neither the Sale Agreement nor the Assets under the Sale Agreement shall be subject to any avoidance claim or cause of action arising under section 363(n) or chapter 5 of the Bankruptcy Code.  The Buyer would not have entered into the Sale Agreement and would not consummate the transactions contemplated thereby if the sale of the Assets to the Buyer was not free and clear of all liens, claims, encumbrances, and other interests, or if the Buyer would, or in the future could, be liable for any such liens, claims, encumbrances, or other interests.  The holders of any liens, claims, encumbrances, or other interests against the Debtors, their estates, or any of the Assets who did not object, who withdrew their objections, or whose objections were overruled, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. To the extent any person or entity that has filed statements or other documents or agreements evidencing liens, claims, encumbrances, or other interests in all or any portion of the Assets, and such person or entity has not filed and executed the appropriate termination statements, instruments of satisfaction, releases of liens and easements, or any other documents necessary to

document the release of such liens, claims, encumbrances, or other interests, the Debtors are hereby authorized, and the Buyer is hereby authorized on the Debtors' behalf, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets. For the avoidance of doubt, the Debtors and the Buyer are each authorized to file, register, or otherwise record a copy of this Sale Order, which, upon filing, shall be conclusive evidence of the release and termination of such liens, claims, encumbrances, or other interests.

6.      Upon the Closing, except as provided in the Sale Agreement, the entry of this Order shall mean that the Buyer (and any of its affiliates, successors, or assigns), as a result any action taken in connection with the Sale Agreement or the consummation of the transactions contemplated thereby, shall not be, nor be deeded to: (a) be a legal successor or successor to the Debtors: (b) have, *de facto*, merged or consolidated with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or otherwise be deemed to be acting in concert or active participation with the Debtors.

7.      Nothing contained in the Motion or this Sale Order, nor any payment made pursuant to the authority granted by this Sale Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

8.      Notwithstanding Bankruptcy Rule 6004(h), this Sale Order shall be effective and enforceable immediately upon entry.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and obtaining a stay prior to the closing of the sale or risk its appeal being foreclosed as moot.

9.      The Debtors and the Buyer are authorized to take all action necessary to effectuate the relief granted in this Sale Order in accordance with the terms of the Sale Agreement.

10.      The Sale Agreement and any related agreements, documents, or other instruments may be waived, modified, amended, or supplemented by the parties thereto, and in accordance with the terms thereof, without further order of this Court; *provided that* any such waiver, modification, amendment or supplement does not have a material adverse effect on the Buyer or the Debtors' estates.

11.      This Sale Order shall inure to the benefit of the Buyer and the Debtors, and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee that may be appointed in these chapter 11 cases, and shall be binding upon any trustee, party, entity, or fiduciary that may be appointed in connection with these chapter 11 cases or any other or further cases involving the Debtors, whether under chapter 7 or chapter 11 of the Bankruptcy Code.

12.      To the extent any provision of this Sale Order conflicts with the terms and conditions of the Sale Agreement, this Sale Order shall govern and control.

13.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Sale Order.

## EXHIBIT A

**Sale Agreement**

CONFIDENTIAL

## ACCOUNT PURCHASE AGREEMENT

This Account Purchase Agreement (the "Agreement") is made and entered into as of December 15, 2023 by and between American Physician Holdings, LLC ("APPHL"), Chapter 11 Debtor and Debtor-in-Possession in Case No. 23-11469 (BLS) (the "Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), such entity having its business mail received at PO Box 150569 Nashville, TN 37215, on behalf of itself and those persons and/or entities listed on Schedule 1 attached hereto and incorporated herein by this reference (such persons and entities other than APPHL, the "Affiliated Parties" and along with APPHL, hereinafter collectively referred to as" APP") and Cascade Capital Funding, LLC ("Buyer"), with its principal place of business at 5341 Old Redwood Highway, Suite 201, Petaluma, CA 94954 (each a "Party, and collectively, the "Parties").

In consideration of the mutual promises in this Agreement and other good and valuable consideration, the sufficiency and receipt of which is mutually acknowledged, the Parties agree as follows:

## ARTICLE 1 DEFINITIONS

"**Accounts**" means accounts receivable owing to APP for services rendered to individuals in the ordinary course of business, including all rights to payment and collection from any payor including but not limited to commercial insurance, government insurance and patient self-pay, and any amounts awarded and fees refunded pursuant to the independent dispute resolution ("IDR") of the federal No Surprises Act ("NSA").

"**Affiliated Parties**" has the meaning ascribed to such term in the Preamble to this Agreement.

"**APP**" and "**APPHL**" have the respective meanings set forth in the Preamble to this Agreement.

"**Approval Order**" shall mean an order of the Bankruptcy Court entered in the Case in form and content reasonably satisfactory to each of Buyer and APP approving this Agreement.

"**Buyer**" shall refer to Cascade Capital Funding, LLC, and its officers, agents, employees, successors, and assigns.

"**Closing**" is defined in Section 3.2 below.

"**Closing Date**" means the date on which APP will transfer all right, title and interest in the Portfolio and Gap Payments to Buyer and the Buyer will pay APP for the Portfolio. The Closing Date is set forth in Section 2.3.1, subject to extension by APP pursuant to Article 10 hereof.

"**Deposit**" means Good Funds in an amount equal to twenty-five percent (25%) of the Purchase Price.

"**Direct Payment(s)**" means any payment with respect to any Account sold under this Agreement, which is received by APP from any third party (including any payments received from any third-party collection agents of APP) on or at any time following the Closing Date.

"**File**" refers to any APP (a) disc, tape, CD-ROM or other agreed physical media, or (b) electronic file (e.g. SFTP, zip), provided to Buyer that identifies the Accounts to be sold and assigned to Buyer under this Agreement.

"**File Date**" means the date the File was created.

"**Gap Payments**" means any payment with respect to any Account sold under this Agreement which is received by APP from any third party (including any payments received from any agents of APP) on or at any time between November 16, 2023 and the Closing Date.

"**Gap Payment Due Date**" will have the meaning set forth in Section 2.4.

"**Good Funds**" is defined in Section 2.3 hereof.

CONFIDENTIAL

**"Governmental Entity"** means (i) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (ii) any federal, state, local, municipal, or other government of the foregoing, (iii) any governmental or quasigovernmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iv) anybody (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

**"Portfolio"** means a group of Accounts, as identified in a corresponding File, that meet the criteria (in the Summary Sheet) and that that are to be sold and transferred to Buyer on the Closing Date.

**"Summary Sheet"** means the schedule attached to and made a part of this Agreement as Exhibit 1. The Summary Sheet contains: the name/date of the File, the aging criteria for Accounts in the Portfolio and the addresses to be used for notices in respect to this Agreement, and may contain the number of Accounts and the aggregate balance of the Accounts included in the Portfolio.

**"Transaction Detail"** means a file listing all transactions received from any collection agency, vendor, provider or agent with whom the Accounts were placed along with the transaction history of the Accounts and the details of any existing payment arrangements.

## ARTICLE 2    SCOPE AND PURCHASE PRICE

2.1    **Agreement to Sell.** Subject to the terms and conditions in this Agreement, APP agrees to sell to Buyer and Buyer agrees to buy from APP, free and clear of any and all security interests, liens and encumbrances to the extent provided in the Approval Order only, all of APP's right, title and interest in the Accounts in the Portfolio and the Gap Payments.

2.1.1    For the avoidance of doubt, the Parties agree that whenever the terms "the Portfolio" or "the Purchase Price" are used in the singular in this Agreement (including such use in the Assignment attached as Exhibit 3), the same (as the context may require) are intended to refer collectively to *each* Portfolio to be sold and transferred pursuant to this Agreement and collectively to the *corresponding* Purchase Price for each such Portfolio. In like manner, "Gap Payments" and "File" are intended to refer collectively to *each corresponding* Portfolio to be sold and transferred pursuant to this Agreement.

2.2    **Delivery of File.** APP will use commercially reasonable efforts (which term, whenever used in this Agreement, shall not be deemed to obligate the Party required to use such efforts to (x) initiate or pursue any action or proceeding of any type or kind against any person or entity, or (y) pay or incur any fee, charge or similar amount to any person or entity) to deliver to Buyer (i) the Collection (Debt Buyer) File Format from Medical Consultants, Inc., a subsidiary of RI ("MCI") as detailed on Exhibit 4 for all Accounts and (ii) the File and the Transaction Detail for the applicable Accounts being serviced by collection agencies, in advance of the Closing Date. Unless otherwise agreed in writing, APP shall use commercially reasonable efforts to cause any File and Transaction Detail to be delivered under this Agreement to be delivered not less than three (3) business days (which term shall refer for purposes of this Agreement every Monday through Friday other than those which are federal bank holidays), prior to the corresponding agreed Closing Date. APP shall use commercially reasonable efforts to cause the File and the Transaction Detail to contain, at a minimum, the respective data fields identified in Exhibit 4.

2.3    **Purchase Price.**
The number of Accounts in the combined Portfolio is: **587,562 (as per Exhibit 1 and supporting schedules provided)**.

The aggregate balance of the Accounts in the combined Portfolio is **$565,025,751 (as per Exhibit 1 and supporting schedules provided).**

The amount Buyer agrees to pay APP (the "Purchase Price"), in cash or other immediately available good funds of the United States of America ("Good Funds"), for the combined Portfolio is **$7,710,000.**

CONFIDENTIAL

Reference bid summary of combined Portfolio in Exhibit 1 for individual bid level details.

Effective upon the Closing and notwithstanding any other provision hereof, Buyer hereby irrevocably and unconditionally waives, discharges and releases any and all litigation and other rights and claims of Buyer against APP (including, without limitation, for all Direct Payments made to APP (whether during the pre-petition or post-petition periods)) in any way related to prior purchased accounts receivable transactions to which APP and Buyer were parties. To the extent that there is any litigation or other proceeding pending in any jurisdiction (including, without limitation, the Bankruptcy Case) with respect to any rights or claims which are the subject of this provision, promptly following the Closing (and in any event no later than fifteen (15) days thereafter), Buyer shall take all steps necessary to cause such litigation or other proceeding to be terminated and dismissed with prejudice.

2.3.1    **Closing Date.**  The Closing Date will be January 12, 2024, or, subject to extension by APP pursuant to the provisions of Article 10 hereof, such other date as may be agreed to in writing by the Parties.

2.4       **Gap Payment Date.** The Gap Payment Due Date shall be the Closing Date.

2.5       **HIPAA.** APP is a "covered entity", as defined in the Privacy Regulations of the Health Insurance Portability and Accountability Act ("HIPAA"). APP is entering into this Agreement in furtherance of the payment functions of APP. The Parties acknowledge and agree that protected health information ("PHI") (as defined in HIPAA) will be disclosed to Buyer, and used and disclosed by Buyer, including without limitation, use and disclosure to collection agencies, credit reporting agencies, and other agents, vendors, subcontractors and assignees of Buyer as Buyer deems necessary or desirable in effecting collection and payment on the Accounts sold under this Agreement. Additionally, Buyer agrees that it will only disclose PHI obtained from APP to Buyer's agents, vendors, subcontractors, and assignees that have agreed to, and will comply at all times with, the HIPAA Privacy Regulations.  APP acknowledges and agrees (expressly subject to the provisions of Section 2.5.1 below) that the ability of Buyer to receive, use and disclose PHI incident to the collection of such Accounts is a material inducement to Buyer's entering into this Agreement.

2.5.1     The terms of the "Business Associate Agreement" between the Parties (executed prior hereto (as modified and amended concurrently with the mutual execution hereof) or executed concurrently with this Agreement and attached hereto as Exhibit 2) is an integral part of this Agreement and is incorporated herein by reference, and will apply to and be complied with by Buyer in connection with any use and/or disclosure by Buyer of any PHI under this Agreement.

### ARTICLE 3    DELIVERY OF DEPOSIT, LIQUIDATED DAMAGES, CONDITIONS TO CLOSING AND CLOSING DATE OBLIGATIONS

3.1       **Closing Conditions.**        In addition to all other conditions to a Party's obligations hereunder set forth under the other provisions of this Agreement, both Buyer's and APP's obligations to consummate the transaction contemplated herein shall be subject to (a) the Approval Order having been entered by the Bankruptcy Court and the Approval Order being unstayed and in full force and effect as of the Closing Date, and (b) there being no temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an order.  Further, each Party's obligations with respect to the Closing shall be conditioned upon the other Party hereto having performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by such Party on or prior to the Closing Date.

3.2       **Obligations Relating to Payment of the Purchase Price.**

3.2.1     Not later than two (2) business days following the Parties' execution and delivery of this Agreement (the date of such mutual execution and delivery is sometimes referred to herein as the "Execution Date"), Buyer shall deliver the Deposit to Bass, Berry & Sims PLC (such entity, or another entity designated by APP in writing, the "Escrow Holder") an amount equal to $1,927,500.00 (the "Deposit"). In turn, the Escrow Holder shall immediately

**CONFIDENTIAL**

deposit the Deposit into a trust account to be held and disbursed only in accordance with the provisions of this Agreement. The Deposit shall become nonrefundable upon the termination of the transaction contemplated by this Agreement pursuant to Section 9.1 hereof by reason of Buyer's default hereunder (a "Buyer Default Termination"). At the Closing, the Deposit shall be credited and applied toward payment of the Purchase Price. In the event the Deposit becomes nonrefundable by reason of a Buyer Default Termination, Escrow Holder shall immediately disburse the Deposit to APP to be retained by APP for its own account. In the event that (1) APP accepts an offer from another bidder for all or any part of the Portfolio, or (2) the transactions contemplated herein terminate by reason of (A) APP's material default under this Agreement, or (B) the failure of a condition to Buyer's obligations hereunder, Escrow Holder shall return to Buyer the Deposit within one (1) business day.

3.2.2    BUYER AND APP HEREBY ACKNOWLEDGE THAT, IN THE EVENT OF BUYER'S DEFAULT AND THE TRANSACTION CONTEMPLATED HEREIN FAILS TO CLOSE BY REASON OF SUCH DEFAULT, IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ESTIMATE THE RESULTING DAMAGES APP MAY SUFFER OR INCUR. ACCORDINGLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, BUYER AND APP HEREBY AGREE THAT CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AT THE EXECUTION OF THIS AGREEMENT, A REASONABLE ESTIMATE OF THE TOTAL DETRIMENT THAT APP WOULD SUFFER IN THE EVENT THAT THE TRANSACTION CONTEMPLATED HEREINFAILS TO CLOSE BY REASON OF BUYER'S DEFAULT IS AND SHALL BE AN AMOUNT EQUAL TO THE AMOUNT OF THE DEPOSIT. EXCEPT AS OTHERWISE PROVIDED IN CLAUSES (ii) AND (iii) BELOW, SAID AMOUNT SHALL REPRESENT THE FULL, AGREED, AND LIQUIDATED DAMAGES TO WHICH APP IS ENTITLED BY REASON OF ANY SUCH BREACH BY BUYER AND APP HEREBY EXPRESSLY WAIVES ANY AND ALL OTHER CLAIMS TO DAMAGES OR OTHER REMEDIES (WHETHER AT LAW OR IN EQUITY). THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT RATHER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO APP. UPON BUYER'S DEFAULT AND APP'S ELECTION TO TERMINATE THIS AGREEMENT BY REASON THEREOF IN ACCORDANCE WITH SECTION 9.1 HEREOF, THIS AGREEMENT SHALL TERMINATE AND EXCEPT FOR (i) APP'S RIGHT TO COLLECT THE AMOUNT OF SUCH LIQUIDATED DAMAGES, (ii) ANY PROVISIONS AND OBLIGATIONS (INCLUDING, WITHOUT LIMITATION, BUYER'S INDEMNITY OBLIGATIONS PURSUANT TO ARTICLE 6 HEREOF) OF THIS AGREEMENT WHICH BY THEIR TERMS SURVIVE ANY TERMINATION OF THIS AGREEMENT, AND (iii) THE PARTIES' RESPECTIVE OBLIGATIONS UNDER THE SECOND SENTENCE OF SECTION 11.1 OF THIS AGREEMENT REGARDING THE PREVAILING PARTY'S RIGHT TO RECOVER ATTORNEYS' FEES, THE PARTIES HERETO SHALL BE RELIEVED OF ANY FURTHER LIABILITY OR OBLIGATION UNDER THIS AGREEMENT. BY PLACING THEIR INITIALS IN THE SPACES PROVIDED BELOW, EACH PARTY SPECIFICALLY ACKNOWLEDGES AND CONFIRMS THE ACCURACY OF THE STATEMENTS SET FORTH ABOVE AND THAT THEY WERE REPRESENTED BY COUNSEL OF THEIR CHOICE WHO FULLY EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME OF EXECUTION OF THIS AGREEMENT.

APP's Initials: _____     Buyer's Initals: _L.B._

3.2.3    On the Closing Date: (a) Buyer shall authorize and instruct the Escrow Holder in writing to deliver the Deposit (in Good Funds) to APP, (b) APP shall identify the amount of the Gap Payments and such amount shall be applied as a credit in favor of Buyer toward payment of the Purchase Price, (c) Buyer shall pay to APP, by wire transfer to APP's bank in Good Funds and in accordance with such written transfer instructions as APP may provide to Buyer prior to the Closing Date the balance of the Purchase Price (i.e., an amount equal to the Purchase Price, minus the Deposit, minus the amount of the Gap Payments, plus other adjustments for charges of MCI related to file creation or processing charges, service fees payable to MCI for the period from and after December 31, 2023, and arbitration fees and collection agency fees paid during the period from November 16, 2023 to the Closing Date); (d) all of the Accounts in the corresponding Portfolio and all of APP's rights, title and interest in such Accounts and in the corresponding Gap Payments, shall be deemed irrevocably and permanently vested in and transferred to Buyer upon receipt by APP's bank of the balance of the Purchase Price as required by subpart (c) above; (e) APPHL shall immediately upon receipt of such balance of the Purchase Price execute and deliver to Buyer an Assignment of Accounts (in the form attached hereto as Exhibit 3); and (f) Buyer will be conclusively deemed to have received all

CONFIDENTIAL

data and information regarding the Accounts which is necessary to collect. The occurrence or deemed occurrence of all of the events/actions/authorizations described in subparts (a) through (f) of this Section 3.2.3 is sometimes referred to in this Agreement as the "Closing."

## ARTICLE 4    POST-CLOSING DATE OBLIGATIONS

4.1    **Cessation of APP operations; Gap Payments and Direct Payments.** On the Closing Date, APP will credit Buyer in the amount of the Gap Payments APP has received prior to such date toward payment of the Purchase Price. Buyer acknowledges and understands that APP is in the process of ceasing operations and such cessation of operations is expected to be final within 30 days following the Closing Date (the "Cessation Date"). Buyer acknowledges and understands that Gap Payments and Direct Payments may continue to be received in APP bank accounts following the Cessation Date and that APP will not have the capacity to facilitate transfers of Gap Payments or Direct Payments to Buyer after the Cessation Date. APP shall, at Buyer's expense, reasonably cooperate in good faith with Buyer following the Closing Date and prior to the Cessation Date to establish mechanisms and procedures designed to facilitate the reporting and transfer to Buyer of Direct Payments or Gap Payments (including, at APP's election, by crediting such amounts against amounts owing from Buyer to APP) received in APP bank accounts after the Cessation Date including reasonably cooperating in good faith to facilitate transferring control of or providing to Buyer access to such accounts. Upon confirmation of APP's Plan of Liquidation (the "Plan"), APP shall use commercially reasonable efforts to (i) provide that the liquidating trust to be established under the Plan shall use commercially reasonable efforts (at no material cost or expense to the trust) to maintain, for a period of not less than six (6) months following the Closing, either directly or by contract, all bank accounts into which payments on any Accounts purchased by Buyer hereunder are made, provided that in no event shall the trust be required to engage in litigation or similar activity in connection with such efforts, and (ii) include provisions in the Plan or the order of the Bankruptcy Court confirming the Plan (the "Confirmation Order" ) to effectuate the efforts of the liquidating trust as provided herein. Provided that APP has provided to Buyer sufficient information to identify accounts sold to third parties (such as a list of accounts purchased by third parties) and Buyer has obtained control of or access to the aforementioned APP bank accounts, Buyer shall use diligent and commercially reasonable efforts to reconcile ownership of those payments and for remittance to the applicable owners and Buyer shall, in addition to Buyer's obligations under Article 6 hereof, indemnify, protect and hold APP and the afore-referenced liquidating trust (and its trustee) harmless of, from and against any claims relating to such reconciliation and/or remittances after the Closing Date. Buyer will not assume any liability to such third party owners pursuant to the reconciliation or remittance process; provided, however, Buyer expressly acknowledges that nothing in this sentence shall be deemed to in any way limit or affect Buyer's obligations to APP, the liquidating trust and the liquidating trustee pursuant to the immediately preceding sentence of this Section 4.1. Buyer shall reimburse the trust for the actual expenses incurred in connection with maintenance of bank accounts following the Closing Date as provided herein. APP irrevocably authorizes Buyer and/or its agents to endorse, negotiate and deposit any checks or other payment instruments drawn by or on behalf of Account obligors and made payable to APP in payment of Accounts included in the Portfolio. Following the Closing, Buyer shall bear and pay all banking fees incurred in connection with the maintenance and operation of the bank accounts into which the payments described above are made.

4.2    **Documentation.** If either Party becomes involved in litigation with a responsible party or a patient, as may be applicable, the other Party agrees to expeditiously, following the other Party's receipt of a written request therefor, provide such reasonable documentation (including payment and collection history) as may be in the other Party's possession or control and assistance, in each of the foregoing cases at the requesting Party's cost and expense. APP shall use commercially reasonable efforts to obtain and provide to Buyer by not later than five (5) days before the Closing Date, imaged copies of itemized billing statements. Notwithstanding the above or anything else to the contrary herein, Buyer hereby expressly acknowledges that APP is not able (and will have no obligation or responsibility) to obtain, provide or seek to facilitate delivery or maintenance by any third party of patient responsibility forms for any of the Accounts.

4.3    **Instructions to Collection Agents.** At least five (5) days before the Closing Date, APP will (a) cease all internal collection efforts on the Accounts in the Portfolio and (b) instruct all collection agencies APP has/had retained to immediately cease all collection activities with respect to such Accounts (including removal of such Accounts from any reports such collection agency makes to credit reporting agencies). At least five (5) days before the Closing Date, APP will direct its collection agents to produce the Transaction Detail and File and use commercially reasonable

CONFIDENTIAL

efforts to seek compliance with this directive; provided, however, it is expressly understood and agreed that APP shall have no liability or responsibility to Buyer whatsoever should such agents fail to comply with such direction.

4.4     **Notice of Transfer.** Buyer or its agent will, as permissible and in accordance with applicable law, include in its initial written collection communication to the responsible party on the Accounts in the Portfolio a notice consistent with the provisions of this Agreement that provides that APP has transferred ownership of such Account(s) to Buyer.

4.5     **Notification of Claims.** Each Party will promptly (and, in no event later than five (5) business days after becoming aware of the same) notify the other in writing of any Claim (as defined in Article 6 below) against the other Party that may come to its attention.

4.6     **Compliance With Laws.** Buyer and APP will each comply fully and at all times with all applicable federal, state and local laws, ordinances, rules, regulations, codes, permits, licenses, authorizations and orders of any governmental body, agency, authority or court with regard to the Accounts that are the subject of this Agreement.

### ARTICLE5   CERTAIN COVENANTS, WARRANTIES AND REPRESENTATIONS OF THE PARTIES

5.1     **Buyer's Authority.** Buyer hereby represents and warrants to APP that it has the power and authority to enter into this Agreement and to fulfill its obligations herein without consent of any third party.

5.2     **APP'sAuthority.** Subject to entry of the Approval Order, APP hereby represents and warrants to Buyer that it has the power and authority to enter into this Agreement and to fulfill its obligations herein without consent of any third party.

5.3     **Buyer's Review of Data.** Buyer represents and warrants that it has reviewed the data and information provided by APP regarding the Accounts and has determined that upon receipt of the File and the Transaction Detail (which, as provided above, APP shall direct its collection agents to provide), there will be sufficient data and information regarding each Account to carry out Buyer's intended purpose.

5.4     Intentionally Omitted.

5.5     **Organization.** To the best of APP's knowledge, the entities comprising APP are all duly organized, validly existing and in good standing under the laws of their applicable states of formation or incorporation, with all requisite power and authority to conduct its business in each jurisdiction where it operates.

5.6     **Accuracy of File.** To the best of APP's knowledge and as represented to APP by its third party revenue cycle manager, Medical Consultants, Inc., a subsidiary of RI ("MCI"), the information and data contained in the File, is complete and accurate, as of the date of its delivery in all material respects. Notwithstanding the foregoing, as the Buyer acknowledges that APP relied on third parties (MCI and collection agencies) with respect to all information and data in the File, APP shall have no responsibility or liability to Buyer whatsoever for any inaccuracies contained therein.

5.7     Intentionally Omitted.

5.8     **Collection Activities.**

        5.8.1     APP hereby covenants and agrees that, following the Closing Date, APP will not take, or, to the extent APP can reasonably control the same, suffer or permit any action inconsistent with Buyer's ownership of the Accounts and the corresponding Gap Payments and Direct Payments, including but not limited to any action purporting to settle, renegotiate, restructure, novate or forgive any debt under any such Account.

        5.8.2     Buyer hereby covenants and agrees that, following the Closing Date, Buyer will not take any action which could injure or harm APP's reputation in the community or its relationships with patients and hospitals. Buyer further agrees not to institute legal action against any Account holder or customer. Notwithstanding the foregoing, or

**CONFIDENTIAL**

anything to the contrary herein, to the extent permissible under applicable law, nothing in this Agreement shall restrict Buyer's ability to initiate, maintain and continue any IDR process or arbitration with respect to the payment of claims or the Accounts, related to the NSA. At the Closing, Buyer shall reimburse to APP (either in cash or by providing a credit to APP increasing the Purchase Price) an amount equal to all arbitration fees paid by APP during the period from November 16, 2023 to the Closing.

5.8.3    Buyer hereby acknowledges that APP has disclosed to Buyer that MCI's service agreement with APP ends on December 31, 2023 (the "Service End Date") and further Buyer agrees that Buyer will bear and pay all fees and charges payable with respect to any continuation of MCI's services beyond the Service End Date from and after the Service End Date, until the later to occur of (i) the transfer of the ownership of the Accounts to Buyer, and (ii) if MCI determines, in its sole discretion, to enter into an agreement with Buyer to render its services directly to Buyer (a "New Service Agreement"), then the date on which such services are transitioned to Buyer to be rendered pursuant to such New Service Agreement.

5.9    **Accounts are As-Is and With All Faults.** Notwithstanding APP's representations and warranties in this Agreement or anything herein to the contrary herein, Buyer expressly acknowledges and agrees it has reviewed the Accounts and it will accept all of the Accounts "as is" and "with all faults" and that APP makes no representations or warranty whatsoever as to the collectability of the Accounts (or any of them).

### ARTICLE 6    INDEMNITY

Buyer agrees to defend, hold harmless and indemnify APP, its officers, directors, members, managers, employees and agents, from and against all liabilities, claims, demands, suits or judgments, damages, legal fees and costs, asserted by any third party (a "Claim") and arising out of or resulting from the activities of Buyer, its employees, agents, subcontractors, vendors and assignees with regard to the collection of Accounts in the corresponding Portfolio or based on arising out of breach of any of Buyer's duties, warranties or representations under this Agreement. APP may, at its own expense, be represented by its own counsel in defense of the Claim. For the avoidance of all doubt, the provisions of this Article 6 and Buyer's obligations hereunder shall survive the Closing.

### ARTICLE 7    LIMITATION OF LIABILITY

Except as to fraud, intentional misconduct, breaches of Section 4.6, and the liabilities and obligations of Buyer arising under Article 6, under no circumstances will either Party be liable to the other for any special, incidental, indirect, punitive, statutory or consequential damages resulting from, arising out of, or related to its performance or failure to perform any of its obligations under, or its breach of, this Agreement, whether or not such Party has been advised, knew, or should have known, of the possibility of such damages.

### ARTICLE 8    ASSIGNMENT

Neither Party may assign this Agreement, in whole or in part, without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of the Party to whom any such request for consent is directed), except that, notwithstanding anything to the contrary herein, APP shall have the right, without Buyer's consent, to transfer and assign this Agreement to any trustee appointed in the Case or any other successor or assign of or from APP pursuant to the Case. For the avoidance of doubt, Buyer may not sell any Account to a third party.

### ARTICLE 9    TERMINATION

9.1    **Certain Termination Rights.** For any material breach of any of the representations and warranties or of any covenants and obligations set forth in this Agreement (including, without limitation, the obligation of Buyer to post the Deposit and the obligation of Buyer to pay the Purchase Price, in each case, as and when required hereunder), the non-breaching Party hereunder may terminate this Agreement if such breach is not cured by the breaching Party within five (5) days after such breaching Party's receipt of written notice thereof unless this Agreement otherwise provides that such termination may be immediate, it being further agreed that neither Party shall be entitled to any cure rights hereunder with respect to any breaches that are not of a nature that can be cured. Any Party who is not then in breach

CONFIDENTIAL

hereunder, may also terminate this Agreement and the transactions contemplated herein immediately upon written notice to the other Party in the event that the Approval Order has not been entered by January 9, 2024 (the "Outside Entry Date," as the same may be extended by APP pursuant to the provisions of Article 10 below) or the Closing has not occurred by January 12, 2024 (the "Outside Closing Date," as the same may be extended pursuant to the provisions of Article 10 below). In addition, Buyer shall be permitted to terminate this Agreement immediately upon entry of an order by the Bankruptcy Court dismissing the Case, converting the Case to a proceeding under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Case or appointing an examiner with expanded powers in the Case, but in each of the foregoing cases, only if the action or event described occurs prior to the Closing.

9.2     **No Further Collections**.  If this Agreement terminates as set forth above in Section 9.1 above, Buyer shall immediately cease collection efforts and return all of the Accounts transferred to Buyer hereunder, including any and all information and documentation in the possession of Buyer pertaining to Buyer's collection activities on such Accounts, to APP within ten (10) days of the date of termination.

<h3 style="text-align:center">ARTICLE 10    CERTAIN BANKRUPTCY MATTERS</h3>

Promptly following mutual execution and delivery of this Agreement, APP shall file a motion with the Bankruptcy Court seeking entry of the Approval Order (the form and substance of which Approval Order shall be subject to both Buyer's and APP's reasonable approval and shall be consistent with the terms of this Agreement). APP shall use commercially reasonable efforts to obtain the Approval Order and Buyer shall reasonably cooperate, if requested by APP, in such efforts. If the Bankruptcy Court has not entered the Approval Order by the Outside Entry Date or the Closing has not occurred by the Outside Closing Date, as applicable, and APP does not elect (which election shall be in APP's sole and absolute discretion) in writing to extend the Outside Entry Date and/or the Outside Closing Date, as applicable (with any such extension of such dates to be no longer than thirty (30) days in length), then, as long as they meet the requirements of the last sentence of Section 9.1, Buyer or APP may terminate this Agreement in accordance with Section 9.1. Notwithstanding anything else to the contrary herein, Buyer expressly acknowledges and agrees that this Agreement is subject to higher and better offers which may be submitted by third parties and considered by APP and the Bankruptcy Court at the Bankruptcy Court hearing on APP's motion for entry of the Approval Order, provided, however that Buyer may immediately terminate this Agreement in its entirety in the event that APP accepts an offer from another bidder for all or any part of the Portfolio.

<h3 style="text-align:center">ARTICLE 11    NOTICES AND MISCELLANEOUS</h3>

11.1     **Remedies**.  All remedies of the Parties will be cumulative. If a Party breaches, the non-breaching Party will be entitled to seek injunctive relief in addition to any remedy at law for actual damages, and the prevailing Party in any litigation or proceeding will be entitled to its reasonable attorney's fees and costs and expenses of suit.

11.2     **Notices**.  All notices required or permitted to be given under this Agreement must be in writing and will be deemed received by the Party to whom addressed, (a) immediately if delivered personally or by facsimile with proof of successful transmission, (b) one (1) business day after over-night dispatch by nationally recognized courier, or (c) five (5) business days after dispatch by certified U.S. mail postage prepaid, return receipt requested. Such notices must be directed as set forth in the Summary Sheet of this Agreement; or to such other address as either Party specifies in a written notice to the other Party given in accordance with the provisions hereof.

11.3     **Entire Agreement**.  This Agreement, the File(s), the Transaction Detail, and the attachments, schedules, and exhibits referred to herein constitute the entire agreement and understanding between the Parties and supersede and merge all prior proposals, understandings and all other agreements, with respect to the subject matter contained herein.

11.4     **Waivers and Modifications; Time of the Essence**.  This Agreement may not be amended except by a writing executed by all of the Parties hereto. No provision hereof may be waived except by a writing signed by the Party against whom any such waiver is sought to be enforced. The Waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach. Time is of the essence with respect to performance of each Party's obligations under this Agreement.

**CONFIDENTIAL**

11.5    **Governing Law, Waiver of Jury Trial, Etc.** This Agreement will be governed by and construed in accordance with the laws of the State of Delaware. Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Bankruptcy Court. Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court for the purpose of any such suit, action or other proceeding. A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth herein shall be effective service of process for any such action, suit or proceeding. Nothing in this Section 11.5, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

11.6    **No Third Party Beneficiaries.** This Agreement is solely between APP (including, without limitation, those Affiliated Parties on whose behalf APPHL is executing this Agreement) and Buyer and is not intended to confer any rights whatsoever on any third parties (other than (i) as provided in the indemnity in favor of the liquidating trust and liquidating trustee included in Section 4.1 hereof, (ii) such Affiliated Parties on whose behalf APPHL is executing this Agreement, and (iii) any trustee appointed in the Case or any other successor or assign of or from APP pursuant to the Case).

11.7    **Effect of Invalid Provisions.** If any provision of this Agreement is held to be invalid, illegal or unenforceable, it will be deemed severed from this Agreement without affecting the validity, legality or enforceability of the remaining provisions of this Agreement.

11.8    **Execution in Counterparts.** This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.

11.9    **Manner of Delivery.** Delivery of an executed counterpart of a signature page to this Agreement, any Ancillary Document or any other agreement or document by facsimile or scanned pages (whether prior to, at or after the Closing) shall be effective as delivery of a manually executed counterpart of the applicable document. No Party shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission as a defense to the formation or enforceability of this Agreement, any Ancillary Document or any such other agreement or document and each Party forever waives any such defense. The words "execution," "executed", "signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, SignNow and DocuSign).

11.10    **Effect of Legal Holidays, Etc.** If any Direct Payment Due Date, Gap Payment Due Date, File delivery date or Closing Date falls on a legal holiday, such date will be deemed to be the next business day that is not a legal holiday. Where the term "month" or "monthly" period is used herein, unless the context requires otherwise, such term refers a calendar month.

11.11    **Effect of Closing on Continuation of Obligations.** Except only for the Parties' respective rights and obligations, as applicable, under Section 2.5, Section 3.2, Section 5.8, Section 5.9, Section 9.2, Article 4("Post Closing Date Obligations"), Article 6 ("Indemnity"), Article 7 ("Limitation of Liability"), Article 8 ("Assignment"), and this Article 11 ("Notice and Miscellaneous Provisions"), which will survive the Closing Date or any termination of this

**CONFIDENTIAL**

Agreement, all representations, warranties and other obligations of the Parties hereunder shall lapse and cease to be of any further force or effect upon the Closing.

11.12    **Agreement Not To Sue.** Buyer affirms that Buyer will not sue obligors as part of its collection practices with respect to the Accounts transferred to Buyer hereunder.

11.13    **No Resale of Accounts.** Upon portfolio purchase, Buyer shall not subsequently re-sell any Accounts to third parties.

11.14    **No Recourse to APP Representative.** Buyer acknowledges that John DiDonato (the "APP Representative") is entering into this Agreement solely in his capacity as Chief Restructuring Officer of APP's bankruptcy estate (and not in his individual or any other capacity) and that in the event of APP's default hereunder or under any document or instrument executed in furtherance of the transaction contemplated herein, APP Representative shall have no personal liability, it being expressly understood that Buyer's recourse in any such event shall be limited solely to the assets of APP's bankruptcy estate.

*[Signatures on following page]*

**CONFIDENTIAL**

As evidenced by their signatures below, the Parties hereby agree to be bound by the terms of this Account Purchase Agreement.

APPHL:   American Physician Holdings, LLC,
           Chapter 11 Debtor and Debtor in Possession, on behalf
           of itself and the Affiliated Parties

By: _____
    James E. Nugent

Its: Interim CEO and Deputy Chief Restructuring Officer

Date: December 15 , 2023

Buyer: Cascade Capital Funding, LLC

By: _____
    Lee Brockett

Its:  CEO

Date: December 15 , 2023

[Signature Page to Account Purchase Agreement]

CONFIDENTIAL

## SCHEDULE 1

### The Affiliated Parties

AMERICAN PHYSICIAN PARTNERS, LLC

APP OF ARIZONA ED, LLC
APP OF FLORIDA HM, LLC
APP EMERGENCY ED TX, INC.
APP OF OHIO ED, PLLC
CAPITAL EMERGENCY PHYSICIANS MADISON LLC

APP OF ILLINOIS ED, PLLC

APP OF ARIZONA HM, LLC
APP OF NEW MEXICO ED, PLLC
APP OF FLORIDA ED, LLC
APP OF ILLINOIS HM, PLLC

CAPITAL EMERGENCY PHYSICIANS LLC

APP OF NEW MEXICO HM, PLLC
APP OF GEORGIA ED, LLC
APP OF KENTUCKY ED, PLLC

APP OF TENNESSEE ED, PLLC

APP AZ ED MEMBER 1, LLC
APP MDPARTNERS, PLLC
APP OF TENNESSEE HM, PLLC

APP MANAGEMENT CO., LLC

APP AZ ED MEMBER 2, LLC

APP MDPARTNERS OF GA, LLC

APP OF MISSISSIPPI ED LLC

APP OF WEST VIRGINIA HM, PLLC

APP AZ ED MEMBER 3, LLC
APP OF MISSISSIPPI HM, LLC

ALIGN, M.D., PLLC

APPROVIDERS, LLC

APP OF WEST VIRGINIA ED, PLLC

APP OF ALABAMA ED, LLC

APP AZ ED MEMBER 4, LLC

**CONFIDENTIAL**

CALEB CREEK EMERGENCY PHYSICIANS, PLLC

APP OF ARKANSAS ED, PLLC
APP AZ ED MEMBER 5, LLC
COOSA RIVER EMERGENCY PHYSICIANS, PLLC
TRUEPARTNERS EMERGENCY PHYSICIANS LLC
APP OF ARKANSAS HM, PLLC
DEGARA APP, PLLC

APP AZ ED MEMBER 6, LLC

DEGARA APP HM, PLLC
DEGARA, P.L.L.C.

EMERGENCY SPECIALISTS OF WELLINGTON, LLC

DEGARA GARDEN CITY APP, PLLC

TRUEPARTNERS COMANCHE EMERGENCY SPECIALISTS LCC

APPTEXASHM, PLLC

TRUEPARTNERS LAKEWOOD INPATIENT SPECIALISTS LCC

TRUEPARTNERS WESTLAKE EMERGENCY SPECIALISTS LCC

APP OF MICHIGAN ED, PLLC

DEGARA GARDEN CITY, PLLC

ELITE EMERGENCY SERVICES OF KENTUCKY, PLLC

APP OF ALABAMA HM, LLC
APP OF EAST TENNESSEE HM, PLLC
ELITE EMERGENCY MANAGEMENT, PLLC
APP OF KANSAS ED, PLLC
APP OF INDIANA ED, PLLC

TRUEPARTNERS RANCH EMERGENCY SPECIALISTS LCC

ELITE EMERGENCY HOT SPRINGS, PLLC
NETEP,PLLC
APPTEXASED, PLLC
ELITE EMERGENCY RUSSELLVILLE, PLLC

TRUEPARTNERS MANATEE EMERGENCY SPECIALISTS LCC

ELITE EMERGENCY SVC OF KY, PLLC
ELITE EMERGENCY SVC OF TN, PLLC
APP OF CENTRAL FLORIDA ED, LLC

LITTLE RIVER EMERGENCY PHYSICIANS, PLLC

**CONFIDENTIAL**

APP OF SOUTHERN ARIZONA ED, LLC
APP OF NORTH CAROLINA ED, PLLC
APP OF SOUTHERN ARIZONA HM, LLC
APP OF NORTH CAROLINA HM, PLLC

AMERICAN PHYSICIANS PARTNERS PSO, LLC

NORTHEAST TENNESSEE EMERGENCY PHYSICIANS, INC.

SAN JACINTO EMERGENCY PHYSICIANS, PLLC

WEST HOUSTON EMERGENCY PHYSICIANS, P.L.L.C.

WOODLANDS EMERGENCY PHYSICIANS, PLLC

ACUTE CARE SPECIALIST, LLC
APP OF INDIANA HM, PLLC

EMERGIGROUP PHYSICIAN ASSOCIATES, PLLC

ST. ANDREWS BAY EMERGENCY PHYSICIANS, PLLC

APP OF KANSAS HM, PLLC

TOWN SQUARE EMERGENCY ASSOCIATES, PLLC

KIRBY EMERGENCY PHYSICIANS, P.L.L.C.

STONEY BROOK EMERGENCY PHYSICIANS, PLLC

APP OF KENTUCKY HM, PLLC
PROGRESSIVE MEDICAL ASSOCIATES, LLC
APP ICU, PLLC
APP OF OHIO HM, PLLC
APP OF EAST TENNESSEE ED, PLLC
APP OF NEVADA ED, PLLC

TEP SELECT EMERGENCY SPECIALISTS PLLC

APP OF SOUTH CAROLINA ED, PLLC
APP OF SOUTHERN NEW MEXICO ED, PLLC

LONGVIEW EMERGENCY MEDICINE ASSOCIATES, P.L.L.C., D/B/A LEADING EDGE
MEDICAL ASSOCIATES, P.L.L.C.

APP TEXAS, PLLC

TEXOMA EMERGENCY PHYSICIANS, PLLC

APP OF SOUTH CAROLINA HM, PLLC

APP OF SOUTHERN NEW MEXICO HM, PLLC

**CONFIDENTIAL**

TRUEPARTNERS NORTHWEST EMERGENCY ASSOCIATES, PLLC

APP OF WESTERN KENTUCKY ED, PLLC

KALAMAZOO EMERGENCY ASSOCIATES, PLC

CONFIDENTIAL

## EXHIBIT 1

### Summary Sheet

Aging criteria for Accounts:          none

The Portfolios being sold and transferred to Buyer on the Closing Date:

- Aged Accounts previously sent to and provided by CMRE (Pool 1): 60,360 accounts with gross balances total of $60,248,119.
- Aged Accounts previously sent to and provided by Wakefield (Pool 2): 242,203 accounts with gross balances total of $242,097,424.
- Active Accounts managed by and provided by MCI (Pool 3): 275,459 accounts with gross balances total of $259,895,287.
- NSA/ IDR Arbitration Claims listing provided by MCI (Pool 4): 9,540 claims for packages submitted for arbitration, invoice received, and pending with entity, representing potential gains totaling $2,784,921 (arbitration fees have been paid for claims labeled packages submitted with potential gains to Buyer totaling $714,713; in addition, paid arbitration fees may be refunded to Buyer for successful arbitration outcomes).

The Buyer expressly acknowledges that APP relied on third parties (MCI/R1 and collection agencies) for the preparation of the above summary of accounts and that, accordingly, APP shall have no liability or responsibility to Buyer whatsoever for any inaccuracies therein.

NOTICES:

*If to APP:*

American Physician Partners, LLC
Attn:  Chief Restructuring Officer
P.O. Box 150569
Nashville, TN 37215

With copy to:

American Physician Partners, LLC
Interim CEO
P.O. Box 150569
Nashville, TN 37215

*If to Buyer:*

Cascade Capital Funding, LLC
Attn: CEO
5341 Old Redwood Highway, Suite 201
Petaluma, CA 94954

CONFIDENTIAL

## EXHIBIT2

### Business Associate Agreement

### HIPAA BUSINESS ASSOCIATE AGREEMENT ADDENDUM

This HIPAA Business Associate Agreement Addendum ("Addendum") amends and by this reference is made part of that certain Account Purchase Agreement dated as of December 15, 2023 (the "Agreement"), by and between American Physician Partners, LLC, Chapter 11 Debtor and Debtor in Possession in Case No. 23-11469 (BLS) pending in the United States Bankruptcy Court for the District of Delaware (such entity is referred to herein as the "Entity") and Cascade Capital Funding, LLC (the "Associate").

Entity and Associate agree that the parties incorporate this Addendum into the Agreement in order to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECH") and their implementing regulations set forth at 45 C.F.R. Parts 160 and Part 164 (the "HIPAA Rules"). To the extent Associate is acting as a Business Associate of Entity pursuant to the Agreement, the provisions of this Addendum shall apply, and Associate shall be subject to the penalty provisions of HIPAA as specified in 45 CFR Part 160.

**1. Definitions.** Capitalized terms not otherwise defined in this Addendum shall have the meaning set forth in the HIPAA Rules. References to "PHI" mean Protected Health Information maintained, created, received or transmitted by Associate from Entity or on Entity's behalf.

**2. Uses or Disclosures.** Associate will neither use nor disclose PHI except as permitted or required by this Addendum or as Required By Law. To the extent Associate is to carry out an obligation of a Covered Entity under the HIPAA Rules, Associate shall comply with the requirements of the HIPAA Rules that apply to such Covered Entity in the performance of such obligation. Without limiting the foregoing, Associate will not sell PHI or use or disclose PHI for purposes of marketing or fundraising, as defined and proscribed in the HIPAA Rules. Associate is permitted to use and disclose PHI:

(a) to perform any and all obligations of Associate as described in the Agreement (the "Services"), provided that such use or disclosure is consistent with the terms of Entity's notice of privacy practices and would not violate the HIPAA Rules, if done by a Covered Entity directly;

(b) to perform Data Aggregation services relating to the health care operations of Entity;

(c) to report violations of the law to federal or state authorities consistent with 45 CFR § 164.502(j)(1);

(d) as necessary for Associate's proper management and administration and to carry out Associate's legal responsibilities (collectively "Associate's Operations") provided that any disclosure made for purposes of Associate's Operations is Required By Law or is made after Associate obtains reasonable assurances, evidenced by a written contract, from the recipient that the recipient will:(1) hold such PHI in confidence and use or further disclose it only for the purpose for which Associate disclosed it to the recipient or as Required By Law; and (2) notify Associate of any instance of which the recipient becomes aware in which the confidentiality of such PHI was breached.

Associate may also use PHI to create de-identified information in accordance with 45 CFR §164.514(b) to the extent necessary to perform the Services or to comply with the minimum necessary standard, provided that such de-identified information may be used and disclosed only consistent with applicable law and shall not be commercialized or sold without Entity's prior written consent.

In the event Entity notifies Associate of an Individual's restriction request granted pursuant to 45 CFR §164.522 that would restrict a use or disclosure otherwise permitted by this Section, Associate shall comply with the terms of the restriction request.

CONFIDENTIAL

**3. Safeguards.** Associate will use appropriate administrative, technical and physical safeguards to prevent the use or disclosure of PHI other than as permitted by this Addendum and shall maintain policies and procedures to detect, prevent, and mitigate identity theft based on PHI or information derived from PHI. Associate will also comply with the provisions of 45 CFR Part 164, Subpart C with respect to electronic PHI to prevent any use or disclosure of such information other than as provided by this Addendum, which obligation shall include maintaining safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI.

**4. Subcontractors.** In accordance with 45 CFR §§ 164.308(b)(2) and 164.502(e)(1)(ii), Associate will ensure that all of its Subcontractors that create, receive, maintain or transmit PHI on behalf of Associate agree by written contract to comply with the same restrictions and conditions that apply to Associate with respect to such PHI, including the obligation to safeguard PHI and comply with 45 CFR Part 164, Subpart C.

**5. Minimum Necessary.** Associate represents that the PHI requested, used or disclosed by Associate shall be the minimum amount necessary to carry out the purposes of the Agreement. Associate will limit its uses and disclosures of, and requests for, PHI (i) when practical, to the information making up a Limited Data Set; and (ii) in all other cases subject to the requirements of 45 CFR § 164.502(b), to the minimum amount of PHI necessary to accomplish the intended purpose of the use, disclosure or request.

**6. Obligations of Entity.** Entity shall notify Associate of (i) any changes in, or revocation of, permission by an individual to use or disclose PHI, and (ii) any confidential communication request or restriction on the use or disclosure of PHI that Entity has agreed to or with which Entity is required to comply, to the extent any of the foregoing affect Associate's use or disclosure of PHI to perform its obligations as described in the Agreement.

**7. Access and Amendment.** In accordance with 45 CFR § 164.524, Associate will permit Entity or an Individual (or the Individual's personal representative) to inspect and obtain copies of any PHI about the Individual that is in Associate's custody or control and that is maintained in a Designated Record Set. If the requested PHI is maintained electronically, Associate must provide a copy of the PHI in the electronic form and format requested by the Individual, if it is readily producible, or, if not, in a readable electronic form and format as agreed to by Entity and the Individual. Associate will notify Entity of any request (including but not limited to subpoenas) that Associate receives for access to PHI that is in Associate's custody or control within five (5) business days of receipt of such request. Associate will, upon receipt of notice from Entity, promptly amend or permit Entity access to amend any portion of the PHI that is in Associate's custody or control so that Entity may meet its amendment obligations under 45 CFR § 164.526.

**8. Disclosure Accounting.** Except for disclosures excluded from the accounting obligation by the HIPAA Rules and regulations issued pursuant to HITECH, Associate will record for each disclosure that Associate makes of PHI the information necessary for Entity to make an accounting of disclosures pursuant to the HIPAA Rules. In the event the U.S. Department of Health and Human Services ("HHS") finalizes regulations requiring Covered Entities to provide access reports, Associate shall also record such information with respect to electronic PHI held by Associate as would be required under the regulations for Covered Entities beginning on the effective date applicable to Entity. Associate will make information required by this Section 8 available to Entity promptly upon Entity's request for the period requested, but for no longer than the six (6) years preceding Entity's request for the information or such other period required by the HIPAA Rules (except Associate need not have any information for disclosures occurring before the effective date of any previous HIPAA business associate agreements between the parties or, if none, the effective date of this Addendum).

**9. Inspection and Audit.** Associate will make its internal practices, books, and records, relating to its use and disclosure of PHI available upon request to Entity or HHS to determine Entity's compliance with the HIPAA Rules. With reasonable advance notice, Entity may inspect the internal practices, facilities, systems, books, records, and policies and procedures of Associate to monitor compliance with this Addendum. Associate will promptly correct any violation of this Addendum found by Entity and will certify in writing that the correction has been made. Entity's failure to detect any unsatisfactory practice does not constitute acceptance of the practice or a waiver of Entity's enforcement rights under this Addendum.

**10.Reporting.** To the extent Associate becomes aware or discovers any use or disclosure of PHI not permitted by this Addendum, any Security Incident involving electronic PHI, any Breach of Unsecured Protected Health Information or any Red Flag (as defined at 16 CFR § 681.2(b)) related to any individual who is the subject of PHI,

CONFIDENTIAL

Associate shall promptly report such use, disclosure, Security Incident, Breach or Red Flag to Entity. Associate shall mitigate, to the extent practicable, any harmful effect known to it of a Security Incident, Breach or use or disclosure of PHI by Associate not permitted by this Addendum. Notwithstanding the foregoing, the parties acknowledge and agree that this Section constitutes notice by Associate to Entity of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents (as defined below) for which no additional notice to Entity shall be required. "Unsuccessful Security Incidents" shall include, but not be limited to, pings and other broadcast attacks on Associate's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of electronic PHI. All reports of Breaches shall be made within five (5) business days of Associate discovering the Breach and shall comply with and include the information specified at 45 CFR § 164.410. Associate shall promptly reimburse Entity all reasonable costs incurred by Entity with respect to providing notification of and mitigating a Breach involving Associate, including but not limited to printing, postage costs and toll-free hotline costs.

**11. Term and Termination.** This Addendum shall be effective as of the effective date of the Agreement and shall remain in effect until termination of the Agreement. Either party may terminate this Addendum and the Agreement effective immediately if it determines that the other party has breached a material provision of this Addendum and failed to cure such breach within thirty (30) days of being notified by the other party of the breach. If the non-breaching party determines that cure is not possible, such party may terminate this Addendum and the Agreement effective immediately upon written notice to other party.

Upon termination of this Addendum for any reason, Associate will, if feasible, return to Entity or securely destroy all PHI maintained by Associate in any form or medium, including all copies of such PHI, at no cost to Entity. Further, Associate shall recover any PHI in the possession of its Subcontractors and return to Entity or securely destroy all such PHI. Notwithstanding the foregoing, Associate shall notify Entity and receive Entity's written consent prior to destroying any PHI of which Entity does not maintain a duplicate copy. In the event that Associate determines that returning or destroying any PHI is infeasible, Associate shall promptly notify Entity of the conditions that make return or destruction infeasible. With regard to any PHI that Entity agrees cannot feasibly be returned to Entity or destroyed, Associate may maintain such PHI but shall continue to abide by the terms and conditions of this Addendum with respect to such PHI and shall limit its further use or disclosure of such PHI to those purposes that make return or destruction of the PHI infeasible. Associate shall comply with this Section within thirty (30) days of termination of this Addendum. Associate shall provide Entity with written certification of its compliance with this Section within forty-five (45) days of termination of this Addendum. Upon termination of this Addendum for any reason, all of Associate's obligations under this Addendum shall survive termination and remain in effect (a) until Associate has completed the return or destruction of PHI as required by this Section and (b) to the extent Associate retains any PHI pursuant to this Section.

**12. General Provisions.** In the event that any final regulation or amendment to final regulations is promulgated by HHS or other government regulatory authority with respect to PHI, this Addendum will automatically be amended to remain in compliance with such regulations, and Associate shall promptly amend its contracts, if any, with Subcontractors to conform to the terms of this Addendum. Any ambiguity in this Addendum shall be resolved to permit the parties to comply with the HIPAA Rules. Nothing in this Addendum shall be construed to create any rights or remedies in any third parties or any agency relationship between the parties. A reference in this Addendum to a section in the HIPAA Rules means the section as in effect or as amended. This Addendum replaces and supersedes and previous business associate agreements between the parties. The terms and conditions of this Addendum override and control any conflicting term or condition of the Agreement. To the extent Associate has limited its liability under the terms of the Agreement by a maximum recovery for direct damages, disclaimer against any consequential, indirect or punitive damages or any other limitation, all limitations shall exclude any damages to Entity arising from Associate's breach of its obligations under this Addendum. All non-conflicting terms and conditions of the Agreement remain in full force and effect.

**13. Indemnification.** Associate agrees to indemnify, defend and hold harmless Entity and its respective employees, directors, officers, subcontractors, agents or other members of its workforce (each an "Indemnified Party") against all liability to third parties arising from or in connection with a non-permitted use or disclosure or other breach of this Addendum by Associate or its Subcontractors or any Breach involving PHI held by Associate or its Subcontractors (collectively, "Claims"). Accordingly, on demand, Associate shall reimburse any Indemnified Party for any and all actual and direct losses, liabilities, lost profits, fines, penalties, costs or expenses (including reasonable attorneys' fees)

CONFIDENTIAL

which may for any reason be imposed upon any Indemnified Party by reason of any suit, claim, action, proceeding or demand by any third party which results from any Claim. If Associate assumes the defense of a Claim, Entity shall have the right, at its expense, to participate in the defense of such Claim. Associate shall not take any final action with respect to any Claim without the prior written consent of Entity. Associate's obligation to indemnify any Indemnified Party shall survive the expiration or termination of this Addendum.

IN WITNESS WHEREOF, the parties have executed this Addendum on the dates indicated below.

ENTITY

By: _James E. Nugent_____
Name: _James E. Nugent_____
Title: _Interim CEO/ Deputy CRO_____
Date: 12/15/2023

ASSOCIATE

By: _Lee B_____
Name: _Lee Brockett_____
Title: _CEO_____
Date: _12/15/2023_____

23481470.1

CONFIDENTIAL

### EXHIBIT 3

### ASSIGNMENT OF ACCOUNTS RECEIVABLE

THIS ASSIGNMENT is dated as of [date], 202[__] and is made and entered into by and between American Physician Holdings, LLC, Chapter 11 Debtor and Debtor-in-Possession in Case No.[___] (the "Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), on behalf of itself and the Affiliated Parties (hereinafter collectively referred to as "Assignor") and Cascade Capital Funding, LLC, with its principal place of business at 5341 Old Redwood Highway, Suite 201, Petaluma, CA 94954 (the "Assignee").

WHEREAS, pursuant to the "Account Purchase Agreement" dated [date], 202[__], between Assignor and Assignee, the Assignee purchased from the Assignor the Accounts, listed in applicable Files and all proceeds, including Gap Payments; and

WHEREAS, all capitalized terms used in this Assignment and not otherwise defined shall bear the meanings ascribed thereto in the Purchase Agreement;

NOW THEREFORE, in consideration of the mutual undertakings of the Parties and the covenants in this Assignment and other good and valuable consideration, the Parties agree as follows:

1.      Assignor hereby absolutely assigns to Assignee all of the Accounts in the Portfolio set forth in the applicable Files and all of Assignor's right and interest in and to such Accounts, and every part of them respectively, together with all payment intangibles, health-care insurance receivables, and proceeds thereof (including Gap Payments); Assignee to receive and take such Accounts for its absolute use and benefit.

2.      This Assignment will be governed by and construed in accordance with the laws of the State of Delaware (without regard to its conflicts of laws principles or rules). In accordance with the Purchase Agreement, this Assignment may be executed by the Parties in separate counterparts (and by facsimile transmission) each of which when so executed and transmitted or delivered shall be an original.

3.      Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the limitations and acknowledgements set forth therein, including, without limitation, Section 11.15). To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of the Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

IN WITNESS WHEREOF the Parties have hereunto duly executed this Assignment on the date first above written.

Assignor

APPHL:  American Physician Holdings, LLC,
              Chapter 11 Debtor and Debtor in Possession,
              on behalf of itself and the Affiliated Parties

By:_____

Name:
Title:

Assignee

By: _____

Name: