IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| American Physician Partners LLC, *et al.,* | : | Case No. 23-11469(BLS) |
| | : | |
| Debtors. | : | Hearing: January 9, 2024, at 10 a.m. |

**SUPPLEMENTAL OBJECTION BY THE UNITED STATES TO THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION OF AMERICAN PHYSICIAN PARTNERS, LLC AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

The United States, on behalf of the Internal Revenue Service ("IRS") and the Department of Health and Human Services ("HHS"), by and through the undersigned attorneys, files this supplemental objection to the Second Amended Combined Disclosure Statement and Plan of Liquidation of American Physician Partners, LLC and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code ("Second Amended Plan"). [Docket No. 805]. In support of its supplemental objection, the United States avers as follows:

**BACKGROUND**

1. On September 19, 2023, the Debtors filed the Combined Disclosure Statement and Plan of Liquidation of American Physician Partners, LLC and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code. [Docket No. 17]. On October 30, 2023, the Debtors amended their plan ("Amended Plan"). [Docket No. 303]. On January 2, 2024, the Debtors filed the Second Amended Plan.

2. On December 21, 2023, the United States filed an objection to the Amended Plan ("Government Objection"). [Docket No. 690]. The United States hereby incorporates and adopts the objections raised in the Government Objection into this supplemental objection to the Second Amended Plan.

3. On January 4, 2024, the Debtors filed a Memorandum of Law in Support of Final Approval of Disclosure Statement and Confirmation of Plan of Liquidation of American Physician Partners and its Affiliated Debtors under Chapter 11 of the Bankruptcy Code and Omnibus Reply to Objections ("Memorandum"). [Docket 814].

4. On January 5, 2024, the Debtors filed their Liquidation Analysis ("Liquidation Analysis"). [Docket No. 822].

5. The United States is a creditor and a party in interest in this matter. The Debtors are comprised of one hundred (100) entities and fifty-one (51) of those entities filed their own federal income tax or partnership returns (collectively, "Income Tax Returns"). To date, the United States, on behalf of the IRS, filed six proofs of claim. Three of these claims assert unsecured priority pre-petition claims against the Debtors. The United States filed an estimated priority pre-petition unsecured claim against Northeast Tennessee Emergency Physicians in the amount of $253,506.48. The claim includes a footnote that the information received from the Debtor has not yet been assessed and the United States reserves the right to amend the claim as necessary upon assessment of the liability or examination of the Debtor's tax return. The United States filed an estimated priority pre-petition unsecured claim against APP of East Tennessee ED PLLC in the amount of $10,126.82. The liability is estimated because the Debtor's federal tax return Form 941 for the second quarter of 2023 is unfiled and the United States reserves the right to amend the

claim after the Debtor files the return or provides other required information.  The United States filed a priority, pre-petition unsecured claim against APP of New Mexico ED, PLLC in the amount of $3,581.24.

6. The Bankruptcy Court established March 18, 2024, as the deadline for Governmental Units to file proofs of claim ("Government Bar Date").  [Docket No. 243].  The United States will continue to review its books and records and may exercise its rights to amend its claims or file additional claims against the Debtors prior to the expiration of the Government Bar Date.

7. The United States may have Administrative tax claims it will assert against the Debtors.  The Debtors' Income Tax Returns for 2023 and 2024 are generally not yet due.  The 2023 returns will need to capture what the Unsecured Creditors Committee described as "a starkly unusual event – nearly all of the value of the Debtors' expansive and complex operating business was "transitioned" out of the enterprise at breakneck speed."  [Objection of the Official Committee of Unsecured Creditors to Conditional Approval of the Combined Disclosure Statement and Plan, Docket No. 269, ¶ 1].  In July of 2023, the Debtors transitioned approximately 150 emergency department and hospital medicine contracts to alternative service providers and its health system/hospital medicine contracts to alternative service providers and health system partners.  [Declaration of John C. Didonato, Docket No. 18, ¶ 10].  The Debtors will also need to file Income Tax Returns for 2024 to reflect the tax ramifications of its bankruptcy transactions.  The United States has no way of determining the amount of taxes that the Debtors might owe until these returns are filed.  Similarly, the Debtors can't know if the United States will agree with the amounts reflected on the returns when they are ultimately filed.  As the Debtors acknowledge, the U.S.

federal income tax consequences of the Combined Plan and Disclosure Statement are complex. [Second Amended Plan, Section 7.12].

8. The United States objects to the Second Amended Plan because creditors are being deprived of an adequate opportunity to review and object to the major changes reflected in the Second Amended Plan. The Second Amended Plan was filed four business days ago and it substantially modifies the treatment of creditors. The asset pool from which several classes of creditors, including Administrative and Priority Tax Claims, will be paid has been reduced. The dedicated fund established solely for the benefit of General Unsecured Creditors in the Amended Plan has increased at least eightfold in the Second Amended Plan. A position of Lender Representative, charged with exerting an inordinate amount of control over the plan process and the Liquidating Trust, has been created. [Second Amended Plan, Section 3.76].

9. The United States objects to the Second Amended Plan because it provides for a priority skipping gift to General Unsecured Creditors in violation of section 1129(a) of the Bankruptcy Code. While more senior creditors are required to look to a newly established finite cash reserve for their plan distributions, the General Unsecured Creditors receive a dedicated fund of $2 million dollars and the prospect of a percentage of what appears to be the remaining balance of the bankruptcy estate assets, the Shared Assets and Causes of Action. The Amended Plan provided that Allowed Administrative, Priority Tax and Priority Non-Tax Claims would be funded from Available Cash and/or the proceeds of other Liquidating Trust Assets. The Second Amended Plan changes the treatment by forcing the Allowed Administrative, Priority Tax, Priority Non-Tax and other Claims to look to an Administrative/Priority/Other Distributions Reserve ("Reserve"). [Second Amended Plan, Section 2.1]. The Reserve is defined as a reserve fund established and

administered by the Liquidating Trustee on or as soon as reasonably practicable after the Effective Date, funded from Available Cash of the Debtors immediately prior to the Effective Date, in an amount determined by the Debtors, subject to consultation with the Prepetition Agent and the Liquidating Trustee. [Second Amended Plan, Section 3.3]. The Reserve is funded in an amount that is solely determined by the Debtors, the Prepetition Agent, and the Liquidating Trustee. The Debtors concede that projected distributions under the Second Amended Plan are based upon good faith estimates of the total amount of the claims ultimately Allowed and the funds available for distribution. "There can be no assurance that the estimated Claim amounts set forth in the Combined Plan and Disclosure Statement are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected." [Second Amended Plan, Section 7.4]. In light of the incredibly complicated tax structure of the Debtors, the lack of financial information that cannot be gleaned by the United States until the Debtors file all of their Federal Income Taxes and the expedited nature of these bankruptcy proceedings that seek confirmation well in advance of the March 18, 2024, Government Bar Date, the Debtors cannot possibly accurately predict the amount of cash that will be needed to fund the Reserve.

10. The United States cited numerous instances of Plan impairment in the Government Objection. None of those defects were addressed in the Second Amended Plan. The Second

Amended Plan impairs the Allowed Administrative Claims of taxing authorities because it specifically eliminates the payment of interest on all Allowed Administrative Claims. [Second Amended Plan, Section 2.1]. Allowed Administrative Claims of taxing authorities are entitled to the payment of interest on their claims pursuant to sections 1129(a)(9)(A) and 511(a) of the Bankruptcy Code. The Second Amended Plan also fails to provide for the payment of interest on the Allowed Priority Tax Claims of the United States in accordance with section 1129(a)(9)(C) and 511(b) of the Bankruptcy Code. [Second Amended Plan, Section 8.2(c)]. Since interest is not being paid on Administrative and Priority Tax Claims in accordance with the Bankruptcy Code, the Reserve will be underfunded from the moment it is created.

11. In the Government Objection, the United States objected to the establishment in the Amended Plan of the GUC Fund which was comprised of $250,000 in cash that was being set aside for the sole benefit of General Unsecured Creditors. The Debtors modified the Second Amended Plan to embody a global settlement among the Debtors, the Prepetition Agent, the Prepetition Lenders, and the Committee ("GUC Global Settlement"). The GUC Global Settlement substantially increases the distributions to unsecured creditors. [Memorandum, ¶ 107]. The GUC Global Settlement entitles holders of general unsecured claims to a pro rata share of a GUC Cash Settlement and a pro rata share of the Shared Assets and the Causes of Action. [Second Amended Plan, Section 2.1]. The GUC Cash Settlement is defined in the Second Amended Plan as meaning $2 million in Cash, free and clear from all other claims funded from Available Cash on the Effective Date, which will fund a payment of Cash to Holders of Allowed Class 4 Claims of General Unsecured Creditors (excluding the Prepetition Lenders Deficiency Claim), in accordance with the Plan and Liquidating Trust Agreement. In addition, General Unsecured Creditors will

6

receive a pro rata share of the Liquidating Trust Interests which entitles the Beneficiaries thereof to a pro rata share of any net proceeds of the Shared Assets and Causes of Action. The holders of the Prepetition Lenders Deficiency Claim will receive on account thereof sixty percent (60%) of the net proceeds from any and all Shared Assets and Causes of Action, with the remaining forty percent (40%) of such net proceeds to be distributed to the holders of Allowed general unsecured claims other than holders of the Prepetition Lenders Deficiency Claim. [Second Amended Plan, Section 2.1]. Thus, the distribution of most, if not all, of the Estate Assets being liquidated, will skip the priority claimants, and be split between the Prepetition Lenders and the General Unsecured Creditors.

12. The Debtors aver that the GUC Global Settlement is appropriate because the Second Amended Plan provides for the "full payment" of Allowed Administrative Claims, Priority Tax Claims and cash payments for Other Secured Claims. [Memorandum, ¶ 118(vi)]. Under the circumstances of this "full payment" the Debtors posit that the distributions pursuant to the GUC Global Settlement to General Unsecured Creditors is appropriate and "is often done in liquidating plans". [Memorandum, ¶ 118(vi)]. As demonstrated above, holders of Allowed Administrative, Priority Tax and other Claims are not being paid in full. Instead, General Unsecured Creditors who would likely receive no recovery in a Chapter 7 proceeding, are being gifted with a priority skipping windfall. [Second Amended Plan, Section 6.8].

13. Although in the context of a novel legal issue involving structured dismissal, the Supreme Court considered a case with a similar fact pattern. The Supreme Court observed that if the affected parties' consent, a Chapter 11 plan may impose a different ordering of plan distributions, but the bankruptcy court cannot confirm a plan that contains priority-violating

distributions over the objection of an impaired creditor class. Czyzewski v. Jevic Holding Corp., 580 U.S. 451, (2017). The Second Amended Plan contains priority-violating distributions and the United States does not consent to such a distribution scheme.

14. The United States requested, and the Debtors refused, to include the following language in the Debtors' proposed confirmation order which would resolve the objections filed by the United States:

> Notwithstanding any provision to the contrary in the Plan, any Plan Supplement, this Order, or any implementing Plan documents (collectively, "Documents"):
>
> As to the United States, nothing in the Documents shall: (1) discharge, release, enjoin, impair or otherwise preclude (a) any liability to the United States that is not a "claim" within the meaning of Bankruptcy Code section 101(5) of the Bankruptcy Code ("claim"), (b) any claim of the United States arising after the Confirmation Date, or (c) any liability of any entity or person under police or regulatory statutes or regulations to any Governmental Unit (as defined by Bankruptcy Code section 101(27) of the Bankruptcy Code) as the owner, lessor, lessee or operator of property or rights to property that such entity owns, operates or leases after the Confirmation Date; (2) release, nullify, preclude or enjoin the enforcement of any police or regulatory power; (3) authorize the assumption, sale, assignment or other transfer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property and patents, (v) leases, (vi) agreements, including but not limited to, any Medicare provider or supplier agreements, or other interests of the federal government (collectively, "Federal Interests") without compliance by the Debtors and the Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law; (4) be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the assumption, transfer or assignment of any Federal Interests; (5) authorize the assumption, transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, obligations and approvals under non-bankruptcy laws; (6) confer jurisdiction to the Bankruptcy Court with respect to the Federal Interests, claims, liabilities and causes of action, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (7) waive, alter or otherwise limit the United States' property rights with respect to the Federal Interests, including but not limited to, inventory, patents, intellectual property, licenses, and data; (8) release, enjoin, impair or discharge any non-Debtor from any claim, liability, suit, right or cause of action of the United States; (9) affect any setoff or recoupment rights of the United States and such rights are preserved; (10) require the United States to file an administrative claim in order to receive payment for any liability described in section 503(b)(1)(B) and (C) pursuant to section 503(b)(1)(D) of the Bankruptcy Code; (11) constitute an approval or consent by

the United States without compliance with all applicable legal requirements and approvals under non-bankruptcy law; (12) be construed as a compromise or settlement of any liability, claim, cause of action or interest of the United States; (13) modify the scope of sections 505 and 502 of the Bankruptcy Code; (14) cause rejection damage claims to have to be filed before the government bar date or alter the treatment of such rejection claims under the Bankruptcy Code; or (15) cause the disallowance of any claim of the United States unless the United States agrees to such disallowance in writing or by final order of the Bankruptcy Court after notice and a hearing.

Liens securing claims of the United States shall be retained until the claim, with interest, is paid in full. Administrative expense claims of the United States allowed pursuant to the Plan or the Bankruptcy Code shall accrue interest and penalties as provided by non-bankruptcy law until paid in full in accordance with section 1129(a)(9)(A) of the Bankruptcy Code. Priority Tax Claims of the United States allowed pursuant to the Plan or the Bankruptcy Code will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. To the extent allowed Priority Tax Claims (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code) are not paid in full in cash on the Effective Date, then such Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate set forth in section 511 of the Bankruptcy Code. Moreover, nothing shall affect a release, injunction or otherwise preclude any claim whatsoever against any Debtor or any of the Debtors' Estates by or on behalf of the United States for any liability arising a) out of pre-petition or post-petition tax periods for which a return has not been filed or b) as a result of a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period. Further, nothing shall enjoin the United States from amending any claim against any Debtor or any of the Debtors' Estates with respect to any tax liability a) arising out of pre-petition or post-petition tax periods for which a tax return has not been filed or b) from a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period. Any liability arising a) out of pre-petition or post-petition tax periods for which a return has not been filed or b) as a result of a pending audit or audit which may be performed with respect to any pre-petition or post-petition tax period shall be paid in accordance with 1129(a)(9)(A) and (C) of the Bankruptcy Code. Without limiting the foregoing but for the avoidance of doubt, nothing contained in the Documents shall be deemed to bind the United States to any characterization of any transaction for tax purposes or to determine the tax liability of any person or entity, including, but not limited to, the Debtors and the Debtors' estates, nor shall the Documents be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in the Documents be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under section 505 of the Bankruptcy Code. The GUC Global Settlement shall be subject to the secured, administrative expense and priority claims of the United States and no amounts shall be distributed to general unsecured creditors unless and until all outstanding federal tax returns of the Debtors and the Debtors' Estates have been filed and all claims of the United States senior in priority to the general unsecured claims have been paid in full.

**CONCLUSION**

15. The Second Amended Plan is not feasible, inappropriately modifies the waterfall distribution scheme required by the Bankruptcy Code and does not comply with section 1129(a) of the Bankruptcy Code and therefore cannot be confirmed pursuant to section 1129(a)(1) of the Bankruptcy Code.

**WHEREFORE**, the United States respectfully requests that the Court deny confirmation of the Second Amended Plan and grant such other and further relief as the Court deems necessary and just.

Dated:  January 8, 2024

DAVID C. WEISS
United States Attorney
BY: */s/ Ellen Slights*
Ellen W. Slights (DE Bar No. 2782)
Assistant United States Attorney